UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
    -against-                                        :      Criminal No. S3-05-CR-59 (DC)
                                                             :
OSCAR S. WYATT, JR., et. al                                  :
                                                             :
                   *Defendant.*                              :
                                                             :
-------------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT OSCAR S. WYATT, JR.'S PRE-TRIAL MOTIONS


Gerald L. Shargel                    Carl A. Parker
Henry E. Mazurek                 The Parker Law Firm
Law Offices of Gerald Shargel      1 Plaza Square
570 Lexington Avenue           Port Arthur, TX  77642
New York, New York  10022     (409) 985-8814
(212) 446-2323

Samuel J. Buffone                 J.A. Canales
Stacy D. Belf                      Canales & Simonson
Ropes & Gray LLP               P.O. Box 5624
One Metro Center               Corpus Christi, TX  78465
700 12th Street, N.W.          (361) 883-0601
Suite 900
Washington, DC  20005
(202) 508-4657

Attorneys for Oscar S. Wyatt, Jr.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................1

    The Iraq Embargoes And United Nations' Oil-For-Food Program ......................................1

    The Indictment ....................................................................................................3

ARGUMENT .........................................................................................................5

I.    COUNT TWO SHOULD BE DISMISSED BECAUSE IT IS BASED ON A
    SCHEME TO DEFRAUD VICTIMS WHO LACK THE CAPACITY TO
    SUSTAIN THE ALLEGED INJURY TO THEIR MONEY OR PROPERTY ....................5

    A.    The Indictment Fails To Adequately Allege The Elements Of Wire
        Fraud .......................................................................................................6

    B.    The People of Iraq, As Subjects Of The Recognized Sovereign
        Government Of Iraq, Lack Independent Juridical Personality And
        Therefore Cannot Constitute A Victim Of The Alleged Fraud ...........................8

        1.    The People of Iraq, As An Entity, Lack Juridical Personality
            Independent of the Government of Iraq and Therefore Are Not
            Cognizable by This Court .........................................................................9

    C.    The Court Should Decline The Government's Invitation To Give
        Official Recognition To The People Of Iraq Because Such Recognition
        Impugns The Sovereignty Of Iraq, And Has Broad Implications For
        Foreign Relations And International Law.............................................................12

        1.    Recognition of the 'People of Iraq' Independently of the Iraqi
            Government, Involves the Court in Determinations of International
            Relations and Offends Iraq's Sovereign Authority, Which Has
            Been Recognized by the United States Government and the
            International Community ...........................................................................12

        2.    The United Nations' Oil-For-Food Program Cannot Constitute A
            Victim Of The Alleged Offense................................................................20

            (a)    The OFFP Lacks Sufficient Capacity to be the Victim of a
                Money or Property Fraud.................................................................20

            (b)    The U.N.'s Regulatory Interest in the Embargo of Iraq
                Does Not Sustain An Actionable Property Interest in
                Surcharge Payments Held In Escrow...............................................22

i

II.   COUNTS THREE AND FOUR SHOULD BE DISMISSED DUE TO THEIR
      RELIANCE UPON AN UNCONSTITUTIONAL DELEGATION OF
      CONGRESSIONAL POWER AND AN INVALID EXTENSION OF A
      NATIONAL EMERGENCY ..................................................................................27

      A.    The ISRs are Dependent on Actions by the U.N. .................................27

      B.     The Charges in Counts Three and Four of the Indictment are Based On
            Violations of OFAC Regulations .........................................................30

      C.    The Carefully Crafted Balance Between The Executive and Legislative
            Branches Established In The Relevant Statutes Was Upset Here By the
            Private Delegation to the U.N. and the Failure to Declare a New
            National Emergency .............................................................................32

            1.    The Overall Structure of IEEPA Demonstrates Congressional
                  Concerns Over Expansion of Executive Authority to Declare and
                  Respond to National Emergencies and Establishes Meaningful
                  Restraints on The Exercise of Such Powers ...............................33

      D.     The Delegation of Authority to the U.N.to Define Criminal Conduct
            Violates the Non-Delegation Doctrine ..................................................37

            1.    The Nondelegation Doctrine ......................................................37

            2.    Congress Permitted a Limited and Restricted Exercise of
                  Delegated Power to Criminalize Conduct under IEEPA ...........39

      E.    The Failure To Declare a New National Emergency Justifying the OFFP
            Constitutes a Significant Breach Of The Restraints Placed Upon the
            Exercise of Delegated Authority Which Precludes Criminal Prosecution ..........43

      F.     The Indictment Rests Upon An Unconstitutional Private Delegation of
            Authority to Define Criminal Conduct and Cannot Stand..................45

III.  DISMISSAL OF COUNTS TWO AND THREE REQUIRES THAT COUNT
      ONE BE DISMISSED ......................................................................................53

IV.   WYATT SHOULD BE GRANTED A SEVERANCE UNDER RULE 8 SINCE
      THE INDICTMENT ALLEGES MULTIPLE, UNCONNECTED
      CONSPIRACIES OR UNDER RULE 14 SINCE HE WILL BE PREJUDICED
      BY THE SCOPE AND COMPLEXITY OF A JOINT TRIAL..........................53

      A.    The Government's Indictment Alleges Multiple Conspiracies ............54

      B.    The Indictment is Facially Deficient Under Rule 8 Because It Groups
            Unrelated Schemes...............................................................................56

            1.    The Court Should Exercise Its Discretion And Sever The Trial
                  Under Rule 14 Because Of The Unfair Prejudice To The
                  Defendants ................................................................................59

V.    WYATT'S PROSECUTION IS SELECTIVE, DISCRIMINATORY AND
      VINDICTIVE AND THE COURT SHOULD EITHER DISMISS THE
      INDICTMENT OR PERMIT DISCOVERY ......................................................................62

      A.    The Prosecution Of Defendant Wyatt Is Selective And Discriminatory. ............62

      B.    The Prosecution Of Defendant Wyatt Denies Him Due Process Since
            He  Has Been Singled Out From Others Who Engaged In Similar
            Conduct Based Upon His Exercise Of First Amendment Rights. ......................67

      C.    Wyatt's Prosecution Is Based On Vindictiveness And Thus Denies Him
            Due Process........................................................................................................71

      D.    Defendant Wyatt Has Produced Sufficient Evidence Of Selective
            Prosecution and Vindictive Prosecution To Obtain Discovery And
            Requires An Evidentiary Hearing .......................................................................72


CONCLUSION...........................................................................................................................74

# TABLE OF AUTHORITIES

## CASES

*Anderson v. NY Racing Association*,
No. 03 civ. 4785, 2004 U.S. Dist. LEXIS 319 (S.D.N.Y. Jan. 12 2004)....................49

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977).......................................................................................................68

*Ashe v. Swenson*,
397 U.S. 436 (1970).........................................................................................................7

*Banco National de Cuba v. Sabbatino*,
376 U.S. 398 (1964)................................................................................13, 14, 17, 19

*Batson v. Kentucky*,
476 U.S. 79 (1986.).......................................................................................................68

*Beanal v. Freeport-McMoroRan*,
969 F. Supp. 362 (E.D. La. 1997)................................................................................9

*Bernstein v. Department of State*,
974 F. Supp. 1288 (N.D. Cal. 1997) ..........................................................................43

*Blackledge v. Perry*,
417 U.S. 21 (1974).......................................................................................................71

*Blumenthal v. United States*,
332 U.S. 539 (1947).......................................................................................................56

*Carpenter v. United States*,
484 U.S. 19 (1987)....................................................................................................6, 22

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)...............................................................................47, 49, 50, 52

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................................................................43

*Clark v. Allen*,
331 U.S. 503 (1947)....................................................................................................17

*Cleveland v. United States*,
    531 U.S. 12 (2000) ......................................................................................... *passim*

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................................43

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ................................................................................................40

*Doron Precision System v. F.A.A.C. Inc.*,
    No. 05 Civ. 7663, 2006 U.S. Dist. LEXIS 12795 (S.D.N.Y. Mar. 23, 2006) .............58

*Eastern States Petroleum Co. v. Asiatic Petroleum Corp.*,
    28 F. Supp. 279 (S.D.N.Y. 1939) .............................................................................14

*Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*,
    189 F. Supp. 2d 385 (E.D. Va. 2002) .......................................................................58

*F. Palicio y Compania v. Brush*,
    256 F. Supp. 481 (S.D.N.Y. 1966) .....................................................................14, 20

*Fountain v. United States*,
    357 F.3d 250 (2d Cir. 2004) ....................................................................................23

*GE Co. v. New York State Department of Labor*,
    936 F.2d 1448 (2d Cir. 1991) .......................................................................47, 48, 50

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................................................34

*Kadic v. Karadz I*,
    70 F.3d 232 (1995) ..............................................................................................9, 10

*Kent v Dulles*,
    357 U.S. 116 (1958) ..........................................................................................38, 42

*Knox v. Palestine Liberation Organization*,
    306 F. Supp. 2d 424 (S.D.N.Y. 2004) .............................................................. *passim*

*Loving v. United States*,
    517 U.S. 748 (1996) ................................................................................................37

*McNally v. Unites States*,
    483 U.S. 350 (1987) ...................................................................................... *passim*

*Mistretta v. United States*,
    488 U.S. 361 (1989)................................................................37, 38, 39

*National Association of Regulatory Comm'rs v. FCC*,
    737 F.2d 1095 (D.C. Cir. 1984)................................................47, 49

*Neder v. United States*,
    527 U.S. 1 (1999)........................................................................6

*North Carolina v. Pearce*,
    395 U.S. 711 (1969)....................................................................71

*Office to Foreign Assets Control v. Voices In The Wilderness*,
    329 F. Supp. 2d 71 (D.D.C. 2004)..............................................50

*Oneida Indian Nation of New York v. State of New York*,
    860 F.2d 1145 (2d Cir. 1988).....................................................18

*Oyler v. Boles*,
    368 U.S. 448 (1962)....................................................................67

*Pasquatino v. United States*,
    544 U.S. 349, 125 S. Ct. 1766 (2005).................................. *passim*

*Peoples Westchester Sav. Bank v. FDIC*,
    961 F.2d 327 (2d Cir. 1992)........................................................26

*Pittston Co. v. United States*,
    368 F.3d 385 (4th Cir. 2004) ................................................47, 48

*Poe v. Menghini*,
    339 F. Supp. 986 (D. Kan. 1972)................................................49

*Russell v. United States*,
    369 U.S. 749 (1962)....................................................................31

*Skinner v. Mid-America Pipeline Co.*,
    490 U.S. 212 (1989)....................................................................39

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940)....................................................................48

*Suss v. ASPCA*,
    823 F. Supp. 181 (S.D.N.Y. 1993)........................................47, 49

*Touby v. United States*,
    500 U.S.C. 160, 165 (1991) ...............................................................................37, 41

*Toy Manufacturers of America, Inc. v. Consumer Product Safety Com.*,
    630 F.2d 70 (2d Cir. 1980)........................................................................................51

*United States v. Al Jibori*,
    90 F.3d 22 (2d Cir. 1996) .........................................................................................73

*United States v. Alameh*,
    341 F.3d 167 (2d Cir. 2003)......................................................................................73

*United States v. Alleyne*,
    454 F. Supp. 1164 (S.D.N.Y. 1978).........................................................................69

*United States v. An-Lo*,
    851 F.2d 547 (2d Cir. 1988)......................................................................................60

*United States v. Andrews*,
    765 F.2d 1491 (11th Cir. 1985) ................................................................................58

*United States v. Anvari-Hamedani*,
    378 F. Supp. 2d 821 (N.D. Ohio 2005)....................................................................42

*United States v. Arch Trading Co.*,
    987 F.2d 1087 (4th Cir. 1993) ............................................................................41, 42

*United States v. Armstrong*,
    517 U.S. 456 (1996).................................................................................62, 68, 73, 74

*United States v. Bass*,
    404 U.S. 336 (1971)............................................................................................38, 49

*United States v. Batchelder*,
    442 U.S. 114 (1979)............................................................................................51. 67

*United States v. Belmont*,
    301 U.S. 324 (1937)...................................................................................14, 16, 17

*United States v. Berrios*,
    501 F.2d 1207, 1211 (2d Cir. 1974), *cert. denied*, 966 U.S. 971 (1989).........69, 73, 74

*United States v. Boylan*,
    898 F.2d 230 (1st Cir. 1990).....................................................................................59

*United States v. Carron*,
  541 F. Supp. 347 (W.D.N.Y. 1982) ..........................................................................73

*United States v. Castro*,
  829 F.2d 1038 (11th Cir. 1987), *modified*, 837 F.2d 441 (11th Cir. 1988) ................58

*United States v. Chalmers*, ,
  410 F. Supp. 2d 287 (S.D.N.Y. 2006) ........................................................................8

*United States v. Covino*,
  837 F.2d 65 (2d Cir. 1988) ..........................................................................................7

*United States v. Crowthers*,
  456 F.2d 1074 (4th Cir. 1972) ...................................................................................70

*United States v. Curtiss-Wright Export Co.*,
  299 U.S. 304 (1936) ......................................................................................... *passim*

*United States v. Debrow*,
  346 U.S. 374 (1953) ......................................................................................................7

*United States v. Dinome*,
  86 F.3d 277 (2d Cir. 1996) ...........................................................................................6

*United States v. Esfahani*,
  No. 05CR0255, 2006 Dist. LEXIS 163035 (N.D. Ill., Jan. 17, 2006) ........................42

*United States v. Evans*,
  844 F.2d 36 (2d Cir. 1988) ...........................................................................................7

*United States v. Falk*,
  479 F.2d 616 (7th Cir. 1973) .....................................................................................70

*United States v. Fares*,
  978 F.2d 52 (2d Cir. 1992) .........................................................................................73

*United States v. Galardi*,
  476 F.2d 1072 (9th Cir. 1973) ...................................................................................53

*United States v. Gallo*,
  No. 98 Cr. 338 (JGK), 1999 U.S. Dist. LEXIS 103 (S.D.N.Y. Jan. 6, 1999) .............57

*United States v. Giffen*,
  326 F. Supp. 2d 497 (S.D.N.Y. 2004) ........................................................................8

*United States v. Goodwin*,
    457 U.S. 368 (1982)........................................................................70, 71

*United States v. Goodwin*,
    457 U.S. 368 (1982)........................................................................67, 72

*United States v. Hinton*,
    703 F.2d 672 (2d Cir. 1983).....................................................................72

*United States v. Johnson*,
    171 F.3d 139 (2d Cir. 1999)....................................................................71

*United States v. Jorgenson*,
    451 F.2d 516 (10th Cir. 1971) ................................................................59

*United States v. King,*
    126 F.3d 394 (2d Cir. 1997)....................................................................72

*United States v. Koh,*
    199 F.3d 632 (2d 1999).........................................................................72

*United States v. Lindh,*
    212 F. Supp. 2d 541 (E.D. Va. 2002) .........................................................42

*United States v. Locascio,*
    357 F. Supp. 2d 536 (E.D.N.Y. 2004) ...................................................59, 61

*United States v. Naiman,*
    211 F.3d 40 (2d Cir. 2000).......................................................................6

*United States v. Napper,*
    553 F. Supp. 231 (E.D.N.Y. 1982) ............................................................73

*United States v. Novak,*
    443 F.3d 150, 156, 159 (2d Cir. 2006) .......................................................19

*United States v. Ramos,*
    346 F. Supp. 2d 567 (S.D.N.Y. 2004)...................................................59, 60

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003).....................................................................8

*United States v. Sanders,*
    211 F.3d 711 (2d Cir. 2000).............................................................71, 72, 73

*United States v. Sattar*,
   272 F. Supp. 2d 348 (S.D.N.Y. 2003).......................................................57

*United States v. Scarpa*,
   913 F.2d 993 (2d Cir. 1990)....................................................................6

*United States v. Spawr Optical Research*,
   685 F.2d 1076 (9th Cir. 1982) ................................................................43

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987).......................................................................7

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992)..............................................................55, 59

*United States v. Steele*,
   461 F.2d 1148 (9th Cir. 1972) ...............................................................69

*United States v. Thomas*,
   377 F.3d 232 (2d Cir. 2004).....................................................................6

*United States v. Urso*,
   369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...................................................59

*United States v. Villaneuva- Madrid*,
   302 F. Supp. 2d 187 (S.D.N.Y. 2003)......................................................8

*Wayte v. United States*,
   470 U.S. 598 (1985)...............................................................................68

*Whitman v. America Trucking Associations*,
   531 U.S. 457 (2001)...............................................................................37

*Williams v. Dow Chemical Co.*,
   255 F. Supp. 2d 219 (S.D.N.Y. 2003)....................................................25

*Women's Medical Prof. Corp. v. Baird*,
   438 F.3d 595 (2006)...............................................................................49

*Yakus v. United States*,
   321 U.S. 414 ...........................................................................................47

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886)...............................................................................67

*Yonkers Commission on Human Rights v. City of Yonkers*,
654 F. Supp. 544 (S.D.N.Y. 1987)..............................................................21

*Zafiro v. United States*,
506 U.S. 534 (1993).................................................................................60, 61

*Zemel v. Rusk*,
381 U.S. 1 (1965)...........................................................................................41

## STATUTES AND REGULATIONS

50 U.S.C. § 1621..........................................................................................34

50 U.S.C. § 1622..........................................................................................34

50 U.S.C. § 1701........................................................................................ *passim*

50 U.S.C. § 1703..........................................................................................36

50 U.S.C. § 1705..........................................................................................36

31 C.F.R. § 575.306 (1999) .........................................................................16

61 FED. REG. 65311 (Dec. 11, 1996) ....................................................28, 51

18 U.S.C. § 2  ...............................................................................................4

18 U.S.C. § 371..............................................................................................3

18 U.S.C. § 1341............................................................................................6

18 U.S.C. § 1343 (2002) ........................................................................3, 4, 6

18 U.S.C. § 1346............................................................................................8

18 U.S.C. § 1346 (1998)..............................................................................22

18 U.S.C. § 1349............................................................................................3

18 U.S.C. § 2332d ................................................................................... 4, 30

22 U.S.C. § 287c(b) .....................................................................................50

## ACTS, RULES AND TREATIES

Act of December 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625 ........................................33

Act of October 16, 1917, ch. 106, 40 Stat. 411 ................................................................32

The National Emergencies Act, Pub. L. 94-412, 90 Stat. 1255 (codified at 50
U.S.C. § 1601 *et seq.* (1976)) ......................................................................................33

The Trading with the Enemy Act ("TWEA"),
50 U.S.C. app. § 5, 12 U.S.C. § 95a .............................................................32, 33, 40

Fed. R. Civ. P. 17 .........................................................................................................20, 21

Fed. R. Crim. P. 8(b) ...........................................................................................................57

S. REP. NO. 94-1168 (1976) ................................................................................................33

Treaty of Westphalia, Peace Treaty, Rome-France, Oct. 24, 1648, 49 Stat. 3097 ...........12

## ADDITIONAL AUTHORITIES

Danzig Railway Officials Case, 1928 P.C.I.J. (ser. B) No. 15 (Mar. 3, 1928) .................14

GA Res. 2625 (XXV), at 123, U.N. Doc. A/8082 (Oct. 24, 1970) ....................................13

Montevideo Convention on Rights and Duties of States art. 1, Dec. 26, 1933, 49
Stat. 3097, 165 LNTS 19 ..............................................................................................10

Report of the International Commission on Intervention and State Sovereignty,
The Responsibility to Protect (Dec. 2001) ...................................................................13

Restatement (Third) of Foreign Relations Law of the United States (1987) ............. *passim*

Observations on the Oil for Food Program: Hearing Before the Senate Committee
on Foreign Relations, 108th Cong. (2004) ...................................................................16

OFAC, GUIDANCE ON PAYMENTS FOR IRAQI-ORIGIN PETROLEUM PURSUANT TO
LICENSED PURCHASE (Dec. 22, 2000) ...........................................................................29

S.S. Lotus, 1927 P.C.I.J. (ser. A) No. 10, at 18 (Sept. 1927) ...........................................16

MALCOLM N. SHAW, INTERNATIONAL LAW 175 (5th ed. 2003) ................................ *passim*

PAUL A. VOLCKER ET. AL, INDEPENDENT INQUIRY COMMITTEE INTO THE UNITED
    NATIONS OIL-FOR-FOOD PROGRAMME 26-48 (Aug. 8, 2005) ....................52, 60, 62, 63

THE UNITED NATIONS IS EXTREMELY CONCERNED ABOUT THE SERIOUS
    ALLEGATIONS OF CORRUPTION SURROUNDING THE OIL-FOR-FOOD
    PROGRAMME, http://www.un.org/News/dh/iraq/oip/facts-oilforfood.htm ..................15

United Nations Member States, U.N. Doc. ORG/1360/Rev. 1 (February 10, 2004) ........15

U.N. Charter art. 2, Para. 1 ................................................................................................15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

UNITED STATES OF AMERICA,          :
                                :

     -against-                   :       Criminal No. S3-05-CR-59 (DC)
                                :

OSCAR S. WYATT, JR., <u>et. al</u>       :
                                :

            *Defendant.*        :
                                :
-------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF
### <u>DEFENDANT OSCAR S. WYATT, JR.'S PRE-TRIAL MOTIONS</u>

### <u>PRELIMINARY STATEMENT</u>

Oscar S. Wyatt Jr. ("Wyatt"), a respected businessman and philanthropist, staunchly opposes the Government's efforts to implicate him in any criminal conduct. In addition to asserting his factual innocence, Wyatt submits this memorandum in support of his pre-trial motions contesting the sufficiency of the Indictment. The complex legal and factual allegations of the Indictment draw on obscure and complex statutes and theories of prosecution. This Memorandum will demonstrate that these charges are not legally viable and that the Indictment must be dismissed.

### <u>FACTUAL BACKGROUND</u>

### <u>The Iraq Embargoes and United Nations' Oil-for-Food Program</u>

In early August of 1990, Iraq launched a military invasion of Kuwait and quickly established control over Kuwait's oil fields and territory. In response, on August 3, 1990, then-President Bush issued Executive Order 12722. The President declared that the actions of the Government of Iraq constituted an unusual and extraordinary threat to the national security of the

1

United States, and declared a national emergency "to deal with that threat." The President exercised his power by imposing economic sanctions effectively embargoing all financial transactions with Iraq.

The United Nations Security Council ("UNSC") also took prompt action and adopted Resolution 661 on August 6, 1990, reaffirming an earlier Resolution of August 2, 1990. Resolution 661 was designed to bring the invasion and occupation of Kuwait to an end. The United Nations ("U.N.") Resolution, like the Executive Order, required an embargo of economic transactions with Iraq. The U.N. Resolution was framed in mandatory terms requiring that all member states take necessary and appropriate actions to effect the embargo. Declaration of Harold H. Bruff, J.D. ("Bruff Decl."), Ex. G (S.C. Res. 661, U.N. Doc. No. S/RES/661 (Aug. 6, 1990)).

A week later, on August 9, 1990, President Bush issued Executive Order 12724 to execute the UNSC Resolution and "to take additional steps with respect to Iraq's invasion of Kuwait and the National Emergency declared in Executive Order 12722." Bruff Decl., Exs. A and B (Executive Orders 12722 & 12724). The new Executive Order more closely aligned the U.S. embargo with that imposed by the U.N. The President then delegated authority to the Secretary of Treasury, who in turn implemented the Executive Orders through its Office of Foreign Assets Control ("OFAC"), which promulgated the Iraqi Sanctions Regulations ("ISR") on January 18, 1991.

Well after Iraq's forced withdrawal from Kuwait following Operation Desert Storm the economic embargoes remained in place. Almost five years after the Kuwaiti invasion, the UNSC passed Resolution 986 on April 14, 1995, based on widespread accounts of a humanitarian crisis in Iraq caused by the continuing embargoes. Bruff Decl., Ex. F (S.C. Res. 986, S/RES/661 (Apr.

14, 1995)).  The Resolution established the U.N. Oil-for-Food Program ("OFFP"), designed to relieve the adverse impact the embargoes were having on Iraqi citizens, and permitted the Iraq Government to sell petroleum.  The U.N. Resolution recognized the continuing sovereignty of the Iraq state and Iraq's sole authority to select purchasers of its oil.  *Id.*  The sale price was set by the overseers of the OFFP and proceeds of oil sales were to be deposited into a bank escrow account administered by the OFFP, from which the Iraq Government could pay for approved humanitarian goods.  These terms and conditions were worked out in negotiations between the U.N. and the Government of Iraq, memorialized in a Memorandum of Understanding (MOU) executed on May 20, 1996.  Bruff Decl., Ex. H (MOU).

In response to these actions, and in order to permit U.S. citizens to participate in the OFFP, OFAC amended the ISRs to provide a general license allowing contracts to purchase Iraq oil and specific licenses for these purchases.  Specifically, on July 12, 1996, the OFAC Regulations were amended to add § 575.522, permitting executory contracts for the purchase of Iraqi oil.  The background statement published in the Federal Register indicates that OFAC, in consultation with the Department of State, was responsible for implementing UNSC Resolution 986, which established the OFFP.  Section 575.522 authorized these purchases pursuant to Resolution 986.  Section 575.523 was added later, further defining contract and performance approval.  Bruff Decl., Exs. D and E (ISR §§ 575.523 & 575.522 Amendments).

## The Indictment

Wyatt is charged in four of the five counts set forth in the Third Superseding Indictment ("Indictment"). Count One charges a conspiracy pursuant to 18 U.S.C. § 371[1] to violate the wire fraud statute, 18 U.S.C. § 1343, and the Antiterrorism and Effective Death Penalty Act, 18

---

[1]  Counts One and Two also reference the enhanced penalty provisions of 18 U.S.C. § 1349, relating to conspiracies to commit wire fraud.

U.S.C. § 2332d.  Count One begins with a lengthy description of the OFFP and alleges that the proceeds of the sale of Iraqi oil under the OFFP "were to be placed into an escrow bank account monitored by the U.N. and used only to purchase various humanitarian goods for the benefit of the Iraqi people."  Indictment ¶ 2.  A special bank escrow account was established in Manhattan to handle these sales and purchases.  Indictment ¶ 3.  It alleges that the U.N. set the price for Iraqi oil at the highest rate bearable by the world market to maximize the revenue generated and in turn increase the amount of humanitarian goods purchased for the People of Iraq.  The Indictment then identifies a "Surcharge Scheme" imposed by the Government of Iraq on purchasers of its oil.  The Surcharge Scheme was based on conditioning the ability to purchase Iraqi oil on the payment of a secret surcharge directly to front companies or bank accounts controlled by the Government of Iraq.  Indictment ¶ 7.

Count Two charges a violation of the wire fraud statute 18 U.S.C. § 1343.[2]  The sole specification of a scheme to defraud is its allegation that the use of the interstate wires was "in order to further and advance the success of the Surcharge Scheme" incorporated from Count One.  Indictment ¶ 29.

Count Three charges engaging in a prohibited financial transaction with a country designated as supporting terrorism, namely Iraq, in violation of 18 U.S.C. § 2332d.  It alleges that Wyatt knew that Iraq was designated under section 6(j) of the Export Administration Act as a country supporting international terrorism and that he engaged in financial transactions with Iraq in the form of payments to the government of Iraq "unauthorized by and concealed from the" OFFP.  Indictment ¶ 31.

---

[2]  Counts Two through Four also cite to 18 U.S.C. § 2.

Count Four charges a violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et. seq*. It recites the Presidents authority to declare a national emergency and the history of the Kuwait invasion national emergency. The Indictment quotes and incorporates specific provisions of the ISRs and alleges that Wyatt violated IEEPA and the regulations promulgated thereunder by engaging in financial transactions with Iraq in violation of the ISRs that were "unauthorized by and concealed from the United Nations' Oil-for Food Program, and traveled to and from Iraq." Indictment ¶ 38.

## ARGUMENT

I.    **COUNT TWO SHOULD BE DISMISSED BECAUSE IT IS BASED ON A SCHEME TO DEFRAUD VICTIMS WHO LACK THE CAPACITY TO SUSTAIN THE ALLEGED INJURY TO THEIR MONEY OR PROPERTY**

Count Two fails both to state an offense and to provide Wyatt with sufficient notice for preparation of a defense or protection against double jeopardy. The Government alleges that the Iraqi people ("People of Iraq"), as distinct from the Government of Iraq, was one of the two parties that Wyatt intended to defraud. Such an amorphous entity lacks capacity to be defrauded and also lacks juridical personality sufficient for recognition by this Court. Further, this Court's recognition of the People of Iraq as an entity independent of their sovereign government would violate established principles of U.S. and international law, undermine the sovereignty of the Iraqi State, and constitute an impermissible judicial foray into U.S. foreign relations.

Wyatt could not have intended to defraud the OFFP of its money or property any more than he could have intended to defraud the People of Iraq. As a mere division of the U.N., the OFFP similarly lacks standing in this Court. Further, the U.N. had no cognizable property interest in the funds obtained from the OFFP, which were merely held in trust for the Government of Iraq incidental to the U.N.'s exercise of regulatory powers. Wyatt moves pursuant to Rules 12 and 7 of the Federal Rules of Criminal Procedure to dismiss Count Two of

the Indictment, to strike wire fraud as an object of the conspiracy alleged in Count One, and to strike the remaining language of the Indictment pertaining to the People of Iraq.[3]

### A.    The Indictment Fails To Adequately Allege The Elements Of Wire Fraud.

To obtain a conviction for violation of the wire fraud statute, 18 U.S.C. § 1343 (2002), the Government must prove: "1) a scheme [or artifice] to defraud; 2) money or property as an object of the scheme; and 3) use of mails or wires to further the scheme." *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (citations omitted); *see also United States v. Naiman*, 211 F.3d 40, 49 (2d Cir. 2000) (setting forth the elements of an analogous statute, 18 U.S.C. § 1341 (mail fraud)).[4]  The alleged scheme to defraud lies at the core of any wire fraud indictment, since it alone provides notice of the nature of the fraud or deceit that renders use of the wires criminal. *See Neder v. United States*, 527 U.S. 1, 20-25 (1999) (defining the scope of prohibited fraud by reference to common law fraud principles).

The potential vagueness of general terms such as 'fraud' and 'deceit' is bounded by the statute's requirement that the defendant contemplate harm to the targeted victim.   Much of the Supreme Court's recent interpretation of the mail and wire fraud statutes focuses on the intended victims' money or property interest. *See Pasquantino v. United States*, 544 U.S. 349, 125 S. Ct. 1766, 1771-72 (2005) (Government of Canada a victim of a scheme to deprive it of its interest in tax revenues, since that interest constituted a property right); *Cleveland v. United States*, 531 U.S. 12, 15, 20-24 (2000) (state's interest in a license was regulatory and not property "in the hands of the victim"); *Carpenter v. United States*, 484 U.S. 19, 25-27 (1987) (property interest in

---

[3]  Paragraphs 2 and 5 of the Indictment refer to the People of Iraq.  If the wire fraud allegations of Count Two are dismissed from the Indictment, these remaining references to the Iraqi People are surplusage and should be stricken from the Indictment as prejudicial. *See United States v. Scarpa*, 913 F.2d 993, 1013-14 (2d Cir. 1990).

[4]  *United States v. Thomas,* 377 F.3d 232, 242 (2d Cir. 2004) (noting that because the mail fraud statute and the wire fraud statute use the same relevant language, they are analyzed in the same way).

misappropriated business information); *McNally v. Unites States*, 483 U.S. 350 (1987) ("As the Court long ago stated, … the words 'to defraud' commonly refer 'to *wronging one* in his property rights by dishonest methods or schemes'") (emphasis added) (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188 (1924)).  Indeed, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a … wire fraud prosecution.  Instead, the deceit must be coupled with a *contemplated harm to the victim*."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis added).

In *United States v. Evans*, 844 F.2d 36, 39 (2d Cir. 1988), the Court recognized the importance of the specification of the victim in defining the parameters of the scheme to defraud, stating that "[i]f a scheme to defraud must involve the deceptive obtaining of money or property, the conclusion seems logical that the deceived party must lose some money or property." (citing *United States v. Covino*, 837 F.2d 65, 71 (2d Cir. 1988) ("[M]ail fraud requires a finding that the victim be defrauded of money or property")).  Absent specificity as to the nature of the alleged scheme to defraud and its intended purpose to deprive a specific victim of money or property, a defendant lacks sufficient notice to defend against the charge or to protect against an effort to retry him in violation of the Double Jeopardy Clause.  *Ashe v. Swenson*, 397 U.S. 436, 445 (1970); *United States v. Debrow*, 346 U.S. 374, 376 (1953) ("The true test of the sufficiency of an indictment is … whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.").

In the case at bar, the Government has already clarified, and this Court has recognized, that the alleged fraud victims are the OFFP and the People of Iraq.  *United States v. Chalmers,* 410 F. Supp. 2d 287 (S.D.N.Y. 2006).  The grand jury chose to indict Wyatt only for the Surcharge Scheme and his alleged intention to deprive the OFFP and the People of Iraq of the surcharge payments paid directly to the Government of Iraq.  Indictment ¶¶ 5, 7, 18-20, 25, 29.

There can be no doubt that Count Two charges Wyatt with obtaining money or property, as opposed to the deprivation of the intangible right to honest services.  Although a scheme to defraud may include a scheme "to deprive another of the intangible right to honest services," 18 U.S.C. § 1346, the Indictment charges only the money or property Surcharge Scheme. Indictment ¶ 25.  The Indictment lacks any reference to § 1346 or any mention of "intangible rights" or "honest services."  *See United States v. Villaneuva- Madrid*, 302 F. Supp. 2d. 187 (S.D.N.Y. 2003) (an indictment sufficiently charges an offense under 18 U.S.C. § 1346 if it includes the relevant statutory language); *see also United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (*en banc*) (setting forth the necessary elements, intent, and other requirements of 18 U.S.C. § 1346, which are not included in the current Indictment).  Furthermore, since §1346 has been limited to U.S. persons, it cannot be read to reach the foreign nationals here alleged to be victims.  Indictment ¶ 25; *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004) (finding § 1346 does not cover bribery of foreign officials, as that section "did not criminalize deprivation of all 'intangible rights of honest services, wherever they may be thought to be.'") (quoting *Rybicki,* 354 F.3d at 138).

**B.      The People of Iraq, As Subjects Of The Recognized Sovereign Government Of Iraq, Lack Independent Juridical Personality And Therefore Cannot Constitute A Victim Of The Alleged Fraud.**

Count Two is dependent on the flawed premise that the People of Iraq have a recognizable legal personality separate and distinct from the sovereign Government of Iraq.

Lacking such juridical personality, the People of Iraq do not have the necessary capacity to be victim of the alleged money or property fraud.

>    1.    *The People of Iraq, As An Entity, Lack Juridical Personality Independent of the Government of Iraq and Therefore Are Not Cognizable by This Court*

The Government's choice of the amorphous entity of the People of Iraq[5] as a victim lacks definition and needs further clarity to provide sufficient notice of the crime alleged.  "Every system requires definition of legal persons – those who possess rights and duties enforceable at law."  MALCOLM N. SHAW, INTERNATIONAL LAW 175 (5th ed. 2003); s*ee Kadic v. Karadz I*, 70 F.3d 232, 244 (1995) (consideration of the previously unrecognized Bosnia-Serb entity of Srpska as potential 'juridical' entity); *Knox v. Palestine Liberation Organization*, 306 F. Supp. 2d 424, 442-43 (S.D.N.Y. 2004).[6]  Determinations of the legal status of an entity "involve[ ] the examination of certain concepts within the law such as status, capacity, competence, as well as the nature and extent of particular rights and duties."  *Id.* at 176; *see also Karadz I*, 70 F.3d at 244-45 (holding that the District Court should have permitted an evidentiary hearing as to whether the claimed state satisfied the necessary criteria).  Although there are "no preset rules governing the extent of rights and duties of international persons," analysis "depends upon the type of entity concerned, its claims and expectations, functions and attitude adopted by the international community."  SHAW, *supra*, at 244.

---

[5]  Although the Government named the People of Iraq as a collective entity, the Indictment would fare no better had they tried to name each and every Iraqi citizen as a victim.  *See, e.g., Beanal v. Freeport-McMoroRan,* 969 F. Supp. 362 (E.D. La. 1997) (plaintiff's genocide claim for destruction of a tribal culture failed as he lacked standing on behalf of those wrongfully executed).

[6]  The Government has alleged two victims in the case, neither of which is a U.S. person.  As such, U.S. and international law will be instructive, particularly in light of the ramifications of recognition, or lack thereof, in international law.  *See United States v. Curtiss-Wright Export Co.*, 299 U.S. 304, 322 (1936) (finding that sovereign powers operate beyond the reach of the Constitution and U.S. law, requiring reference to treaties, international compacts, and the principles of international law); *Karadz I*, 70 F.3d at 238.  Other Second Circuit Courts have previously cited to this authoritative international law treatise, SHAW, *supra*, for guidance.  *Knox*, 306 F. Supp. 2d at 437.

The Second Circuit has defined a 'state' as those with a defined territory and a permanent population, under the control of its own government, which engages in or has the capacity to engage in, formal relations with other such entities. *Karadz I*, 70 F.3d at 244 (citing Restatement (Third) of Foreign Relations Law of the United States § 201 (1987) ("Restatement")); *Knox*, 306 F. Supp. 2d 424; *see also,* Montevideo Convention on Rights and Duties of States art. 1, Dec. 26, 1933, 49 Stat. 3097, 165 LNTS 19. The People of Iraq obviously fail to meet such criteria, particularly since it lacks control of its own government and capacity to enter into foreign relations.

The collective citizens of a state are generally considered derived subjects "possessing only such international powers as conferred exceptionally upon them" by the sovereign and/or the international community. SHAW, *supra*, at 243; *Knox*, 306 F. Supp. 2d at 429, 439-40. The People of Iraq, as a body, achieved no special independent recognition within the international community and are therefore recognized only by and through the Government of Iraq. *See* Restatement Pt. II, Intro. note ("An international organization has the legal capacity and personality of the rights and duties given it by the international agreement that is its charter and governs its activities."). Affirmation of Gerald L. Shargel, Ex. T ("Shargel Affir.") (Iraq 1990 Interim-Constitution).

As a result, the legal personality of the Iraqi citizenship under international law is subsumed in, and cannot be separated from, the Government of Iraq. *See Curtiss-Wright Export Co.*, 299 U.S. at 317 (individual U.S. states "did not posses the peculiar features of sovereignty – they could not make war, nor peace, nor alliances, nor treaties. Considering them as political beings, they were dumb, for they could not speak to any foreign sovereign whatever. They were deaf, for they could not hear any propositions from such sovereign.").

The International Court of Justice determines if a group is a legal entity distinct from a larger aggregation – whether composed of states, tribes, or of individuals under the following test:[7] "in the case of non-individual entities the claimant will have to be in such a position that it possesses, in regards to its members, rights which it is entitled to ask them to respect."  ICJ Reports, 1949, at 174, 178; 16 AD, at 318, 321.  The People of Iraq as an entity lacks any such rights against individual citizens, nor does it have a spokesperson or the ability to assert such rights.  Indeed, such an amorphous entity is incapable of intelligent capacity or collective will sufficient to be deceived, to hold a tangible right to money or property, or speak with one voice, such as to provide testimony.

Where, as alleged here, the recognized government takes an official action, such as requesting and receiving the payment of surcharges, the People of Iraq lack the capacity to obtain a cognizable money or property interest in the surcharge payments made to that government. Nor does the existence of the OFFP alter these rights.  The OFFP permitted the State of Iraq to define who could purchase its oil and how it would spend the proceeds for humanitarian purposes.  *See* Bruff Decl., Ex. H (MOU).  The People of Iraq, while the ultimate beneficiaries of purchases of humanitarian goods and services by their government, have no independent and distinct interest in those funds.

---

[7] As seen in the example of the Bantustans, tribal entities within Iraq, such as the Kurds, would not constitute a people entitled to self-determination.  The people of a state cannot be confused with ethnic, religious, or linguistic minorities of a state, whose rights are recognized in Article 27 of the International Covenant on Civil and Political Rights (UNCHR, Subcommission 1978).

C.    **The Court Should Decline The Government's Invitation To Give Official Recognition To The People Of Iraq Because Such Recognition Impugns The Sovereignty Of Iraq, And Has Broad Implications For Foreign Relations And International Law.**

1.    *Recognition of the 'People of Iraq' Independently of the Iraqi Government, Involves the Court in Determinations of International Relations and Offends Iraq's Sovereign Authority, Which Has Been Recognized by the United States Government and the International Community.*

It is a fundamental premise that "the principle persons under international law are states. States have legal personality and duties under international law."  Restatement, Pt. II, Intro. note; *see also* SHAW, *supra,* 175, 242 ("States are the original and major subjects of international law," the personality of which "derives from the very nature and structure of the international system."); *Curtiss-Wright*, 299 U.S. at 317 (finding a unified nation as ideal for exercise of the powers of external sovereignty).  "Legal personality of the state is analogous to the status and legal capacity of persons in developed national legal systems, including personality before the law, capacity to own property, make contracts, and pursue legal remedies for injury." Restatement § 206, cmt. c.

Statehood is defined and assessed under four factors: population, territory, under the control of the entity, and capacity to enter into foreign relations.  *Knox*, 306 F. Supp. 2d at 434; *see supra*, Sect. I, B.  These criteria of statehood convey not only "status as a legal person, with capacity to … pursue, and be subject to legal remedies," but also grant the state "sovereignty over its territory and general authority over its nationals."  Restatement § 206(a)-(b).

Sovereignty is defined as the state's "lawful control over its territory generally to the exclusion of other states, authority to govern in that territory and authority to apply law there." Restatement § 206 cmt. b; *see also* Treaty of Westphalia, Peace Treaty, Rome-France, Oct. 24, 1648, 49 Stat. 3097 (recognizing extensive autonomy of the state in its domestic, economic, and

social policy, largely free from the interferences from other states and powers).[8]  "[N]o state or group of states has the right to intervene, directly or indirectly for any reason whatever, in the internal or external affairs of any other state."  GA Res. 2625 (XXV), at 123, U.N. Doc. A/8082 (Oct. 24, 1970) ("U.N. Declaration and Principles of International Law Concerning Friendly Relations and Cooperation Among States"); *see also Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) ("Every sovereign is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of another, done within its own territory.").  Of particular import, a state "cannot purport to enforce its laws in the territory of another state without the consent of the state concerned."  SHAW, *supra*, at 192.

In addition to the powers granted by sovereignty, states also gain certain duties to its citizens and territory, including responsibility for the protection of its permanent population. Report of the International Commission on Intervention and State Sovereignty, The Responsibility to Protect, at XI (Dec. 2001), *available at* http://www.iciss.ca/pdf/Commission-Report.pdf ("State sovereignty implies responsibility, and the primary responsibility for the protection of its people lies with the state itself.")  Further, sovereign states must answer to its

---

[8] Other, analogous concepts in international law support recognition of the state, as opposed to the individual or individuals of that state.  For example, in redress of wrongs committed by the official acts of another state, tenets of international law specifically proscribe that the state is to stand in the place of its citizens in obtaining relief:

> [C]ustomary international law and numerous international agreements have created obligations for states in relations to persons. … Injury by a state to the nationals of another state implicates relations between those states and responsibility for such injury was established early as a norm of customary international law.  …  *[I]njury to the person has been seen as an offense to the state of his nationality. . . .[t]herefore remedy of the violation also runs to the state.*

Restatement, Pt. VII, Intro. note (emphasis added).

subjects "for any violation of its obligations under international law resulting from action or inaction by … the government of the state" or any subdivision or representative thereof.[9] Restatement § 207; *see also United States v. Belmont*, 301 U.S. 324, 330 (1937) ("[N]ationals must look to their own government for any redress which they may be entitled.")

The complementary duties and rights of sovereignty among the states has been historically and consistently recognized in the U.S. judicial system, as seen in concepts such as the act of state doctrine. *See e.g., id.* at 332 ("What another country has done in the way of taking over property of its nationals, … is not a matter for judicial consideration here."); *F. Palicio y Compania v. Brush*, 256 F. Supp. 481 (S.D.N.Y. 1966) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the actors of the government of another, done within its own territory.") (citing *Banco National v. Sabbatino de Cuba*, 376 U.S. 398, 416 (1963)); *Eastern States Petroleum Co. v. Asiatic Petroleum Corp.*, 28 F. Supp. 279, 281 (S.D.N.Y. 1939) ("The very meaning of sovereignty is that the decree of the sovereign makes law. A foreign power must, in our courts, be assumed to be acting lawfully."). The Supreme Court, in considering the sovereignty of nations and their relations with one another has commented, "[w]e should hesitate long before limiting or embarrassing such powers." *Curtiss-Wright*, 299 U.S. at 322.

During the period of the Indictment the Government of Iraq was a sovereign state, exhibiting all elements of statehood, and was recognized as such by the U.N. and the U.S. during the period of the Indictment. First, Iraq was a recognized member of the U.N. Press Release,

---

[9] Just as states are the appropriate actors to obtain remedies for its nationals, "individuals as a general rule lack standing to assert violations of international treaties in the absence of a protest by the state of nationality… ." SHAW, *supra*, at 233; *see also* Danzig Railway Officials Case, 1928 P.C.I.J. (ser. B) No. 15 (1928) (Permanent Court of International Justice held that international treaties did not generally create direct rights and obligations for private individuals.)

United Nations Member States, U.N. Doc. ORG/1360/Rev.1 (February 10, 2004), updated

February 24, 2005 (listing Iraq as a member of the U.N. Dec. 21, 1945);  U.N. Charter art. 2,

Para. 1 ("The Organization is based on the principle of the sovereign equality of all its

Members").  Following the Kuwaiti invasion, the U.N. continued to recognize the "Government

of Iraq," even in the resolution adopting sanctions against it.  Bruff Decl., Ex. G [S.C. Res. 661,

¶ 4, U.N. Doc. S/RES/661 (Aug. 6, 1990)], (making reference to the "Government of Iraq").

That recognition of Iraq's sovereignty continued in the OFFP, including during contract

negotiations over the MOU.  THE UNITED NATIONS IS EXTREMELY CONCERNED ABOUT THE

SERIOUS ALLEGATIONS OF CORRUPTION SURROUNDING THE OIL-FOR-FOOD PROGRAMME at 3,

http://www.un.org/News/dh/iraq/oip/facts-oilforfood.htm ("OFFP Article")  (Noting that Iraq

would not have allowed humanitarian goods to enter Iraq at a high enough rate to alleviate

suffering had the Security Council not agreed to allow the Government of Iraq to choose whom

could buy Iraqi oil, and from whom Iraq would import humanitarian supplies).  Additionally, the

Security Council permitted the Government to have sole discretion over which approved

humanitarian goods it would buy.  *Id.*  Finally, the resolution establishing the OFFP, as well as

the MOU explicitly provided for the integrity of Iraq's sovereign authority.  MOU ("Nothing in

the present Memorandum should be construed as infringing upon the territorial integrity of

Iraq."); Bruff Decl., Ex. F (S.C. Res. 986) ("Reaffirming the commitment of all Member States

to the sovereignty and territorial integrity of Iraq.").

Further, the U.S. consistently acknowledged the sovereignty of the Government of Iraq,

despite the tension caused by concurrent U.S. military operations.  Although diplomatic ties were

severed after the U.S. invaded Iraq in 1991, the U.S. Government was nonetheless explicit in its

continued observation of Iraqi sovereignty.  OFFP Article, at 3 (citing statement of Patrick

Kennedy, U.S. Representative to the U.N,) ("Mr. Chairman, here I want to reiterate a point that I made earlier on the issue of sovereignty.  While we oppose the authoritarian regime of the former Saddam era, Iraq was and is a sovereign nation.").  Further, despite its veto power in the Security Council, the United States permitted the Government of Iraq, as a sovereign entity, to negotiate contracts directly with the purchasers of Iraqi oil and suppliers of commodities. Observations on the Oil for Food Program: Hearing Before the Senate Committee on Foreign Relations, 108th Cong. (2004) (statement of Joseph A. Christoff, Director International Affairs and Trade), *available at* http://foreign.senate.gov/hearings/2004/christofftestimony040407.pdf. Rather than diminish them, the ISR confirm the view of Iraq as the sovereign state: "The term Government of Iraq includes: … the state and Government of Iraq, as well as any political subdivision, agency, or instrumentality thereof, including the Central Bank of Iraq."[10]  31 C.F.R. § 575.306 (1999).  Finally, even in the present Indictment, the government has persistently recognized the "Government of Iraq," referring to the state over 60 times in the charging document.

Given the Iraqi Government's attributes of statehood – defined population, territory, control thereof, and foreign relations – it retains the qualities of a state and thereby enjoys sovereign immunity.  The forced displacement of the ba'athist regime and interim transition to the Coalition Provision Authority does not negate the sovereignty of the prior government. "Rulers come and go; governments end and forms of government change, but sovereignty survives. … Sovereignty is never held in suspense."  *Curtiss-Wright*, 299 U.S. at 316-17; *see also Belmont*, 301 U.S. 330.  Furthermore, Iraq's independent status was not diminished by its

---

[10] The regulations do not include a definition for People of Iraq, only "Iraqi person," which is defined as "an Iraqi citizen, any person organized under the laws of Iraq, or any person *owned and controlled*, directly or indirectly, *by* a Iraqi national or *the Government of Iraq*."  31 C.F.R. § 575.312 (emphasis added).

interactions with the U.N. following the Kuwaiti invasion.  S.S. Lotus, 1927 P.C.I.J. (ser. A) No.

10, at 18 (Sept. 1927) (Emphasizing that "[r]estrictions upon the independence of states cannot

therefore be presumed."); *see also* SHAW, *supra,* at 189 ("Any political or economic dependence

that may in reality exist does not affect the legal independence of the state…").  Finally, the use

of force by the U.S. in the first Iraqi conflict did not abrogate Iraq's sovereignty.  *See Clark v.

Allen*, 331 U.S. 503, 508-10 (1947) (upholding treaty provisions between the U.S. and Germany,

during the time of World War II).[11]

        Given the Government of Iraq's recognized status by the U.S., as well as its acceptance in

the international community, the government cannot now be permitted to retroactively substitute

the People of Iraq for the state government.  *Knox*, 306 F. Supp.2d at 429 (holding Defendants

cannot "obtain, through the back channel of a judicial ruling by this Court, what has eluded them

so far from national and international discourse in the political and diplomatic arenas").

Specifically, although the U.S. Government has remedies to contest Iraq's failure to observe

international sanctions, it cannot disregard Iraq's territorial sovereignty and authority over its

nationals by purporting to act here on behalf of the People of Iraq.  *See Belmont*, 301 U.S. at 332

("What another country has done in the way of taking over property of its nationals, … is not a

matter for judicial consideration here.  Such nationals must look to their own government for any

redress to which they may be entitled."); *see also Banco National*, 376 U.S. at 425. ("The courts

of one independent government will not sit in judgment upon the validity of the acts of another

done within its own territory.").

_____

[11] The U.S.'s current operations in Iraq occurred outside of the relevant period of the Indictment.

Further, by attempting to do so, the Government invites this Court to enter into determinations of U.S. foreign relations and policy, something the Supreme Court has been extremely reluctant to do. *Id.* at 431-33 (demonstrating the failures and perils of judicial involvement in determining violations of international law); *see also Oneida Indian Nation of New York v. State of New York*, 860 F.2d 1145, 1162 (2d Cir. 1988) ("Even under the constitution, with federal courts authorized by statute to decide questions arising under federal law, including treaties, it is clear that many questions concerning peace and war are not appropriate for determination by the Judicial Branch.") "To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of the nations." *Id*. at 417-18.

A recent district court case considering recognition of the Palestinian Liberation Organization provides a useful framework for considering the consequences of recognition of a foreign entity like the People of Iraq:

> Moreover, because comity is often a function of recognition, matters concerning who is recognized as the sovereign or government of a particular territory, and whether and to what extent comity is accorded to its acts and officials, are political questions *uniquely within the domain and prerogatives of the executive branch.* …Recognition of a foreign entity of a sovereign state, or of a regime as the government of a state, may be effectuated by express declaration of the executive branch, by bilateral agreement with the foreign state, by the presentation of credentials by the United States to the authorities of the state and by the United States receiving the credentials of the diplomatic representatives of the foreign state. *See KMW Int'l v. Chase Manh. Bank, N.A.,* 606 F.2d 10, 17 n. 5 (2d Cir.1979); Restatement (Third) § 204 Rptrs. n. 2. … This constraint on judicial authority is especially compelling because *the political discretion to recognize foreign states and governments carries with it "the power to determine the policy which is to govern the question of recognition." United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct.

552, 86 L.Ed. 796 (1942).

*Knox*, 306 F. Supp. 2d at 440 (emphasis added).  Further, recognition of the People of Iraq would vitiate the executive's consistent recognition of the sovereignty of Iraq, despite war, embargo and succession.  *See Id.* at 443.  (Courts generally accept as conclusive Executive Branch determinations of United States international relations policy.).  With such a clear public record, the Court should refuse the Government's invitation to now interfere with Iraq's sovereign status and the United States' international policy.

It is obvious from the face of the Indictment that the Government's theory of prosecution is that defendants participated in the Government of Iraq's scheme to divert surcharge payments from the restrictions of the OFFP and direct them to the Government of Iraq.  Indictment ¶¶ 7, 18-20, 27.  As such, the Government of Iraq was complicitous in the scheme and defendants necessarily lack any intent to defraud the Government of Iraq.  *United States v. Novak*, 443 F.3d 150, 156, 159 (2d Cir. 2006).  In an apparent attempt to circumvent this problem with its theory of prosecution, the Government has substituted the People of Iraq as the victims of the Surcharge Scheme and sought to confer rights on them separate from those of their state government.  As the above discussion illustrates, a recognition of the People of Iraq is inconsistent with international law, the sovereignty of nations, and would require an unprecedented detour by this Court into the conduct of the foreign relations of the U.S.  Further, to ask the defendants to answer for a policy decision that was allegedly made by the Government of Iraq, namely the decision to circumvent international sanctions and obtain funds outside of OFFP control, is likewise contrary to international law, and again indirectly interferes in the territorial sovereignty of another state.[12]

---

[12]  The injustice effected is obvious – should the Government of Iraq itself be made to answer for the present charges, certain defenses would be available to it, such as the act of state doctrine.  *See Banco National*, 376

2. ***The United Nations' Oil-For-Food Program Cannot Constitute A Victim Of The Alleged Offense.***

Lacking the People of Iraq as a viable victim, Count Two and its incorporated Surcharge Scheme must rest upon the only other proffered victim – the OFFP – but this theory is similarly unavailing. The U.N. does not possess a sufficient property interest in the funds allegedly diverted from the OFFP bank escrow account to qualify as a victim of the alleged fraud, nor does the OFFP have the capacity to hold such an interest, if in fact there was one.

(a) The OFFP Lacks Sufficient Capacity to be the Victim of a Money or Property Fraud.

Like the evanescent entity, the People of Iraq, the OFFP lacks sufficient capacity to serve as a victim of the alleged fraud. As seen in our earlier discussion of juridical personality, the OFFP is a subdivision and component of the U.N. and as such is not a cognizable actor under international law. *See Curtiss-Wright*, 299 U.S. at 322 (holding that only the federal government, namely the executive, and not the U.S. states can operate in areas of foreign relations). As a mere program of the Security Council, the OFFP lacks sufficient capacity to hold a property interest in the surcharge payments.

Analogous principles in U.S. law confirm the lack of capacity before this court. Fed. R. Civ. P. 17 determines the capacity to sue or be sued, stating:

> The capacity of an individual ... shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held...

---

U.S. at 436-37 ("However offensive to the public policy of this country … an expropriation of this kind may be, we conclude that both the national interest and progress toward the goal of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in this realm."); *F. Palicio y Compania*, 256 F. Supp. at 487 ("Thus confiscations by a state of the property of its nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law.").

Regardless of which prong would be used, the OFFP lacks recognized capacity in U.S. courts.  As an individual, the law of domicile applies, which means that international law would govern, the results of which are discussed above.  If, instead, the OFFP is considered as a corporation, we turn to the creation document, namely Resolution 986.  That resolution merely effects the intent of its individual members to permit limited trade with Iraq, but creates no entity with standing independent of the U.N.  In fact, the resolution provides only for the immunity and privileges of the U.N. to attach to the petroleum products transferred under the agreement, the escrow account, and all persons appointed to assist in implementation.  Bruff Decl., Ex.  F (S.C. Res. 986, ¶ 14-16).  Similarly, the 661 Committee, which is retooled in Resolution 986 to perform functions related to the program, is simply another subdivision of the U.N., as shown in its composition – members of the Security Council.  Neither the resolution creating the OFFP, nor the subcommittee who worked on it, were given sufficient standing in their creation documents to confer capacity.  Finally, the catchall of Fed. R. Civ. P. 17 provision again confirms that there is no capacity.  The law of New York State directs us back to the unavailing enabling documents.  *See Yonkers Comm'n on Human Rights v. City of Yonkers*, 654 F. Supp. 544, 551 (S.D.N.Y. 1987) ("As creatures of statute, arms or departments of the municipal government have only those powers which are expressly granted by statute and those powers which are necessary to implement the expressed powers.  Accordingly, the New York Court of Appeals has consistently held that a commission's powers must be expressly given to it by the legislature.").

The OFFP, a temporary operational program to effect certain limited purposes set forth by the UNSC, through its members, is merely a division of the U.N.  The OFFP lacks any meaningful capacity and cannot serve as a victim of the fraud alleged in Count Two.

        (b)      The U.N.'s Regulatory Interest in the Embargo of Iraq Does Not Sustain An Actionable Property Interest in Surcharge Payments Held In Escrow.

Both the U.N., and its operations through the OFFP, lack a  property interest in the funds involved in the Surcharge Scheme by virtue of either its control over Iraqi oil or the payments made through the OFFP. [13]  In a string of recent Supreme Court cases, the Court has clearly defined the scope of property rights protected under the fraud statutes.  First, in *McNally*, the Supreme Court considered the scope of property rights protected by the fraud statutes and held that it did not include the citizenry's intangible right to the honest services of its government.[14] 483 U.S. at 356.  Concerned by the potential for creating "constructive offenses" if the outer bounds of the statute were left ambiguous, the Court limited the statute to property rights.  *Id.* at 360.  The Court further defined those property rights in *Carpenter v. United States*, 484 U.S. 19, 25 (1987), holding that provided a *property right* was misappropriated, it was within the statute regardless of the intangible nature of the right.  The Court applied this holding to a corporation's property right, albeit intangible, to its confidential business information and found that right protected.  *Id.*

These property rights principles were applied to governmental processes in two later cases, *Cleveland,* 531 U.S. at 26 (2000) (holding that permits or licenses do not qualify as property interests under the mail fraud statutes), and *Pasquatino v. United States*, 544 U.S. 349, 125 S. Ct. 1766, 1770 (2005) (holding that potential foreign tax revenue constitutes property in the hands of the victim).  In both cases, the Court made clear that the ability of a government to

---

[13]  Even if the OFFP had sufficient capacity to serve as victim, it too lacks a property interest in the money held in the escrow bank account and therefore cannot serve as the victim of the Surcharge Scheme, for the same reasons as the U.N. proper.  *See infra*.

[14]  Following the Court's holding in *McNally*, Congress passed 18 U.S.C. § 1346 (1998), the inapplicability of which is discussed further in Sect. I, A., *supra*.

be the victim of a scheme to defraud, whether the United States or a foreign authority, was

"limited to the Government's interest as property holder."  *Cleveland*, 531 U.S. at 26 (citing

*McNally*, 483 U.S. at 359 n.8); *Pasquatino*, 125 S. Ct. at 1770.

      In *Cleveland*, the Supreme Court specifically considered whether the fraud statute

reached false statements made to obtain a license, in that case a license to operate video poker

machines.  531 U.S. at 12.  Vacating the conviction, the Court held that the permits or licenses

did not qualify as property, because they lacked such status "in the hands of the victim."  *Id*. at

15.  To reach its result, the Court assessed the nature of the state's interest as a victim in these

licenses, finding them to be regulatory as opposed to revenue-generating.  *Id.* ("In short, the

[licensing] statute establishes a typical regulatory program.  It licenses, subject to certain

condition, engagement in pursuits that private actors may not undertake without official

authorization."); *accord, Fountain v. United States*, 357 F.3d 250, 256 (2d Cir. 2004) ("The

factor upon which the Court appears to have placed most weight is whether the government's

right is regulatory or revenue-enhancing.").  In finding an exercise of regulatory powers, the

Court was undeterred by the "substantial economic interest" that the state would obtain from the

licensed transactions, including the collection of an upfront processing fee, a separate processing

fee for each renewal, an annual fee from each owner, an additional device operation fee, as well

as a fixed percentage of net revenue from each video poker device.  *Cleveland*, 531 U.S. at 22.

Nonetheless, the Court found that the bulk of these payments came after and were incidental to

transference of the license.  Given that the state's interest was grounded in its regulatory powers,

the Court found that its licenses and/or the resulting payments could not be "property in the

hands of the victim," and were therefore insufficient to provide a relevant and protected property

interest.

The Supreme Court applied the principles of *Cleveland* in *Pasquantino* and concluded that a government holds property interests in its uncollected taxes. The Court found that the Canadian government's interest in its tax proceeds are revenue based, as opposed to regulatory. *Pasquantino*, 125 S. Ct. at 1770. Therefore, contrary to the state's interest in *Cleveland*, the right to tax revenue was a straightforward economic interest and property in Canada's hands. *Id.* at 1770-71.

Like the state in *Cleveland*, the United Nations' interests in the sale of Iraqi oil and its resulting proceeds were predominently regulatory and cannot serve as a sufficient property interest to support claims that it was a victim of fraud. The OFFP was created solely to allow the Iraqi sanctions to continue despite the suffering they were causing to the People of Iraq. According to U.N. Resolution 986 creating the Iraq OFFP, the Security Council took action:

> Concerned by the serious nutritional and health situation of the Iraqi population, and by the risk of a further deterioration in this situation, [and] Convinced of the need as a temporary measure to provide for the humanitarian needs of the Iraqi people *until the fulfillment by Iraq of the relevant Security Council resolutions*… allows the Council *to take further action* with regard to the *prohibitions referred to in Resolution 661*… .

(emphasis added). Indeed, the Committee referred to as "OFFP," was created as part of the sanctions resolution, and was simply later re-tooled to "monitor the sale of petroleum and petroleum products to be exported by Iraq." Bruff Decl., Ex. F (S.C. Res. 986, ¶ 6); *see also* Bruff Decl., Ex. H (MOU) (referring appropriate functional oversight to the "661 Committee"). As with the relevant authority in *Cleveland*, the United Nations' monitoring and administration of payments through the OFFP was an exercise of its regulatory powers, namely attempting to enforce the sanctions against Iraq, and did not give rise to a property interest. *Cleveland,* 531 U.S. at 24. ("A right to exclude in that governing capacity is not one appropriately labeled as

property.")  Hence, the U.N.'s operation of the OFFP involved a mere regulatory interest, not actionable under the fraud statute.[15]

Additionally the OFFP had no property interest in the escrow account since the funds obtained from the controlled sale of Iraqi oil are a mere by-product of the U.N.'s regulatory program and cannot constitute a property interest.  *Cleveland*, 531 U.S. at 23. ("Even when tied to an expected stream of revenue, the State's right of control does not create a property interest…").  Just as for the state in *Cleveland*, the funds obtained by the OFFP were derivative of the controlled sale of Iraqi oil and were not obtained until after the U.N. exercised its regulatory control to permit the sale and set the price.  As such, the U.N.'s function is equivalent to the issuance of a license and cannot constitute a property interest.  *Id.* at 24.  ("Equating issuance of licenses or permits with deprivation of property would subject to … fraud prosecution a wide range of conduct traditionally regulated by state and local authorities."); *McNally,* 483 U.S. at 359, n.8  ("[T]he … fraud statute … had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder.").  In sum, the manner and means through which the U.N. implemented its regulatory program in Iraq, namely control over the price and sale of Iraqi oil, merely resulted in payments to the OFFP escrow account, but that receipt of funds was incidental to the U.N.'s regulatory purpose and did not create a property interest.

Finally, regardless of the timing of the funds' receipt within the regulatory process, it would not have been property in the hands of the U.N.  Given its predominantly regulatory

---

[15]  Given the regulatory nature of the U.N.'s interest, the alleged statements made by Wyatt affecting the sale price of Iraqi oil cannot constitute a scheme to defraud the U.N.  *See Williams v. Dow Chemical Co.*, 255 F. Supp. 2d 219, 226 (S.D.N.Y. 2003) (holding that fraudulent statements to the EPA, designed to obtain regulatory approval, could not ground a scheme to defraud under the wire fraud statute).

purpose, the U.N. lacked the economic interest that the Canadian government held in *Pasquantino*.[16]  Instead, the U.N. served as a mere conduit, holding the obtained funds in "escrow."  Indictment ¶ 2.  As stated in the Indictment, the U.N. established the OFFP "to administer, among other things, the sale and purchase of humanitarian goods by Iraq."  *Id.* ¶ 3.  "[P]roceeds of all sales of Iraqi oil were to be deposited into an escrow bank account monitored by the United Nations and used *only* to purchase various humanitarian goods for the benefit of the Iraqi people."  *Id.* ¶ 2 (emphasis added).  The allegedly diverted funds "otherwise would have been available to purchase humanitarian goods under the [OFFP]."  *Id.* ¶ 20.  Therefore, the U.N. lacked discretion over the funds and the "straightforward economic interest" found in *Pasquantino*.  125 S. Ct.  at 1772.  As a mere trustee over funds to be diverted to the People of Iraqi, the U.N. held no recognized property interest in the funds obtained.  *Peoples Westchester Sav. Bank v. FDIC*, 961 F.2d 327, 332-33 (2d Cir. 1992) (recognizing that holder of escrow account does not have property interest over funds in the account) .

The Court's recent precedent has made clear what property interests are protected in the mail and wire fraud statutes.  A governing authority is like any other putative victim; it is only protected in its interests as property holder.  The regulatory interest sought to be advanced on behalf of the OFFP fails to concern a property interest, and is therefore not protected by statute, regardless of the subsequent funds it may generate.  Additionally, the U.N.'s strict handling of the funds in escrow further substantiates its lack of a cognizable property interest in the underlying funds.

---

[16]  Indeed, whatever the U.N's interest in the funds, it lacks traditional recognition as a property right, and the Court should be skeptical of extending such treatment to it.  *See Pasquantino*, 125 S. Ct. at 1770. (analyzing whether Canada's right to excise taxes has been considered a property right at common law).

II.     **COUNTS THREE AND FOUR SHOULD BE DISMISSED DUE TO THEIR RELIANCE UPON AN UNCONSTITUTIONAL DELEGATION OF CONGRESSIONAL POWER AND AN INVALID EXTENSION OF A NATIONAL EMERGENCY**

Counts Three and Four of the Indictment are both based upon allegations that Wyatt made surcharge payments to the Government of Iraq that "were unauthorized by and concealed from the United Nations Oil-for-Food Program and were in violation of the licensing scheme set up by OFAC to implement United Nations Security Council Resolution 968 and the resulting Oil-for-Food Program."  Indictment ¶¶ 31 & 38.  Accordingly, both Counts are dependent on the validity of the OFAC licensing regulations promulgated to implement the U.N.'s OFFP.

Both Counts must be dismissed since the OFAC Regulations implementing the OFFP were dependant upon an improper private delegation of the power of Congress to define criminal conduct and were also based on a declaration of national emergency that no longer reflected the basis for the delegated exercise of executive power to define criminal conduct.  The improper delegation was even more egregious since it was to a private entity, the U.N.

A.     **The ISRs are Dependent on Actions by the U.N.**

In order to permit U.S. citizens to participate in the OFFP, OFAC amended the ISRs to provide a general license allowing executory contracts to purchase Iraq oil and to issue specific licenses for these purchases.[17]  Section 575.522 authorized these purchases pursuant to Resolution 986.[18]  The amendments permitted executory contracts to purchase Iraq oil so long as the contracts were:

---

[17] The OFAC regulations allowing for participation in the OFFP, like the OFFP itself, have since been repealed due to recent developments in Iraq.

[18] The amendments included a definition of the "661 Committee," § 575.323, United Nations Security Council Resolution 986, § 575.324, and the "986 Escrow Account," § 575.325.

> Consistent with all requirements of UNSC Resolution 986, other applicable Security Council Resolutions, the May 20, 1996 Memorandum of Understanding between the Secretariat of the United Nations and the Government of Iraq on the implementation of Security Council Resolution 986 (1995), and applicable guidance issued by the 661 Committee.

Bruff Decl., Ex. E (ISR § 575.522 Amendment).  Accordingly, as of the date of its enactment, § 575.522 exempted from the ISR's criminal penalties an executory contract that was consistent with UNSC Resolution 986 and any other applicable Security Council Resolution, including resolutions that had not yet been adopted.  To obtain these protections, contracts were also required to conform with the MOU which permitted the Government of Iraq alone to determine who may purchase the oil allotments.  Finally, the regulations mandated that any contract be in conformity with undefined "applicable guidance" issued by the "661 Committee," which was comprised of Security Council members, as well as Committee overseers and staff.  The result was that any executory contract could be criminalized depending on actions taken by the Government of Iraq, the U.N. Security Council or the 661 Committee.

The ISRs were further amended on December 11, 1996, to provide for both a general and specific license to effectuate the OFFP.  61 FED. REG. 65311 (Dec. 11, 1996).  The Amendment included modifications of § 575.522 and the addition of § 575.523, to provide for specific licenses for OFFP purchases of Iraq oil.[19]  First, it added a general license in § 575.522, authorizing United States persons to import Iraq-origin oil if the purchase and export from Iraq "have been authorized by the 661 Committee or its designee."  The addition of § 575.523 then established requirements for issuance of a specific license, which would issue on a "case-by-case basis" so long as the purchases of oil from the Government of Iraq were in:

---

[19] The Summary of Purpose appearing in the Federal Register indicated that the Amendment was meant to cover "products that have been exported from Iraq with United Nations and U.S. Government approval."  61 FED. REG. 65312.

> [A]ccordance with the provisions of UNSC Resolution 986, other
> relevant Security Council Resolutions, the Memorandum of
> Understanding, and other guidance issued by the 661 Committee.

Bruff Decl., Ex. D (ISR § 575.523 Amendment).  This amendment thereby continued OFAC's

reliance on the UNSC Resolutions, the MOU and guidance of the 661 Committee.  Further, the

amendment provided that authorized purchasers would simply be identified by OFAC on a list,

which was then to be provided to the 661 Committee for further approval by the Committee "or

its designee" to purchase Iraq oil.  Only after the 661 Committee had set the price terms and

granted additional approval could the licensees perform on a contract, provided that that

performance was then in accordance with terms set by the Committee or its designee.

The role of the U.N. in the OFAC regulations was confirmed in agency guidance as well

as in periodic six month reports issued by the President to Congress.  The President's Report of

February 12, 2001 stated that the regulations had been amended "to authorize dealing in Iraq-

origin petroleum and petroleum products exported from Iraq with United Nations and United

States Government approval."  Bruff Decl., Ex. C31.  Further, OFAC issued guidance on the

application of the Amendments to surcharge payments which confirmed that Iraqi oil

transactions could proceed "[w]hen specifically authorized by the 661 Committee" and OFAC. It

advised that the import of Iraqi petroleum was subject to approval "by the Security Counsel[sic]

Committee established by Resolution 661."  OFAC, GUIDANCE ON PAYMENTS FOR IRAQI-ORIGIN

PETROLEUM PURSUANT TO LICE'NSED PURCHASE (Dec. 22, 2000), *available at*

http//www.ustreas.gov/offices/enforcement/ofoc/programs/iraqlgls/iraqoil.pdf.

As a result, this implementation of the OFFP by OFAC relied heavily on actions by the

U.N. and its subdivisions, including requirements that failure to comply with guidance from the

U.N. 661 Committee or its designees could constitute a violation of the OFAC regulations. Bruff Decl. ¶ 21.

**B.      The Charges in Counts Three and Four of the Indictment are Based On Violations of OFAC Regulations.**

The prohibitions of Section 2332d, charged in Count Three, of engaging in a financial transaction with the government of a country designated as a country supporting terrorism, contains an important exception for any actions taken in compliance with Treasury regulations. 18 U.S.C. § 2332d  ("Except as provided in regulations issued by the Secretary of the Treasury, . . .").

Count Three reflects this exception in its charging language alleging that Wyatt and others engaged in financial transactions with the Government of Iraq, which at the time was designated as a country supporting international terrorism, by making payments to the Government of Iraq that "were unauthorized by and concealed from the United Nations Oil-for-Food Program," "without complying with the licensing and authorization requirements of the Iraq Sanction Regulations."  Indictment ¶ 31.  Accordingly, the charges in Count Three are dependent upon a determination of whether the charged financial transactions were in conformity with the licensing provisions of the OFAC Regulations.  As the other factual allegations of the Indictment make clear, these allegations center on payments of surcharges pursuant to the "Surcharge Scheme" which in turn implicate OFAC Regulations.  Indictment ¶¶ 3-7, 31.  Similarly Count Three implicates actions of the U.N., not only as they are incorporated into the regulations, but by its specific reference to transactions unauthorized by and concealed from the OFFP.  Indictment ¶ 31.

Likewise, the overall structure and language of the IEEPA charge of Count Four indicates that it seeks to criminalize a failure to comply with the OFAC Regulations.  Count Four

includes a description of the promulgation of the OFAC Regulations and specific citations to several provisions of those regulations. Indictment ¶ 37. The charging language of the Count in paragraph 38, alleges that Wyatt and others "violated IEEPA, and the regulations promulgated thereunder."[20] Indictment ¶¶ 37-38.

The confused language of paragraph 38 of the Indictment, however, makes it difficult to determine exactly what is charged. After specifying the time period, individuals allegedly involved, general nature of the charged violation of IEEPA and the regulations in paragraph 38, the specific illegal conduct is identified as:

> [W]ithout obtaining the required OFAC approval, which transactions were designed to and did allow those recipients to make payments to the Government of Iraq unauthorized by and concealed from the United Nations Oil-for-Food Program, engaged in financial transactions with the Government of Iraq, which transactions were unauthorized by and concealed from the United Nations Oil-for-Food Program, and travel to and from Iraq.

Indictment ¶ 38. The first phrase beginning "which transactions" makes no grammatical sense, since there is nothing in the preceding language which would identify "which transactions" are referred to. Wyatt should not be made to read this ambiguous language at his peril; accordingly, it lacks sufficient specificity to charge an offense other than whatever may be charged by the remaining language of the Indictment. *Russell v. United States*, 369 U.S. 749, 761-69 (1962). Accordingly, the charges of paragraph 38 are limited to: "defendants . . . unlawfully, willfully, and knowingly violated IEEPA, and the regulations promulgated thereunder, without obtaining the required OFAC approval, engaged in financial transactions with the Government of Iraq,

---

[20] While the parenthetical following the charging language of Count Four contains citations not only to IEEPA and the regulations, but also to the Executive Orders and the Iraq Sanctions Act, the specificity of the charging language of the Indictment and its caption precludes a reading that charges independent violations of the Executive Orders or the Iraq Sanctions Act.

which transactions were unauthorized by and concealed from the United Nations Oil for Food

Program, and travel to and from Iraq."[21]

C.     **The Carefully Crafted Balance Between The Executive and Legislative
       Branches Established In The Relevant Statutes Was Upset Here By the
       Private Delegation to the U.N. and the Failure to Declare a New National
       Emergency.**

There is a long history in this country of the use of embargoes for foreign policy

purposes.  The Trading with the Enemy Act ("TWEA"), 50 U.S.C. app. § 5, 12 U.S.C. § 95a,

was originally enacted in 1917, six months after the United States entered World War I.  *See*

Bruff Decl. ¶ 14.  As originally enacted, TWEA authorized the President to restrict economic

transactions between the United States and foreign countries during times of war.  *See* Act of

October 16, 1917, ch. 106, 40 Stat. 411.  These powers were extended during the banking crisis

in 1933 to cover domestic national emergencies.

In subsequent years TWEA authority was used by a series of Presidents to declare broad

national emergencies.  *See* Bruff Decl. ¶ 14.  Executive power was exercised under these

declarations of national emergencies despite radically changed circumstances.  *Id.* ¶¶ 13-14.  The

President's broad authority under TWEA to investigate, regulate, prevent or prohibit transactions

with respect to foreign countries or nationals in times of declared national emergency, was

significantly revised in a series of legislative initiatives in the 1970s.  *Id* at ¶¶ 13-15.  As part of

the general post-Vietnam and Watergate realignment of the relationship between the executive

and congressional branches, presidential authority during times of declared national emergencies

was revisited by Congress.  *Id* at ¶¶ 10-11, 13-15.

---

[21] Wyatt contests the propriety of the language pertaining to travel.  We incorporate and adopt those
portions of co-defendant Chalmer's Motion to Strike Count Four based on the language relating to conspiracy
liability and travel.  *See* Memorandum of Law in Support of the Bayoil Defendants' Pre-Trial Motion, David
Chalmers (May 5, 2006).

In 1976, Congress passed The National Emergencies Act, Pub. L. 94-412, 90 Stat. 1255 (codified at 50 U.S.C. § 1601 *et seq.* (1976)) ("NEA"). The NEA arose out of congressional frustration with the misuse of the power of the President to declare national emergencies. Bruff Decl. ¶ 13. The legislative history indicates that the NEA was designed in part to make sure that the President used his emergency powers "only when emergencies actually exist." S. REP. NO. 94-1168, at 2 (1976). The Senate left no doubt that the legislation was designed to curtail expansive exercises of executive power:

> [A]t a time when governments throughout the world are turning with increasing desperation to an all-powerful executive, this legislation is designed to ensure that the United States travels a different road marked by carefully constructive legal safeguards.

S. REP. NO. 94-1168, at 2; *see also* Bruff Decl. ¶ 13.

A year later Congress amended TWEA to limit the President's authority under that statute to times of war. Act of December 28, 1977, Pub. L. No. 95-223, 91 Stat. 1625. At the same time, Congress enacted the International Emergency Economic Powers Act ("IEEPA"), which provided a framework for the President to exercise national emergency powers in peace time, similar to those previously exercised under TWEA. 50 U.S.C. § 1701. Unlike TWEA, however, the IEEPA set a number of procedural limitations on the exercise of executive power pursuant to declarations of national emergency. *See* Bruff Decl. ¶ 15.

1. ***The Overall Structure of IEEPA Demonstrates Congressional Concerns Over Expansion of Executive Authority to Declare and Respond to National Emergencies and Establishes Meaningful Restraints on The Exercise of Such Powers.***

The Congressional response to perceived abuses in the use of presidentially declared national emergencies resulted in a statutory system designed to ensure that the Executive was accountable both for declarations of national emergencies and actions taken pursuant to those

declarations.  More importantly, enacted legislation enhanced the role of Congress to permit

effective oversight of the use of these expansive presidential powers.

Under the NEA, 50 U.S.C. § 1621a et. *seq*., the President may not utilize any "special or

extraordinary power" authorized by any other Act of Congress during a period of national

emergency, without first declaring a national emergency, transmitting that declaration to

Congress and publishing it in the Federal Register.  50 U.S.C. § 1621.  The NEA also provides

mechanisms for the President or Congress to terminate a national emergency.  50 U.S.C.

§ 1622.[22]  Section 1631 requires that the President, prior to the utilization of any of the powers or

authorities available to him during a period of national emergency, specify in his declaration of

national emergency the specific provisions of law on which he is relying to exercise his

authority.  Consistent with the more detailed limitations and restraints of IEEPA, the NEA also

contains provisions regarding the accountability and reporting requirements of the President.

Bruff Decl. ¶ 13.  Under § 1641, the President is required to make periodic six month reports to

Congress on the total expenditure of U.S. funds during the reporting period that are attributable

to the exercise of powers pursuant to the declaration of national emergency.  The NEA,

accordingly, conferred no rights on the President other than the ability to declare a national

emergency, but set procedural accountability and reporting requirements applicable to any such

declaration.  *Id.*

This overall effort to limit and control the exercise of executive power during a declared

national emergency was carried forward in IEEPA.  *Id.* ¶¶ 14-15.  IEEPA grants authority to the

President to exercise enumerated powers during a peacetime national emergency declared

---

[22]  Following the Supreme Courts decision in *INS v. Chadha*, the legislative veto provisions of the Act were
found to be unconstitutional.  462 U.S. 919 (1983).  The Act was subsequently amended to cure this defect by
providing for presentment.  *Id.*

pursuant to the NEA. *Id.* ¶¶ 13, 15. Section 1702 provides broad authority to the President to promulgate regulations and proscribe by instructions, license or other means, transactions involving any property of a foreign country or a foreign national. While broad, these powers are subject to numerous limitations under the remaining provisions of the Act. *Id.* ¶ 15. Section 1701 limits the use of these powers to only "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Section 1701(b) further limits the exercise of these authorities to actions designed to deal only with the "unusual and extraordinary threat" justifying the declaration of a national emergency, and specifically provides that they "may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

This language deals with the concerns expressed in the legislative history that broad declarations of national emergencies had been used by Presidents to deal with matters attenuated from the original declaration of the national emergency. Section § 1701(b) goes on to make this clear by indicating that "[a]ny exercise of such authority to deal with any *new threat* shall be based on a *new declaration of national emergency* which must be with respect to such threat." 50 U.S.C. § 1701(b) (emphasis added). Accordingly, Congress required not only that any exercise of authority under IEEPA be directly linked to a declaration of national emergency, but more importantly, if the threat which gave rise to that emergency changed into a new threat, the President is required to declare a new national emergency. Bruff Decl. ¶ 15.

Congress made sure in other sections of IEEPA that it would be able to enforce these limitations on the exercise of presidential power. *Id.* Section 1703 sets forth a detailed series of requirements regarding consultation with and reporting to Congress. The President is first

required "in every possible incidence" to consult with Congress before exercising any authorities granted under the statute and is required to "consult regularly with the Congress so long as such authorities are exercised."  In addition to these consultive requirements, the President is required to report to Congress in a number of very specific circumstances.  First, the President is required to report immediately upon the exercise of any authority under the statute, giving details of the circumstances necessitating the exercise of authority, why the President believes that there is an unusual and extraordinary threat, the precise authorities to be exercised and the actions to be taken to deal with the threat, the rationale for these actions, the designation of the foreign countries with respect to which the actions will be taken, and why it is necessary to take actions with respect to those countries.  50 U.S.C. § 1703(b).

In addition to the consultive requirements of subsection (a), and the reports upon exercise pursuant to subsection (b), the President is also required to file periodic follow-up reports at least once during every succeeding six month period.  These six month reports must include any changes which have occurred concerning any of the information previously furnished.  Bruff Decl. ¶ 15. In order for § 1703 to have meaning, the consultive provisions of subsection (a), the initial report under subsection (b) and the periodic follow-up reports under subsection (c) must be read to be separate and distinct reporting and consultive requirements.

Section 1704 permits the President to issue regulations in order to implement his powers under the Act.  This authority has been used to promulgate the OFAC ISRs.  Finally, § 1705 criminalizes violations of any license, order or regulation issued under the statute.  50 U.S.C. § 1705(b).  It is this authority which serves as the charging statute under Count Four.

Following the Iraq invasion of Kuwait and the declaration of a national emergency in Executive Order 12722 and 12724, the Iraq Sanctions Act of 1990 ("ISA"), Pub. L. No. 101-513,

was enacted on November 5, 1990. Bruff Decl. ¶¶16-17. It expresses congressional will to support the "imposition and enforcement of multi-lateral sanctions against Iraq," including the then-recent UNSC resolutions. ISA § 586A. This legislation was clearly based on a congressional view that Iraq's occupation of Kuwait and the violation of human rights in Kuwait caused by the Iraqi occupation should cease. The ISA also continued the restraints over the exercise of executive power originally enacted in the NEA and IEEPA. Specifically, § 586B of the ISA also requires consultations with Congress. The President was further mandated to fully inform and consult with Congress regarding the international crisis caused by Iraq's invasion of Kuwait.[23] Bruff Decl. ¶¶ 16-17.

**D.     The Delegation of Authority to the U.N. to Define Criminal Conduct Violates the Non-Delegation Doctrine.**

### 1.     *The Nondelegation Doctrine*

The nondelegation doctrine is based on Article I, Section 1, of the Constitution of the United States which vests "all legislative powers herein granted . . . in a Congress of the United States." As a general matter, Congress is prohibited from delegating its legislative powers. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citing *Loving v. United States*, 517 U.S. 748, 771 (1996)). The Supreme Court has derived from the reservation of legislative power "the non-delegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S.C. 160, 165 (1991). The doctrine is based on the concepts of separation of powers that form the basis for our three-branch system of government. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). While

---

[23] The limitations placed on the exercise of executive power under Section 1701(b) of IEEPA, requiring that the President designate any new threat and not rely on outdated threats and previously declared national emergencies, were also carried forward in the ISA. The second half of the statute, beginning in Section 586F, identifies various potential threats from Iraq, separate and distinct from those supporting the trade embargo. Of note, Congress proscribed specific sanctions to deal with such threats, and did not believe that they were supported or were to be addressed by the trade embargo.

courts have evolved a modern jurisprudence recognizing the need for delegation to the executive

branch as a necessary component of effective governance, they have done so with a close eye to

these underlying constitutional considerations.

Concerns over inappropriate delegations of congressional power are at their highest point

when individual liberties are placed at risk under a delegation of the exclusive authority to define

criminal conduct.  *See Kent v. Dulles,* 357 U.S. 116, 129 (1958).  Throughout our constitutional

history, courts have insisted that crimes be defined by Congress "because of the seriousness of

criminal penalties, and because criminal punishment usually represents the moral condemnation

of the community, legislatures and not courts should define criminal activity."  *United States v.*

*Bass*, 404 U.S. 336, 348 (1971).  This long-standingrecognition that courts cannot define

common law crimes is based upon Congress's sole authority to define crimes and precludes

inappropriate delegation of that power.

The Supreme Court has, however, recognized that separation-of-powers concerns and the

nondelegation doctrine do not prevent Congress from obtaining the assistance of its coordinate

branches of government.  The Court has insisted that Congress at a minimum "lay down by

legislative act an intelligible principle to which the person or body authorize to act, is directed to

conform."  *Mistretta*, 488 U.S. at 372.  This willingness to accept delegation is premised on the

demands of an increasingly complex society in which "Congress simply cannot do its job absent

an ability to delegate power under broad general directives."  *Id.* at 372.  Accordingly, the

Supreme Court "has deemed it constitutionally sufficient if Congress clearly delineates the

general policy, the public agency which is to apply it, and the boundaries of the delegated

authority."  *Id.* at 372-73.  (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

After striking down two statutes on nondelegation grounds during the New Deal, the

Court has consistently upheld congressional delegations. *Mistretta*, 488 U.S. at 373-374. It has

done so, however, with the recognition that the primary purpose of intelligible principle review is

to permit a court to determine "whether the will of Congress has been obeyed." *Skinner v. Mid-*

*America Pipeline Co.*, 490 U.S. 212 (1989). In recent years Supreme Court review of non-

delegation claims "has been limited to the interpretation of statutory texts, and, more particularly,

to giving narrow constructions to statutory delegations that might otherwise be thought to be

unconstitutional." *Mistretta*, 488 U.S. at 374 n.7.

> ### 2. *Congress Permitted a Limited and Restricted Exercise of Delegated Power to Criminalize Conduct under IEEPA.*

While Congress has the authority to delegate its exclusive legislative function to define

criminal laws pursuant to broadly formulated standards, it maintains the reserved right to limit

the scope of delegated authority by establishing both substantive and procedural limitations on

the exercise of such authority. As the prior discussion demonstrates, the entire history of the

NEA, IEEPA and the ISA demonstrate that while Congress intended to grant broad authority to

the President to both declare and take action in response to national emergencies, this authority is

in fact subject to "meaningful restraints." Bruff Decl. ¶¶ 10-12.

First, the President must take responsibility for declarations of national emergencies by

stating the statutory basis and rationale in reports to Congress. This insures direct presidential

accountability to Congress. The delegation to the U.N. of authority to define conduct that can be

subjected to criminal penalties under IEEPA is in direct conflict with this congressional effort to

hold the executive accountable. Second, Congress protected against accretions of power to the

Executive by requiring that new threats could not be piggy-backed onto existing declarations of

national emergency, but instead required a new determination and corresponding review by

Congress.  Further "meaningful restraints" over exercises of expansive presidential power is provided for by the reporting and consultive requirements of the statutes.  Bruff Decl. ¶ 11.

As the declaration of Professor Bruff demonstrates, the executive branch has relied largely upon its six-month reports to discharge these obligations to Congress.  Bruff Decl. ¶¶ 18-19.  Further, the President has never declared a new national emergency, but rather has justified ongoing sanctions against Iraq on the original declaration, well after the invasion and occupation of Kuwait ended.  *Id.* ¶ 19. This history of less than robust compliance by the President with these "meaningful restraints" has implications for non-delegation analysis.  *Id.* ¶¶ 18-19.  Where the existence of "meaningful restraints" serves as the basis for a broad delegation, a failure to comply with those restraints not only raises questions of *ultra vires* actions but also requires narrowing the breadth of the otherwise constrained delegation.  *Id.* ¶ 25.  These principles must be given increased emphasis where the delegation and noncompliance implicate criminal liability.

The case law upholding exercises of authority by the Executive under IEEPA, in the face of non-delegation challenges, supports this analysis.  In *Dames & Moore v. Regan*, 453 U.S. 654, 671 (1981), the Supreme Court found that despite TWEA's broad declaration of presidential authority the enactment of IEEPA indicated congressional intent "to limit the President's emergency power in peace time."  *Id*. at 672-73.  The Court recognized the power of the President under IEEPA to nullify attachments and orders of transfers based in part on its view that congressional legislation in the area indicated that the President was not acting on his own, but rather with the acceptance of Congress.  *Id*. at 678-79.

Accordingly, where Congress grants broad substantive authority to the President, as in § 1702 of IEEPA, deference should be accorded to those actions in the area of foreign policy.

This language cannot be read, however, to disregard a procedural limitation placed upon the exercise of that power. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas… [But this] does not mean that simply because a statue deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice.").

In *United States v. Arch Trading Co.*, 987 F.2d 1087 (4th Cir. 1993), the Fourth Circuit upheld a criminal prosecution under IEEPA in the face of a non-delegation challenge. The court first recognized that while an unconstitutional delegation of authority to define criminal conduct would run afoul of the non-delegation doctrine "a challenge to a specific Congressional grant of authority to define only the details of criminal conduct presents a more complex question." *Id*. at 1093. The court reviewed this question in light of the Supreme Court's then-recent decision in *Touby,* 500 U.S. 160. In *Touby*, the Court upheld a delegation of authority to the Attorney General to specify illegal substances based upon the need to quickly identify newly-designed and dangerous drugs. *Id.*

The Court in *Touby* did not resolve the question of whether something more than an "intelligible principle" is required when Congress authorizes another branch to promulgate regulations that contemplate criminal sanctions. *Id.* The Court did not address this issue because the statute in *Touby* was unquestionably constitutional, since the exercise of discretion to define criminal conduct by the Attorney General was meaningfully restrained. *Id.* The *Touby* Court relied on a series of carefully crafted congressional limitations on the exercise of the Attorney General's power as dispositive. *Id.*

The court in *Arch Trading* applied similar analysis to IEEPA and recognized the numerous limitations on the exercise of executive power contained in Sections 1701 through 1703. *Arch Trading*, 987 F.2d at 1093-94. The Court found that these limitations combined with the President's special powers in areas of foreign policy and congressional acceptance of presidential action, saved the statute from unconstitutionality under the non-delegation doctrine. Other courts have found this reasoning persuasive. *See United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002); *United States v. Anvari-Hamedani*, 378 F. Supp. 2d 821 (N.D. Ohio 2005); *United States v. Esfahani*, No. 05CR0255, 2006 U.S. Dist. LEXIS 163025, at *4 (N.D. Ill., Jan. 17, 2006).

Hence, it is the "meaningful restraints" on the exercise of executive power in the sensitive area of defining criminal conduct that saved the statute from non-delegation problems. Here Congress has indeed meaningfully restrained the exercise of executive power through the numerous restrictions it has placed on the exercise of delegated powers. The failure to rigorously comply with these restraints accordingly requires that regulations promulgated in violation of these meaningful restraints be carefully reviewed to determine if they can serve as the basis for imposition of criminal liability. As the Supreme Court stated in *Kent*:

> If [] 'liberty' is to be regulated, it must be pursuant to the lawmaking functions of Congress. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests. Where activities or enjoyment, natural and often necessary to the well-being of an American citizen ... are involved, we will construe narrowly all delegated powers that curtail or dilute them.

357 U.S. at 129 (citations omitted). Further, given the extensive oversight Congress anticipated, an end run around these obligations through privatization of the grant of authority is inconsistent with congressional intent.

Where the President's delegee acts within the scope of a broadly formulated legislative standard, but in contravention of express limitations on the exercise of delegated authority, such actions are subject to judicial review to determine if they are *ultra vires*.  In *Dalton v. Specter*, 511 U.S. 462, 474 (1994), the Court "assumed for the sake of argument" that while the exercise of discretion by the Executive was not subject to judicial review "some claims that the President has violated a statutory mandate are judicially reviewable."  Indeed, "courts will ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 (1986)).  Review of the exercise of authority under IEEPA has been the subject of just such review.  *See United States v. Spawr Optical Research*, 685 F.2d 1076 (9th Cir. 1982); *Bernstein v. Dep't. of State*, 974 F. Supp. 1288 (N.D. Cal. 1997).  To the extent the executive in fact ran afoul of mandated restraints, exercise of authority is *ultra vires*, as the authority given to create and enforce such regulations was contingent upon such restraints.  *See* Bruff Decl. ¶ 25.

E.     **The Failure To Declare a New National Emergency Justifying the OFFP Constitutes a Significant Breach Of The Restraints Placed Upon the Exercise of Delegated Authority Which Precludes Criminal Prosecution.**

Counts Three and Four of the Indictment are derivative of the declaration of the Kuwaiti-invasion national emergency, due to their reliance upon the regulations and licensing provisions of OFAC promulgated under that emergency.  Given the intricate statutory framework involved, and the policy reasons underlying Congress's decision to retain substantial oversight, such agency conduct is only valid to the extent the underlying exercise of delegated authority was legitimate.  Because the President was required to declare a new national emergency prior to

43

OFAC's promulgation of its regulations implementing the OFFP, imposition of criminal liability premised upon those regulations cannot stand.

As discussed above, § 1701(b) of IEEPA provides that the powers granted to the President under that statute can only be exercised to deal with a declared national emergency. Of import here, any exercise of those authorities to deal with a new threat must be "based on a new declaration of national emergency which must be with respect to such threat." 50 USC § 1701(b). Such powers "may not be exercised for any other purpose." *Id.*

At the time OFAC implemented the OFFP, the Iraqi occupation of Kuwait had long since ended and U.S. foreign policy had shifted to other perceived threats emanating from Iraq. Concerns over chemical, nuclear and perhaps other weapons of mass destruction, repression of minorities and widespread human rights abuses dominated the public and governmental dialogue over Iraq. In July 1995, Iraq finally acknowledged "it had an offensive biological weapons program and that it produced 19,000 liters of botulinum, 8,400 liters of anthrax, and 2,000 liters of aflatoxin, clostridium, and ricin." Shargel Affir., Exs. O, Q, P. (CRS Issue Brief for Congress, at CRS-8); (Development of Weapons of Mass Destruction, at 8); (Proliferation: Threat and Response, at 39). In 1995, the U.S. also learned from a defector that Saddam Hussein initiated a crash program to build a nuclear weapon after his invasion of Kuwait. *Id.* at Exs. R, S (Colin Powell Address to the U.N., at slide 30); (H.R. 107-721, at 12). Despite this clear "new threat" the executive branch never declared a new national emergency under the NEA, instead choosing to rely on the declaration of national emergency designed to repel the Kuwaiti invasion, which had since been overtaken by events. Committing the very abuses that gave rise to that legislation, the President's reliance on a stale emergency thereby invalidated any agency action premised upon the authority granted to the President by IEEPA. Bruff Decl. ¶ 18. Given

the civil liberty implications of a criminal prosecution, the president's exercise of authority, to wit, the executive orders and OFAC regulations, made in violation of his enabling authority, cannot stand.

Appropriate sanctions for the executive's failure to comply with the new threat provisions of § 1701(b) implicates fundamental questions of separations of powers and inter-branch relationships, which are uncomfortable territory for a federal court. Bruff Decl. ¶ 25. This Court, however, need not resolve the totality of that thorny question. Whatever limitations § 1701(b) placed on the executive, the limits of delegated authority must be subjected to their utmost scrutiny where they result in the imposition of criminal liability. Here the combination of a private delegation and noncompliance with a critical meaningful restraint on the exercise of delegated powers is sufficient to void any reliance on the OFAC OFFP regulations as the basis for the imposition of criminal liability.

**F.     The Indictment Rests Upon An Unconstitutional Private Delegation of Authority to Define Criminal Conduct and Cannot Stand.**

Despite the ISR, OFAC encouraged participation in the OFFP through the issuance of licenses to exempt participants from otherwise violating the Iraqi embargo. In doing so, however, OFAC delegated its licensure authority, and thereby its power to define criminal conduct to private entities, namely the U.N., its various subdivisions and member nations, and the Government of Iraq. That delegation offends constitutional principles of separation of powers and due process, and therefore cannot sustain a criminal indictment.

Both Counts Three and Four seek to criminalize payments made to the Government of Iraq that "were unauthorized by and concealed from the United Nations' Oil-for-Food Program." Indictment ¶¶ 31 & 38. These references are far from surplusage since the U.N. played a critical role in defining what potentially constitutes a criminal violation of the OFAC Regulations as

they relate to the OFFP.  *See* Bruff Decl. ¶¶ 19-22.  As set forth in Sect. II. B., OFAC permitted participation in the OFFP to the extent the "licensee" complied with: 1) the U.N.; 2) the 661 Committee, its "designees," and/or its "guidance"; 3) Security Council resolutions—those existing and those yet to be determined; and 4) the MOU between the U.N. and Iraq, which ensured a concurrent exercise of authority by the Government of Iraq.  These requirements are set forth in the amendments creating ISR § 575.522 and § 575.523, which established the scope of licensure and thereby set the bounds of criminalized conduct for a U.S. person participating in the OFFP.  *See* Bruff Decl. ¶ 20.

The result of these Amendments to the ISR was to critically link actions by various components of the U.N. and/or the Government of Iraq with a determination of whether a transaction violated the OFAC Regulations and was therefore subject to criminal penalties.  Any purchase not consistent with such authority, including unknown Security Council resolutions, amorphous "guidance issued by the 661 Committee," or approval by "designees" of the 661 Committee, violated the regulations.  Even full and exacting compliance with OFAC requirements did not exempt putative licensees, as even if listed as approved by the agency, they still needed further approval of the 661 Committee or its designees and needed to be compliant with any and all terms established by either entity.

In sum, the OFAC regulations pertaining to licensure under the OFFP constitute a private delegation of its rule-making authority to the U.N. and its various subcommittees.  *See* Bruff Decl. ¶¶ 19-22.  Such unlimited and ill-defined designation is constitutionally invalid, particularly in light of the criminal prohibitions attaching to the licensure process.

Although some delegation of authority by Congress is permitted, as discussed above, delegation to a third-party presents additional concerns which can serve to invalidate such

delegations altogether. In *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), the Supreme Court considered the delegation of congressional authority to a private entity, in this case permitting industry representatives to set workers' hours and wages. "[T]he delegation is so clearly arbitrary, and so clearly a denial of rights safeguarded by the due process clause of the Fifth Amendment, that it is unnecessary to do more than refer to decisions of this court which foreclose the question." *Id.* at 311; *see also Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (recently applying the 'private delegation doctrine').

The inherent skepticism of private delegations arise from substantial concern over the potential for self-interest and corrupt enforcement by the private entity involved. *Carter*, 298 U.S. at 311 ("This is legislative delegation in its most obnoxious form."); *GE Co. v. New York State Dep't of Labor*, 936 F.2d 1448, 1458-59 (2d Cir. 1991) (sustains facial challenge to the statute involved based on the entities' self-interest in establishing underlying rates); *Suss v. ASPCA*, 823 F. Supp. 181, 188 (S.D.N.Y. 1993) ("For an interested party to make decisions utilizing governmental authority is anathema to due process."). In contrast to the legislative and executive branches, delegations and sub-delegations to private entities lack the public accountability and system of checks and balances otherwise provided by our tripartite system of government:

> [O]ne of the rationales against excessive delegation [is] the harm done thereby to principles of political accountability. Such harm is doubled in degree in the context of a transfer of authority from Congress to an agency and then from agency to private individuals. The vitality of challenges to the former type of transfer is suspect, but to the latter, unquestionable.

*Nat'l Asso. of Regulatory Comm'rs v. FCC*, 737 F.2d 1095, 1143 (D.C. Cir. 1984). This reasoning should apply with even greater force where, as here, the executive branch can avoid

specific restraints, discussed above, that were placed on its exercise of delegated powers by merely tasking out legislative authority to a private entity.

Due to such concerns, delegation to a private entity is narrowly constrained. Like any other delegation, one to a private entity must include specific guidance from the legislature or designated agency, such that the entity is strictly limited to only a ministerial or advisory capacity. *Pittston Co.*, 368 F.3d at 395 ("Congress may employ private entities for ministerial or advisory roles, but it may not give these entities governmental power over others"); *see also, Yakus v. United States*, 321 U.S. 414. 423 (1944) (finding that in its delegation of powers, Congress had provided sufficient methods of achieving the objective and standards for the determinations to be made). However, the agency must retain "authority and surveillance" over the private entity. *Pittston Co.*, 368 F.3d at 394 (citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940)). Further, the agency must exercise substantive review of the private entity, as opposed to serving as a mere 'rubber stamp' to the third-party's actions. *GE Co.*, 936 F.2d at 1458-59 (holding that the Department's *pro forma* adoption of the delegated entity's recommendations constituted a failure to exercise its discretion and therefore an unconstitutional delegation of legislative authority).

Although private delegation has been upheld if effected within these limited constraints, conveyance of legislative and coercive authority, such as proscribing criminal prohibitions, is not within the ministerial capacity permitted for private delegation:

> Where delegation of governmental functions to private entities occurs, the nature of the function involved is crucial. Contracts for work to be done for the public sector are traditionally utilized for carrying out ministerial or mechanical functions and for performing noncoercive services, but not for decision-making involving coercive exercise of sovereign power. Such decision-making is inherently suspect.

*Suss*, 823 F. Supp. at 189; *see also Poe v. Menghini*, 339 F. Supp. 986, 994 (D. Kan. 1972) ("The legislature cannot delegate to private individuals and private associations the power to make obligatory rules concerning the management and care of property, nor can it provide that the breach of such rules shall be a penal offense.") (citing *Carter*, 298 U.S. 238).

OFAC's reliance on and incorporation of the policies and approval of the U.N. creates an improper delegation of congressional authority. *See* Bruff Decl. ¶¶ 23-24. This is unique to the OFAC regulations designed to implement the OFFP, rendering prosecution based upon that portion of the regulations unconstitutional. Although those regulations have since been repealed as obsolete due to the lifting of the embargo after the transition to the interim government, they still serve as the basis for the prosecution of Wyatt under Counts Three and Four. The language discussed above, with numerous references to the MOU, Security Council resolutions present and future, and the 661 Committee's (and its designees') terms and guidance, defines the scope of criminal prohibitions, as any performance not in compliance with it run afoul of the regulations and therefore of IEEPA. Indeed, a party could comply with every enumerated requirement of the regulations and obtain an OFAC license,[24] but still violate the regulations based on a deviation from a U.N. resolution or authorization.[25]

Worse, the offending delegation which permits private party definition of criminal conduct is many levels removed from congressional authority. *Nat'l Assoc. For Regulatory Comm'rs*, 737 F. 2d at 1143. ("Such harm is doubled in degree in the context of a transfer of

---

[24]   The delegation of authority to set the terms of licensure, like any other delegation of legislative power, is subject to scrutiny for private delegation. *Anderson v. N.Y. Racing Ass'n.*, No. 03 civ. 4785, 2004 U.S. Dist. LEXIS 319 (S.D.N.Y. Jan. 12, 2004); *see also Women's Med. Prof. Corp. v. Baird*, 438 F.3d 595 (6th Cir. 2006). The inherent skepticism of delegations to define criminal conduct fully applies to licensing situations. *Poe*, 339 F. Supp. at 993-95.

[25]   To the extent that any language of IEEPA, its implementing regulations, or any delegated authority is unclear as to the nature or means of compliance, the Court should interpret that language in Wyatt's favor. *Bass*, 404 U.S. at 347 ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

authority from Congress to an agency and then from the agency to private individuals."). For these licensure provisions, Congress granted the President the power to define prohibited conduct and merely criminalizes violation of that indeterminate conduct. The President, in turn, delegated this power to the Secretary of the Treasury, who again, delegated it to the OFAC. Though already questionable as a clear delegation with specific guidance to the designated authority, OFAC again delegated its authority to the U.N., an international body comprised of subdivisions and member states operating beyond U.S. borders. The delegation does not end there, however, as the 661 Committee is permitted and expected to further delegate purchase approval to the Government of Iraq and to undefined "designees." Permitting the bounds of penal enforcement to be defined in this complex and attenuated exercise of authority provides a blatant debasement of constitutional protections, the likes of which were specifically forewarned in *Carter* and its progeny. Bruff Decl. ¶ 23.

This structure, inimical to due process and constitutional proscription of criminal offenses, further lacks the substantial guidance and oversight required for a private delegation. *See* Bruff Decl. ¶ 24. Since OFAC gave its approval to contracts prior to the U.N.'s review, approval of U.N. action was foreclosed, abrogating all responsibility for the required substantive review. *GE Co.*, 936 F.2d at 1458-59. Perhaps the reason OFAC failed to exercise any authority over 661 committee approval is that it lacks any such authority. The United States' participation in the U.N. carries obligations to conform with its action, not the other way around. 22 U.S.C. § 287c(b); *Office of Foreign Assets Control v. Voices In The Wilderness,* 329 F. Supp. 2d 71, 78 n.2 (D.D.C. 2004) (The U.N. Participation Act "clearly authorized – and, in light of U.N. Resolution 661, may command in some form – licensing requirements."). Such a delegation of

authority in the absence of any control over the third party is particularly offensive when that party is permitted to define the scope of criminal conduct.

Beyond its inability to oversee and/or control actions of the U.N., or perhaps because of it, OFAC also failed to provide any guidance as to what transactions should receive U.N. approval, much less give 'intelligible principles' or impose the meaningful restraints of the relevant statutes.  Indeed, the only guidance cited flowed in the opposite direction, from the U.N. to OFAC, and is alarming vague.  61 FED. REG. 65312, 65313 ("[s]pecific licenses may be issued ... in accordance with the provisions of the UNSC Resolution 986, *other relevant Security Council Resolutions*, the Memorandum of Understanding, and *other guidance issued by the 661 Committee.*") (emphasis added).  Bruff Decl., Ex. D (ISR § 575.523 Amendment) (Noting that the final rule amends the ISR "to provide a general license in new § 575.522, authorizing U.S. persons to enter into executory contracts with the Government of Iraq for the purchase of Iraqi-origin petroleum products ... permitted pursuant to UNSC Resolution 986").  Such questionable notice and its attendant due process concerns are compounded by the potential for ex post facto definition of crimes by subsequent security council resolutions and 661 guidance.  The vagueness of these provisions allows would-be licensees to guess at the peril of criminal retribution.  *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("It is a fundamental tenet of due process that no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.  A criminal statute is therefore invalid if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.") (Internal citations and quotations omitted);  *see also Toy Mfrs. of America, Inc. v. Consumer Product Safety Com.*, 630 F.2d 70, 77 (2d Cir. 1980) (where criminal penalties could attach to a violation of a

regulation, that regulation should conform to the due process proscription against unreasonably

vague criminal statutes).

As was feared in *Carter* and its progeny, the potential for corrupt enforcement and self-

interested parties is fully realized in the Iraq OFFP.  Beyond the U.N.'s stated purpose of

exerting pressure upon Iraq to comply with UNSC resolutions, numerous reports have revealed

that various persons in the U.N., such as Bevan Sevon, the executive director of the OFFP, were

criminally involved with the resulting scandal.  PAUL A. VOLCKER ET. AL, INDEPENDENT INQUIRY

COMMITTEE INTO THE UNITED NATIONS OIL-FOR-FOOD PROGRAMME 26-48 (Aug. 8, 2005),

www.iic-offp.org.  Although this alone demonstrates the fears expressed in private delegation

precedent, the fatal factor here is the involvement and control of the Government of Iraq itself.

Pursuant to the MOU, the U.N. could not permit a transaction with any party in the absence of

consent from the Government of Iraq, who retained authority over the designation of the

allotment recipients.  According to the Indictment, the Government of Iraq abused this authority

for self-interested purposes and was complicit in any criminal conduct.

In sum, the OFFP and its attendant licensure program under OFAC was a perfect storm of

all the perils of private delegation.  Numerous delegations, sub-delegations, and undefined sub-

sub-delegations resulted in the designation of authority to define criminal conduct by

independent third parties known and unknown.  Despite the U.S.'s invitation for parties to

participate in the program, attempts to comply with its requirements were treacherous, given that

to do so a party would have to satisfy the United States Government, who was attempting to

effectuate its foreign policy for an undeclared threat; the U.N., whose officials were criminally

involved and profiting from the alleged scheme; and the Government of Iraq itself, exercising its

control and self-interest over the program as well.  To permit criminal liability to attain in such a

morass, particularly given the extensive limitations upon the exercise of this authority that was initially envisioned by Congress, violates all constitutional principles of separation of powers and due process.

## III.    DISMISSAL OF COUNTS TWO AND THREE REQUIRES THAT COUNT ONE BE DISMISSED

The Court should dismiss Count One of the Indictment if it finds Counts Two and Three legally deficient because they are the only alleged objects of the conspiracy, and the dismissal of an underlying substantive crime as legally insufficient should result in dismissal of an accompanying conspiracy charge based on similar allegations.  *See McNally*, 483 U.S. at 361 (reversing conspiracy conviction based on  reversal of substantial mail fraud conviction).  "It should require no citation of authority to say that a person cannot conspire to commit a crime against the U.S. when the facts reveal there could be no violation of the statute under which the conspiracy is charged."  *United States v. Galardi*, 476 F.2d 1072, 1079 (9th Cir. 1973).  In *Galardi* the court found that defendants who had stolen and transported moneys orders fell within an exception to the criminal statute which precluded them from being in violation of the statute.  *Id.*  Thus, they could not "be guilty of conspiring to commit that offense."  *Id.*   If this Court similarly finds that Counts Two and Three of the motion are deficient and there has been no violation of the substantive laws, this Court should also dismiss the associated conspiracy charge.

## IV.    WYATT SHOULD BE GRANTED A SEVERANCE UNDER RULE 8 SINCE THE INDICTMENT ALLEGES MULTIPLE, UNCONNECTED CONSPIRACIES OR UNDER RULE 14 SINCE HE WILL BE PREJUDICED BY THE SCOPE AND COMPLEXITY OF A JOINT TRIAL

The allegations in Count One of the Indictment fail to adequately allege an agreement to commit a single conspiracy and rather alleges two separate conspiracies: (1) a conspiracy involving Oscar Wyatt, Jr.,  Catlina del Socorro Mieguel Fuentes, Mohammed Saidji, Nafta

Petroleum Company Limited, MedNafta Trading Company Limited  and Sarenco, S.A,.[26] and (2) a second conspiracy involving the David B. Chalmers, Jr.,  John Irving, Ludmil Dionissiev, Bayoil (USA), Inc. and Bayoil Supply and Trading Limited.[27]  Rule 8(b) F. R. Crim. P. requires the Court to sever Wyatt, because the charges against him are wholly separate from the charges against any other defendant.[28]   A Rule 14 severance should be granted to avoid a trial that will preclude the basic fairness to which Wyatt is entitled.

### A.     The Government's Indictment Alleges Multiple Conspiracies.

The Indictment, when read as a whole, demonstrates that the grand jury charged two distinct conspiracies.  The "Means and Methods" of the conspiracy in Paragraph 14 first alleges that Wyatt and several associates purchased oil directly from Iraq and that Chalmers and his corporation purchased Iraqi oil through a different method involving payment of commissions to holders of allocations.  Indictment ¶ 15.  The Indictment then alleges that both groups arranged to transport the oil.  *Id.* ¶ 16.  The only other factual allegation potentially relevant to a conspiratorial agreement joining the Nafta and Bayoil Conspiracy is the claim that Chalmers and Wyatt  "consulted with each other" to make consistent recommendations to oil overseers and to government officials of Iraq regarding market conditions and the OSP.  *Id.* ¶ 17.

The allegation that both groups arranged transport for the oil does not establish that the parties acted in a concerted manner.  Any purchaser of oil must make arrangements for

[26]  The group of individuals and companies that make up this alleged conspiracy will be collectively referred to as the Nafta Conspiracy. Nafta Petroleum Company Limited, MedNafta Trading Company Limited and Sarenco, S.A, will be collectively referred to as Nafta Companies.

[27]  The group of individuals and companies that make up this alleged conspiracy will be collectively referred to as the Bayoil Conspiracy.

[28]  Tongsun Park, who is named as a defendant in the indictment has already been severed from the case. Defendants Mohammed Saidji and Catalina del Socorro Miguel Fuentes a/k/a Cathy Miguel are presently in Switzerland and have not been extradited to the United States for trial. Nafta Petroleum Company Limited, MedNafta Trading Company Limited  and Sarenco, S.A, have not appeared in this case to date, leaving Wyatt as the only individual from the Nafta Conspiracy scheduled to participate in the upcoming trial.

transportation and there is no allegation that the two groups of defendants in any way coordinated their transportation arrangements.

Next, the Indictment alleges Wyatt and Chalmers, each acting on behalf of their companies, "offered advice about market conditions to the United Nations oil overseers in Manhattan and to officials of the Government of Iraq in Baghdad in an effort to influence the overseers' recommendation of an O.S.P." and "consulted with each other, … in an effort to ensure that they were making consistent recommendations to the oil overseers and to officials of the Government of Iraq." *Id*. ¶ 17. However, these allegations suggest that the parties were doing nothing more than exercising their right to advocate for the lowest possible sales price that was in both parties best interest.

The remainder of the Indictment provides additional support for the proposition that there are two distinct conspiracies. There are allegations that Chalmers asked Wyatt to hand-deliver a letter from Chalmers to an official of the Government of Iraq in which "CHALMERS sought favorable considerations from the Iraqis on future shipments of Iraqi oil based on *his and the Bayoil companies* long history of cooperation with the Government of Iraq." *Id.* ¶ 28(j) (emphasis added). There is no allegation that Wyatt was even aware of the contents of the letter.

In the face of this consistent pleading of facts supporting two separate conspiracies paragraph 24 simply alleges a conspiratorial agreement among defendants to violate Title 18 Sections 1343 and 2332d. Paragraphs 25 and 26 then set out these offenses by quoting the statutory language.

Most critically, these factual allegations give no description of the conspiratorial agreement between all Defendants – the necessary essence of the Government's case. *See United States v. Stavroulakis*, 952 F.2d 686,690 (2d Cir. 1992) ("A conspiracy involves an

agreement by at least two parties to achieve a particular illegal end.") (citing *United States v. Gleason*, 616 F.2d 2, 16-17 (2d Cir. 1979)). *See also Blumenthal v. United States*, 332 U.S. 539, 557 (1947).

The alleged Overt Acts also demonstrate the absence of an overarching conspiracy: Defendants Wyatt, Miguel, and Saidji, are alleged to have caused cash to be deposited in a bank account controlled by the government of Iraq. Indictment ¶ 27(k)-(l), (q),(t). Defendants Wyatt and Miguel are alleged to have negotiated a sale of Iraqi oil with an El Paso oil trader. *Id.* ¶ 27(o)-(p). The Indictment then shifts focus and alleges representatives of Bayoil faxed invoices to the United States requesting funds to pay illegal surcharges. *Id.* ¶ 27(i). The Indictment then alleges that Dionissiev and Chalmers on behalf of Bayoil, negotiated several contracts with representatives to purchase their oil allocation and paid the commissions on the deals. *Id.* ¶ 27(v)-(z). These different groups of defendants are not alleged to have jointly engaged in any of the above overt acts.

The Indictment also alleges that Wyatt and Chalmers exchanged pricing information about the OSP and newspaper articles discussing surcharges. *Id.* ¶ 27(b)-(c). However, such allegations, even if accepted as true, do not even hint at a conspiratorial agreement. Thus, there is a logical division between the Nafta Conspiracy, and the of Bayoil Conspiracy, even in the very heart of the overarching conspiracy allegation that the government has attempted to plead.

### B. The Indictment is Facially Deficient Under Rule 8 Because It Groups Unrelated Schemes.

The Court should order severance under Rule 8 because the Government has presented an Indictment that, on its face, does not establish that the defendants participated "in the same act or

transaction, or in the same series of acts or transactions, constituting an offense or offenses."

Fed. R. Crim. P. 8(b).[29]

Merely alleging that two groups engaged in the same type of criminal activity and in fact communicated with each other does not mean, without more, that they entered into a conspiratorial agreement.  For example, in *Gallo* the Government tried to allege there was a connection between two conspiracies because the members of each met, and had a "sit down" about how they both could extort money from the same victim.  1999 U.S. Dist. LEXIS 103, at *11.  The court found that this did not evidence a common plan or scheme,  but instead indicated "that each set of conspirators thought that its own scheme would be furthered by coming to an understanding with the other set of conspirators about how their separate extortion of the victim could continue."  *Id*. at *12.

Similar to *Gallo*, joinder is improper in this case because the Indictment at best presents two sets of conspirators allegedly acting to further their "own scheme."  *Id*.  Even if the allegations of the Indictment here are accepted as true, the only tie between the Bayoil Conspiracy and the Nafta Conspiracy is the claim that Chalmers and Wyatt lobbied the OFFP to reduce the sale price.   Just like the "sit down" in *Gallo*, this is insufficient to knit the two schemes into a single conspiracy; any alleged efforts to control the official selling price was not part of an overarching conspiracy, but separate efforts by each group to further "its own scheme . . . by coming to an understanding with the other set of conspirators." *Id.*

These separate schemes are not properly joined in the Indictment because they are not "so closely connected that proof of such facts is necessary to establish each offense . . . nor is there a

---

[29]  The Second Circuit has not determined whether an 8(b) severance motion should be decided solely on the basis of allegations in the Indictment or instead may be decided on the basis of pretrial representations made by the Government, and courts differ on this issue. *See United States v. Sattar,* 272 F. Supp. 2d 348 (S.D.N.Y.  2003) (citing *United States v. Gallo*, No. 98 Cr. 338 (JGK), 1999 U.S. Dist. LEXIS 103, at *12 (S.D.N.Y. Jan. 6, 1999)).

substantial identity of facts and participants involving similar acts in furtherance of a common plan." *United States v. Castro*, 829 F.2d 1038, 1045 (11th Cir. 1987), *modified*, 837 F.2d 441 (11th Cir. 1988). In *Castro*, as here, even though the prosecution charged an overarching conspiracy, the only "overt acts alleged in the conspiracy count relating to [one conspiracy are] unrelated, in any meaningful way, to the overt acts alleged in the [other] conspiracy." *Id.* at 1045. Moreover, the "facts underlying the various acts . . . are not 'so closely connected that proof of such facts is necessary to establish each offense' . . . nor is there a substantial identity of facts and participants involving similar acts in furtherance of a common plan." *Id*. at 1045. (quoting *United States v. Andrews*, 765 F.2d 1491, 1496 (11th Cir. 1985)).

The alleged concerted action by Wyatt and Chalmers to influence the sales price of Iraqi oil set by the OFFP, even if true, amounted to nothing more than the protected exercise of their right to lobby the U.N. and as such was legal and permissive under the *Noerr-Pennington* doctrine. "The Noerr-Pennington doctrine, which is grounded in the Petition Clause of the First Amendment, protects the right of private entities to petition government by shielding such lobbying activities from liability under the antitrust laws." *Doron Precision Sys. v. F.A.A.C. Inc*., No. 05 Civ. 7663, 2006 U.S. Dist. LEXIS 12795, at * 41 (S.D.N.Y. Mar. 23, 2006). *See*, *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385 (E.D. Va. 2002)(applying the doctrine to the WIPO a U.N. agency).

Lobbying the U.N. and other foreign officials is an action that plainly falls within the *Noerr-Pennington* doctrine.[30] Additionally, the "courts of this District have unanimously held that *Noerr-Pennington* immunity protects all lobbying and solicitation of public entities." *Doron,*

---

[30]  In Wyatt's Notice of Motion, Wyatt has incorporated and adopted those portions of co-defendant Chalmer's motion to dismiss Count Two based on the *Noerr Pennington* Doctrine that do not conflict with Wyatt's argument. *See* Notice of Motion; Memorandum of Law in Support of the Bayoil Defendants' Pre-Trial Motion, 12-15 David Chalmers (May 5, 2006).

2006 U.S. Dist. LEXIS 12795, at * 48.  Therefore, the alleged actions of Wyatt's and Chalmers even if true, are legal and thus cannot serve as the basis for a conspiratial agreement to violate the law.  *Stavroulakis*, 952 F.2d at 690.

The mere inclusion of conclusory statutory language in paragraphs 24-26 of the Indictment does not satisfy Rule 8.  An indictment must contain "some factual particularity in order to withstand constitutional scrutiny."  *United States v. Urso*, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005).  "The standard for joinder under Rule 8(b), … requires that the acts in which the defendants participated be 'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'"  *United States v. Locascio*, 357 F. Supp. 2d 536, 541 (E.D.N.Y. 2004) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).  "If this proof is lacking, there is no room for the exercise of judicial discretion and the court must grant severance."  *United States v. Jorgenson*, 451 F.2d 516, 522 (10th Cir. 1971); *see also United States v. Boylan*, 898 F.2d 230, 245 (1st Cir. 1990) ("[A] rational basis in fact, sufficient to warrant joinder, must be discernible from the face of the indictment.").  The Court should therefore reject the Government's attempt to join these two separate schemes and should grant a severance under Rule 8.

> 1.    ***The Court Should Exercise Its Discretion And Sever The Trial Under Rule 14 Because Of The Unfair Prejudice To The Defendants.***

Even if this Court concludes that joinder is proper under Rule 8, it should still order severance under Rule 14 because of the risk of prejudice to Wyatt, a risk that is enhanced because of the complexity of this trial.  "[A] defendant seeking severance must prove 'facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial.'"  *United States v. Ramos*, 346 F. Supp. 2d  567, 570 (S.D.N.Y. 2004) (citing

*United States v. An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988)(quoting *United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983); s*ee also Zafiro v. United States,* 506 U.S. 534,539 (1993).

      This Court should consider the following factors in determining if severance is warranted: "(1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others." *Ramos*, 346 F. Supp. 2d at 570 (citing *United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001)).

      This is that exceptional case where the complexity of the trial along with the prejudice resulting from "evidence admissible as to some defendants, but not others" is so great that it is unlikely that the jurors will be able to separate the government's complicated cases against each individual defendant. *Id.* The sheer amount of evidence to be introduced is likely to cause confusion. It appears that the scope and number of the as yet undisclosed and unindicted co-conspirators is potentially massive. The Indictment alleges that Chalmers, Wyatt, Irving, Dionissiev, Miguel, Saidji, Bayoil, Bayoil Supply and Trading Limited, Nafta Petroleum Company Limited, Mednafta Trading Company Limited, and Sarenco, S.A., and "others known and unknown", conspired to participate in the alleged schemes. Indictment ¶ 24.

      The Volcker Report, indicates "Oil surcharges were paid in connection with the contracts of 139 companies" and kickbacks or surcharges were paid in connection with the contracts of 2,253 companies that supplied the humanitarian goods and services paid for out of the United Nations Oil For Food Program. VOLCKER, *supra*, at 1. During the two years that Iraq implemented the very Surcharge Scheme charged in the Indictment, "every contracting customer was advised of the requirement." *Id*. at 3.

The complexity of this multi-defendant, multi-count case will likely cause the jury difficulty in comprehending the financial transactions and it will also threaten Wyatt's right to due process.  The Bayoil Conspiracy involves a substantial volume of transactions and deals in which Wyatt is not alleged to be involved.  By forcing Wyatt to be tried with only the Defendants in the Bayoil Conspiracy, the jury is likely to presume Wyatt is somehow connected to the parties.[31]  As stated in *Zafiro*, "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened."   506 U.S. at 539.  There is also a possibility that 404(b) evidence could be introduced during the trial and prejudice Wyatt.  Accordingly, even if the prejudice from, for example, the 404(b) evidence against Wyatt's codefendants would not usually convince the Court to sever Wyatt's trial from the others, the added risk of complexity and confusion that is uniquely present in this trial should warrant severance.

Here, evidence will be admitted against codefendants that would not be admissible if Wyatt were tried alone, and this will create an intolerable risk of prejudice.  *See United States v. Locascio*, 357 F. Supp. 2d 536 (E.D.N.Y. 2004) (severance granted to three co-defendants where most prejudicial evidence did not relate to defendants).  The complexity of the trial will so exacerbate the prejudice suffered by Wyatt that the Court should sever the two groups of Defendants to ensure a fair trial.

---

[31] *See supra* note 28.

V.   **WYATT'S PROSECUTION IS SELECTIVE, DISCRIMINATORY AND VINDICTIVE AND THE COURT SHOULD EITHER DISMISS THE INDICTMENT OR PERMIT DISCOVERY**

A.      **The Prosecution Of Defendant Wyatt Is Selective And Discriminatory.**

There is a clear indication that Wyatt was singled out for prosecution based on his outspoken opposition to government policy towards Iraq while other "similarly situated individuals" that had not exerted their constitutional rights were not prosecuted.  *United States v. Armstrong*, 517 U.S. 456, 465 (1996).  Mr. Wyatt has been an outspoken critic of the government's policies and actions towards Iraq and many other middle eastern countries for many years.  He had directed much of his criticism at the Iraqi embargoes and their adverse effect on Iraqi citizens and the U.S. economy.  The Government is now seizing its opportunity to silence Wyatt and vindictively punish him for his expression of these views.  In a classic case of selective and discriminatory prosecution the government has chosen to select only the most outspoken of its critics for prosecution for regulatory violations of the very embargo he strenuously has criticized.

The Government has focused its theory of prosecution on allegations of payments of surcharges designed to bypass the OFFP.  In stark contrast to the prosecution of Wyatt more than 2,000 companies have been identified as paying similar surcharges but have escaped prosecution.  According to the Volcker Report, "Oil surcharges were paid in connection with the contracts of 139 companies" and kickbacks or surcharges were paid in connection with the contracts of 2,253 companies that supplied the humanitarian goods and services paid for out of the OFFP.  VOLCKER, *supra*, at 1.[32]  During the two years that Iraq implemented the very Surcharge Scheme

---

[32] In a clear indication that the Indictment was coordinated with the release of the Volcker Report, Wyatt was arraigned one hour after the United Nations issued the report.  Shargel Affir., Ex. F (David Ivanovich, *Wyatt Pleads Innocent: Houston Oilman Claims no Kickback to Saddam Regime,* THE HOUSTON CHRONICLE, Oct. 28, 2005).

charged in the Wyatt indictment, "every contracting customer was advised of the requirement." *Id.* at 3. Accordingly, the payment of surcharges was not only widespread but endemic to the entire OFFP.

Furthermore, Mr. Wyatt was singled out for prosecution although companies and individuals largely known to be intimately involved with the corruption of the OFFP have not been charged. The United States Congress investigated payments under OFFP and named several individuals including Sergey Issakov and Alexander Voloshin who paid over $5,000,000 in surcharges to the Hussein regime. Shargel Affir., Ex. L (Sen. Permanent Subcomm. On Investigations, *Report on Oil Allocations Granted to the Russian Presidential Council*, (May 2005)). Additionally, the VOLCKER Report indicated that the companies Glencore, Vitol, and Taurus received and paid surcharges for over 40% of the oil products during Phase IX of OFFP when surcharges where at there highest. Volcker, *supra*, at 13. However, none of these individuals or companies have yet to be indicted by the Government.

Wyatt has been a long-standing and outspoken critic of (1) both the first and second Iraq wars, (2) the Bush administrations and (3) the embargoes directed at Iraq. Wyatt's highly publicized role as a critic of these policies first came to the public's attention during the U.S. response to the Iraq invasion of Kuwait in 1990 and the Desert Storm military operation. In a highly publicized incident Mr. Wyatt, along with former Texas Governor John Connolly, met with Saddam Hussein and arranged for the release of all "human shield" hostages. Shargel Affir., Ex. B (Jan Jarboe, *Dog Eat Dog,* TEXAS MONTHLY, April 1991, at 161). This successful act of personal intervention both ran contrary to U.S. Government policy and focused attention on Mr. Wyatt's long-standing involvement in the Iraq oil trade and his relationship with Iraq. "Mr. Wyatt began traveling to Iraq in the early 1970s, shortly after the nationalization of the

Iraqi oil industry, and established envied ties with officials in Baghdad." Shargel Affir., Ex. C

(Julia Preston & Simon Romero, *Oilman Indicted Over Kickbacks to Saddam Hussein's Regime*,

N.Y. TIMES, Oct. 22, 2005).

Before the trip to Baghdad Wyatt warned his associate Connally, "You know, if you

come, it is going to upset the U.S. government." Shargel Affir., Ex. D (Marie Brenner, *Oscar

Wyatt's Private War*, VANITY FAIR, Apr. 1991, at 217). The President, George Bush, "had been

sending the word fast and furious through intermediaries to Wyatt that [he] was outraged at the

remarks [Wyatt] had been making against the president in public speeches." *Id*. There was no

question that the Government would be annoyed with the mission. *Id*. The State Department

"discouraged the private evacuation as it had discouraged all previous private American trips to

Baghdad since the invasion of Kuwait." *Id*. However, after Wyatt pled with Saddam Hussein

that the "human shields" weren't doing him any good, were "hurting [him] in the eyes of the

world," and "costing [him] money," Wyatt and Connally "received word privately that Hussein

had decided to unconditionally release all 3,000-odd foreign hostages held in Kuwait since early

August." Shargel Affir., Ex. E (Edwin Chen, *Texans May Have Spurred Hussein to Act*, LOS

ANGELES TIMES, Dec. 9, 1990, at A1, A8).

In a second highly publicized incident Wyatt delivered a speech to the Corpus Christi

Chamber of Commerce in which he was extremely critical of the Gulf War and Bush

administration policies regarding Iraq. During Wyatt's speech, he quoted a Persian Gulf sheik

as saying, "You think I want to send my eighteen-year-old son to die for Kuwait? That would be

crazy when we have our white slaves from America to do that." Shargel Affir., Ex. B (TEXAS

MONTHLY, Apr. 1991, at 124). He went on to discuss in detail what he considered "a decade of

domestic mismanagement under presidents Reagan and Bush." *Id*. at 127. The speech was

controversial and resulted in criticism of Wyatt that caused him to take out an advertisement and draft a guest editorial to clarify his position.  Shargel Affir., Ex. F (Oscar Wyatt, Letter to the Editor, *Viewpoints*: *100% Behind Troops,* HOUSTON CHRONICLE, Jan.  28, 1991.)

Wyatt continued to exercise his right to free speech and vocalized his profound disagreement with the policies and the practices of government.  In an October 18, 2001 speech Wyatt continued his advocacy for a change in Iraq and middle east policy.  Shargel Affir., Ex. G (Oscar S. Wyatt Jr., Chairman of the Bd., Coastal Corp., Remarks at the Houston Marine Association (Oct. 18, 2001)).  Wyatt argued that the "United States' diplomatic actions related to Palestine, Iran, Libya, Iraq, Syria, and Pakistan" had caused the United States to set itself "against the people of the Islamic faith."  *Id*. at 2.  Wyatt noted that the only time the United States sided "with the Islamics" was when it was "convenient."  *Id*.  He explained how the United States suddenly became friendly "with Egyptians, Syrians, Saudi's, the Kuwaiti's, and others, while trying to mend a coalition together against Iraq."  He discussed how the United States "supported elements of the Taliban, Osama Bin Laden, and other political groups, in driving the Russians out of Afghanistan."  *Id*. at 3.  Wyatt then stated that the United States was in a position where it did not have any friends in the Middle East it hadn't bought and it was beginning to look quite "friendless."  *Id*.  He concluded by noting that the government's past diplomatic actions were "egregious" and that the Government must work hard in the future to correct the wrongs it committed over thirty years.  *Id*. at  4, 7.

Wyatt's speech at the Houston Marine Association was illustrative of speeches he made throughout the years whenever given the opportunity.  *See* Shargel Affir., Ex. H (Oscar S. Wyatt, Jr., Chairman of the Bd., Coastal Corp., The Effect of the Energy Industry Revolution on Property Valuation,  Remarks at Texas Association of Assessing Officers (Aug. 14, 1995))

(remarking that foreign companies competing against U.S. companies in the crude oil market did not "have to bear the costs of our unfortunate, politically-induced embargoes"); Shargel Affir., Ex. I (Oscar S. Wyatt, Jr., Chairman of the Bd., Coastal Corp., Enhancing the Security of Our Nation and Our Industry While Preserving Texas's Most Precious Resource, Remarks at Texas Railroad Commission Gas Forum (Feb. 21. 1996)) (noting that the time was coming "when the United States – prodded by a strong political minority – will not have the luxury of embargoing 10 million barrels of oil a day."); Shargel Affir., Ex. J (Oscar S. Wyatt, Jr., Chairman of the Bd., Coastal Corp., Geopolitical Factors Now Shaping The Global Energy Industry, Remarks at Jobbers Meeting (June 1, 1996)) (discussing his concern that in five years, the world won't have the luxury of embargoing several million barrels of oil a day from such countries as Iran, Iraq, and Libya).

Wyatt is publicly identified as a persistent voice attempting to influence U.S. policy towards Iraq in ways that are antithetical to current U.S. governmental policies. This is vividly illustrated by a request for legal assistance filed by the U.S. Government with Swiss authorities during their investigation of Iraq. In the MLAT request the U.S. stated that "Wyatt developed strong relationships with the Hussein regime. For example, Wyatt unsuccessfully lobbied the United States Government in 1990 to not join the international military response to the Hussein regime's invasion of Kuwait. " Shargel Affir., Ex. M (U.S. Department of Justice, Request for Assistance in the Investigations of Oscar Wyatt and Possible Conspirators (U.N. Oil-For-Food) (Sept. 14, 2005)). This admission by a prosecutor that Wyatt' advocacy against the Iraq war was a basis to believe he committed a crime demonstrated the discriminatory purpose of his prosecution. [33]

---

[33] The special vengeance reserved for Wyatt is reflected in the actions of the five special agents and two uniformed police officers that the U.S. felt were necessary to arrest the elderly Wyatt at his home at 6:13 AM for the

**B.**    **The Prosecution Of Defendant Wyatt Denies Him Due Process Since He Has Been Singled Out From Others Who Engaged In Similar Conduct Based Upon His Exercise Of First Amendment Rights.**

The doctrine of selective prosecution has been recognized by the Supreme Court for well over a century.  In *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), defendants raised a Fourteenth Amendment's Equal Protection challenge to their convictions for violating a San Francisco ordinance requiring operators of laundries in wooden buildings to obtain a permit.  Approximately two hundred Chinese owners of wooden laundries were denied permits, but eighty non-Chinese owners were granted permits to continue their businesses.  *Id*. at 374.  The Supreme Court reversed their convictions holding that discriminatory selection of targets, from a class of potential violators of a criminal statute, was unconstitutional when based on a prohibited classification.  *Id*. at 374.

Although prosecutors have broad discretion in determining whether to prosecute, *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982), "[s]electivity in the enforcement of criminal laws is . . . subject to constitutional constraints."  *United States v. Batchelder*, 442 U.S. 114, 125 (1979).  Therefore, a decision to prosecute "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification' is a denial of equal protection.  *Oyler v. Boles*, 368 U.S. 448, 456 (1962).[34]  In addition to claims based on prohibited classifications, the

---

crimes alleged in this Indictment.  Shargel Affir., Ex. N (Federal Bureau of Investigation Report, File # 205-NY-288902 Sub B13 (Oct. 21, 2005)).  Wyatt indicated that he needed to put on his "shorts" before coming to the door.  *Id*. at 1.  Wyatt made it to the door by 6:22a.m., however, a special agent had called the house three times during that time frame.  *Id*. at 1.  One of the agents alleged that Wyatt did not put his hands up quick enough, so he forcibly placed Wyatt against the wall and put cuffs on him.  *Id*. at 2.  Wyatt asked for the handcuffs to be placed in the front of his body because he had recently had rotator cuff surgery, however, the agents told him that would violate policy.  *Id*. at 2.  Mr. Wyatt went to the hospital after the incident and the doctor indicated that Wyatt's rotator cuff that had been recently repaired and healed, was totally disrupted and that there was "a fresh tear of the infraspinatus rotator cuff tendon."  Shargel Affir., Ex. K (William J. Bryan, M.D., Medical Report of Oscar Wyatt, Dec. 15, 2005).

[34]  The doctrine of selective prosecution is not limited to states but also applies to the Federal Government under the Fifth Amendment's Due Process Clause.  *Wayte v. United States,* 470 U.S. 598, 608 n.9 (1985).

Supreme Court has prohibited selective prosecution based on the exercise of the First Amendment right to free speech. *Wayte,* 470 U.S. 598. Accordingly, a prosecution of Wyatt that singles him out from others similarly situated based on his exercise of First Amendment rights offends the Fifth Amendment's guarantee of due process.

To establish a selective prosecution claim, a defendant must demonstrate that the challenged exercise of prosecutorial discretion has both a discriminatory effect and that it is motivated by a discriminatory purpose. *Armstrong*, 517 U.S. at 465. To establish a discriminatory effect a defendant must demonstrate that "similarly situated individuals of a different [classification] were not prosecuted." *Id.* The discriminatory purpose prong requires a showing that the prosecution is motivated "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte,* 470 U.S. at 610 (quoting *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979))(emphasis supplied). This discriminatory purpose can be shown by either direct or circumstantial evidence. *Batson v. Kentucky*, 476 U.S. 79, 93 (1986.) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

Since the Government will often be in sole possession of the facts relevant to discriminatory purpose the standard to obtain discovery of evidence of this factor is less rigorous. Rather than providing the "clear evidence" of discriminatory intent and purpose necessary to meet a defendant's ultimate burden, courts require only "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), *cert. denied*, 966 U.S. 971 (1989)).

In *Berrios*, 501 F.2d at1211, the court held that a defendant asserting such a claim has the burden of establishing a prima facie case: "(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he ha[d] been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution ha[d] been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." The Second Circuit, however, recognized that once a threshold showing of "some evidence tending to show the existence of the essential elements of the defense" is made discovery is appropriate where the defendant also shows "that the documents in the government's possession would indeed be probative of [the] elements." *Id.* at 1211-1212.

In *Berrios*, the defendant produced an affidavit in which counsel indicated a belief that there had only been three prosecutions under the statute charged and that hundreds of similarly situated union officers had criminal records. *Id*. at 1210. The court found that the lower court did not abuse its discretion by ordering the government to turn over a government memorandum. *Id*. at 1212. *See also, United States v. Alleyne*, 454 F. Supp. 1164 (S.D.N.Y. 1978).

In this motion Wyatt has met this test. He has demonstrated that a large class of similarly situated parties who paid surcharges to the Government of Iraq under the OFFP have not been prosecuted. The materials submitted, including the statements by the government in its Swiss request for mutual legal assistance, meets the "some evidence" test to demonstrate that his prosecution is based at least in part on his exercise of protected rights.

Courts have recognized that when only vocal critics of a government policy are prosecuted for violations of that policy the prosecutorial decision is inherently suspect. In *United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), the Ninth Circuit overturned the

conviction of an anti-government activist for refusing to fill out a census form.  Only four people

in Hawaii were chosen for prosecution and all had participated in the census resistance

movement.  The Defendant was able to establish that six others committed the same offense, but

only the four that had participated in the census resistance movement were prosecuted.  *Id*. at

1151, 1152.  The court stated that "[a]n enforcement procedure that focuses upon the vocal

offender is inherently suspect." *Id*. at 1152.  After noting that the Government offered no

explanation for its selection of the defendants, and that the Defendant presented evidence that

suggested a strong inference of discriminatory prosecution, the court found that Steel

demonstrated a "purposeful discrimination" and reversed the conviction.  *Id*.

Similarly in *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973) (en banc), the Seventh

Circuit reversed the conviction of a draft resistance leader for selective service violations.  The

defendant alleged he was singled out for selective and discriminatory treatment because he spoke

out against the draft and the war in Vietnam.  *Id*. at 619, 620.  The court stated that

discrimination against a party on the basis of protected First Amendment activities was forbidden

by the Constitution.  *Id*. at 620.  The Court vacated the conviction finding the circumstances of

the enforcement suspect.  *Id*. at 621-622.  In particular, the court noted that it seemed unusual

that a number of high-ranking Department of Justice officials reviewed and approved the

decision to bring charges.  *Id*. at 622.

In *United States v. Crowthers*, 456 F.2d 1074 (4th Cir. 1972), the Fourth Circuit

overturned convictions for creating a disturbance at the Pentagon during a prayer service

protesting the Vietnam War. The Court found an equal protection violation because the

Government had not prosecuted participants in sixteen other events that had the same disruptive

effect as the defendant's conduct.  *Id*. at 1078.  The Court stated, "In choosing whom to

prosecute, it is plain that the selection is made not by measuring the amount of obstruction or noise but because of governmental disagreement with ideas expressed by the accused." *Id*. at 1079. Here the Government has singled out Wyatt for prosecution as a persistent and vocal critic of U.S. policy and support for commerce with Iraq.

C.     **Wyatt's Prosecution Is Based On Vindictiveness And Thus Denies Him Due Process.**

A prosecution brought with vindictive motive penalizing those who choose to exercise constitutional rights is in violation of the Due Process Clause of the Constitution. The roots for the doctrine of prosecutorial vindictiveness were established in *North Carolina v. Pearce*, 395 U.S. 711 (1969) and *Blackledge v. Perry*, 417 U.S. 21 (1974) which establish that a defendant cannot be punished for his exercise of constitutionally protected rights.

To prove a vindictive prosecution claim in the Second Circuit, the defendant must show that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another such that the prosecutor could be considered a 'stalking horse' and (2) [the defendant] would not have been prosecuted except for the animus.*" Sanders*, 211 F.3d at 717 (quoting *United States v. Koh*, 199 F.3d 632 (2d Cir. 1999)). This standard has been applied in the context of free speech. *Id.*

A finding of actual vindictiveness requires "direct" evidence, such as evidence of a statement by the prosecutor, which is rarely available. *United States v. Johnson,* 171 F.3d 139, 140-41 (2d Cir. 1999) (quoting *United States v. Goodwin*, 457 U.S. 368, 380-381 (1982)). A presumption of vindictiveness arises when the circumstances of a case create a "realistic likelihood" of prosecutorial vindictiveness. *Id.* at 141 (quoting United States v. King, 126 F.3d 394, 397 (2d Cir. 1997)). The relevant question is whether there is a realistic likelihood the Government acted out of a vindictive motivation rather than a legitimate one. *Id.*

71

Although a presumption of prosecutorial vindictiveness does not normally apply in a pretrial setting a defendant may be able to obtain a pretrial presumption of prosecutorial vindictiveness if he can show a "realistic likelihood" of vindictive prosecution considering the "totality of the objective circumstances." *King*, 126 F.3d at 397-398 (discussing superseding indictment following a mistrial). The Second Circuit has found that "the presumption of prosecutorial vindictiveness generally does not arise in the pretrial setting," *United States v. Koh*, 199 F.3d 632, 639 (2d 1999) (emphasis added); *Sanders*, 211 F.3d at 717 (citing *Koh,* 199 F. 3d 632); s*ee also United States v. Goodwin*, 457 U.S. 368, 381 (1982) ("There is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting" (emphasis added)), however, some of the decisions that indicate that a general presumption does not exist in the pretrial context have not precluded the use of the presumption standard under all circumstances. *See Koh*, 199 F.3d at 639-40 (considering evidence presented by the defendant to find that the defendant was "not entitled to a presumption of [prosecutorial] vindictiveness in the circumstances present here"); *United States v. Hinton*, 703 F.2d 672, 678-79 (2d Cir. 1983) (stating that "a presumption of prosecutorial vindictiveness does not exist in a pretrial setting," but finding that "these circumstances occurring prior to trial, without more do not warrant" the presumption).

The Court should dismiss the Indictment because Wyatt has provided sufficient evidence to  establish vindictive prosecution under the actual or presumptive vindictiveness standard.

    **D.**    **Defendant Wyatt Has Produced Sufficient Evidence Of Selective Prosecution and Vindictive Prosecution To Obtain Discovery And Requires An Evidentiary Hearing.**

Even if the Court determines that Wyatt has not provided sufficient evidence of selective or vindictive prosecution to dismiss the charges, the Court should grant discovery in order for Wyatt to assert a  more complete claim.  In order to obtain discovery of selective prosecution

rather than clear evidence, courts require only "some" evidence of both discriminatory effect and discriminatory intent. *United States v. Alameh*, 341 F.3d 167 (2d Cir. 2003); s*ee United States v. Fares,* 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Sanders*, 211 F.3d 711 (2d Cir. 2000). The Second Circuit applies the same discovery standard for selective prosecution claims to vindictive prosecution claims. *Sanders*, 211 F.3d at 717 (citing *Berrios*, 501 F.2d at 1211). Wyatt has at a minimum met this test.

Several district courts in New York have found discovery permissible based on a claim of selective prosecution. In *United States v. Napper*, 553 F. Supp. 231, 234 (E.D.N.Y. 1982), the Court found that although the defendant did not provide sufficient evidence to satisfy either of the prongs of the *Berrios* test, a showing of a "colorable basis" justified discovery. *Id*. at 234. The Court noted that "certain information which might support a selective prosecution claim would exist, if at all, in the possession of the government." *Id;.see also United States v. Carron*, 541 F. Supp. 347, 350 (W.D.N.Y. 1982) (Proffered statements provided a "colorable basis" for a defense and defendants had "established their entitlement to some discovery to support their defense.").

In *United States v. Al Jibori,* 90 F.3d 22 (2d Cir. 1996), defendant alleged that he was prosecuted for presenting a false passport because he was a citizen of Iraq and Muslim. Based on the defendant's initial claims, he would not have produced sufficient evidence to reach the *Armstrong* threshold for discovery. *Id*. at 25. However, the court took notice of information that the defendant was prosecuted because he came from the Middle East much like a defendant in another case. *Id.* The Court found that "other than the superficial similarities between the two defendants' fake passports, the only established commonality between the two [was] their national (or regional) origin, a consideration which standing alone is an unconstitutional basis for

selecting prosecution." *Id*. at 26.  Therefore, the Court remanded the case with an order to accumulate additional information from the Government.  *Id*.

Wyatt  has satisfied both prongs of *Armstrong* and *Berrios*, although the case law suggests that a defendant can meet either one or none of the prongs and obtain discovery. Therefore, he should be able to obtain discovery under either his selective or vindictive prosecution claim.

## **CONCLUSION**

For these reasons Wyatt's pre-trial motions should be granted.

Respectfully submitted,


____/s/_____
GERALD L. SHARGEL
HENRY E. MAZUREK
Law Offices of Gerald Shargel
570 Lexington Avenue
New York, New York  10022
(212) 446-2323

____/s/_____
CARL A. PARKER
The Parker Law Firm
1 Plaza Square
Port Arthur, TX  77642
(409) 985-8814


____/s/_____
SAMUEL J. BUFFONE
STACY D. BELF
Ropes & Gray LLP
One Metro Center
700 12th Street, N.W.
Suite 900
Washington, DC  20005
(202) 508-4657

____/s/_____
J.A. CANALES
Canales & Simonson
P.O. Box 5624
Corpus Christi, TX  78465
(361) 883-0601


**Attorneys for Oscar S. Wyatt, Jr.**