UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

          - v. -                         :

DAVID B. CHALMERS, JR.,                   :    S4 05 Cr. 59 (DC)
OSCAR S. WYATT, JR.,
LUDMIL DIONISSIEV,                        :
BAYOIL (USA), INC., and
BAYOIL SUPPLY & TRADING LIMITED,          :

                    Defendants.           :

- - - - - - - - - - - - - - - - - - - -x


### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS


                              MICHAEL J. GARCIA
                              *United States Attorney for the*
                              *Southern District of New York*

                              *Attorney for the United States*
                              *of America*


Edward C. O'Callaghan
Stephen A. Miller
Michael E. Farbiarz
*Assistant United States Attorneys*
*Of Counsel*

# TABLE OF CONTENTS

I.   COUNT TWO STATES A VALID WIRE FRAUD CHARGE.. . . . . . . . 2

    A.   Wyatt is not being held responsible for
        the Government of Iraq's actions... . . . . . . . . . 4

    B.   The Indictment alleges that the Surcharge
        Scheme diverted money from the Bank Account.. . . . . 5

    C.   The OFFP is a legally cognizable victim of
        the charged wire fraud . . . . . . . . . . . . . . 7

    D.   The Iraqi people are a legally cognizable
        victim of the charged wire fraud . . . . . . . . . 13

II.  THE NOERR-PENNINGTON DOCTRINE IS INAPPLICABLE. . . . . . 24

III. THE DEFENDANTS' MISCELLANEOUS REQUESTS FOR
    CLARIFICATION OF THE INDICTMENT WILL BE ADDRESSED
    IN A SUPERSEDING INDICTMENT. . . . . . . . . . . . . . 33

IV.  COUNTS THREE AND FOUR PROPERLY NAME DEFENDANT
    BAYOIL SUPPLY & TRADING LIMITED AS A DEFENDANT.. . . . . 35

V.   DEFENDANTS ARE NOT ENTITLED TO SEPARATE TRIALS.. . . . . 40

    A.   Severance is not warranted under
        Fed. R. Crim. P. 8 . . . . . . . . . . . . . . 40

    B.   Severance is not warranted under
        Fed. R. Crim. P. 14 . . . . . . . . . . . . . . 49

VI.  THE BAYOIL DEFENDANTS ARE NOT ENTITLED TO EARLY
    DISCLOSURE OF THE GOVERNMENT'S EXHIBIT
    AND WITNESS LISTS. . . . . . . . . . . . . . . . . . 55

VII. COUNTS THREE AND FOUR DO NOT REST UPON AN
    UNCONSTITUTIONAL DELEGATION OF POWER.. . . . . . . . . 64

    A.   IEEPA and the Iraqi Sanctions Regulations ... . . . 65

    B.   There was no unconstitutional delegation of
        authority to the United Nations.. . . . . . . . . 71

C.    There was no need to declare a new emergency
      to issue the ISR . . . . . . . . . . . . . . . . .  78

D.    There is no basis to dismiss Count Three . . . . . .  82

VIII. WYATT'S ALLEGATION OF "SELECTIVE PROSECUTION"
      IS UNSUPPORTABLE. . . . . . . . . . . . . . . . . . .  83

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . .  95

# TABLE OF AUTHORITIES

## CASES

*Allied Tube & Conduit Co.* v. *Indian Head, Inc.*,
  486 U.S. 492 (1988). . . . . . . . . . . . . . . . . . . 25, 32

*Ass'n of Amer. Physicians & Surgeons* v. *Mathews*,
  395 F. Supp. 125 (N.D. Ill.) (3-judge panel),
  <u>aff'd</u>, 423 U.S. 975 (1975). . . . . . . . . . . . . . . 73

*Attorney General of Canada* v. *R.J. Reynolds
  Tobacco Holdings, Inc.*, 268 F.3d 103
  (2d Cir. 2001). . . . . . . . . . . . . . . . . . . 16-17, 19

*Australia/Eastern U.S.A. Shipping Conf.* v. *United States*,
  537 F. Supp. 807 (D.D.C. 1982). . . . . . . . . . . . . . 31

*Banco Nacional de Cuba* v. *Sabbatino*,
  376 U.S. 398 (1964). . . . . . . . . . . . . . . . . . 18-19

*Cardtoons, L.C.* v. *Major League Baseball Players Ass'n*,
  208 F.3d 885 (10th Cir. 2000). . . . . . . . . . . . . . 31

*Carter* v. *Carter Coal Co.*,
  298 U.S. 238 (1936). . . . . . . . . . . . . . . . . 76, 78

*Chiglades Farm, Ltd.* v. *Butz*,
  485 F.2d 1125 (5th Cir. 1973). . . . . . . . . . . . . . 74

*City of Columbia* v. *Omni Outdoor Adver.*,
  499 U.S. 365 (1991). . . . . . . . . . . . . . . . . . . 27

*Cleveland* v. *United States*,
  531 U.S. 12 (2000). . . . . . . . . . . . . . . . . . 10-12

*Coastal States Mktg., Inc.* v. *Hunt*,
  694 F.2d 1358 (5th Cir. 1983). . . . . . . . . . . . . 29-33

*Cobb* v. *Pozzi*,
  363 F.3d 89 (2d Cir. 2004). . . . . . . . . . . . . . . . 84

*Corum* v. *Beth Israel Med. Ctr.*,
  373 F. Supp. 550 (S.D.N.Y. 1974). . . . . . . . . . . 77-78

*Cospito* v. *Heckler*,
  742 F.2d 72 (3d Cir. 1984). . . . . . . . . . . . . . . . 73

*Currin* v. *Wallace*,
   306 U.S. 1 (1939).. . . . . . . . . . . . . . . . 76-78

*Dames & Moore* v. *Regan*,
   453 U.S. 654 (1981).. . . . . . . . . . . . . 65, 80-81

*Durland* v. *United States*,
   161 U.S. 306 (1896).. . . . . . . . . . . . . . . 9-10

*Eastern Railroad Presidents Conf.* v. *Noerr
Motor Freight, Inc.*, 365 U.S. 127 (1961). . . . . . . . . *passim*

*Energy Conservation, Inc.* v. *Heliodyne, Inc.*,
   698 F.2d 386 (9th Cir. 1983). . . . . . . . . . . 30-31

*Ford* v. *United States*,
   273 U.S. 593 (1927).. . . . . . . . . . . . . . . . 39

*Fountain*  v. *United States*,
   357 F.3d 250 (2d Cir. 2004).. . . . . . . . . . 2, 3, 12

*Goldberg* v. *Kelly*,
   397 U.S. 254 (1970).. . . . . . . . . . . . . . . . 22

*Goldfarb* v. *Virginia State Bar*,
   421 U.S. 773 (1975).. . . . . . . . . . . . . . 28, 32

*Havoco of America, Ltd.* v. *Hollobow*,
   702 F.2d 643 (7th Cir. 1983). . . . . . . . . . . . 29

*Joseph Muller Corp. Zurich* v. *Societe Anonyme
de Gerance et D'Armament*,
   451 F.2d 727 (2d Cir. 1971) . . . . . . . . . . . . 8

*Kapps* v. *Wing*,
   404 F.3d 105 (2d Cir. 2005).. . . . . . . . . . . 22-23

*Knox* v. *Palestine Liberation Org.*,
   306 F. Supp. 2d 424 (S.D.N.Y. 2004).. . . . . . . . 15

*Landmarks Holding Corp.* v. *Bermant*,
   664 F.2d 891 (2d Cir. 1981).. . . . . . . . . . . . 30

*Mather Constr. Co.* v. *United States*,
   475 F.2d 1152 (Ct. Cl. 1973). . . . . . . . . . . . 8-9

*Miracle Mile Associates* v. *City of Rochester*,
617 F.2d 18 (2d Cir. 1980). . . . . . . . . . . . . . . . 30

*National Org. for Women* v. *Scheidler*,
968 F.2d 612 (7th Cir. 1992),
rev'd on other grounds, 510 U.S. 249 (1994).. . . . . . . . 25

*New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*,
439 U.S. 96 (1978). . . . . . . . . . . . . . . . . . . . 76

*Noblecraft Indus., Inc.* v. *Sec. of Labor*,
614 F.2d 199 (9th Cir. 1980). . . . . . . . . . . . . . . 74

*Occidental Petroleum Corp.* v. *Buttes Gas & Oil Co.*,
331 F. Supp. 92 (C.D. Cal. 1971). . . . . . . . . . . . . 31

*Pasquantino* v. *United States*,
544 U.S. 344 (2005).. . . . . . . . . . . . . . . . . . *passim*

*Perot* v. *Federal Election Comm'n*,
97 F.3d 553 (D.C. Cir. 1996). . . . . . . . . . . . . 73-74

*Primetime 24 Joint Venture* v. *National
Broadcasting Co., Inc.*, 219 F.3d 92 (2d Cir. 2000). . . . . . 26

*R.H. Johnson & Co.* v. *Sec. & Exch. Comm'n*,
198 F.3d 690 (2d Cir. 1952).. . . . . . . . . . . . . 74-75

*Richardson* v. *Marsh*,
481 U.S. 200 (1987).. . . . . . . . . . . . . . . . . . 42

*Shannon* v. *United States*,
512 U.S. 573 (1994).. . . . . . . . . . . . . . . . . . 51

*St. Louis, Iron Mountain, & Southern Ry. Co.* v. *Taylor*,
210 U.S. 281 (1908).. . . . . . . . . . . . . . . . . . 77

*Sunshine Anthracite Coal Co.* v. *Adkins*,
310 U.S. 381 (1940).. . . . . . . . . . . . . . . . 72-73

*Thomas Cusack Co.* v. *City of Chicago*,
242 U.S. 526 (1917). . . . . . . . . . . . . . . . . 76-77

*Todd & Co., Inc.* v. *Sec. & Exch. Comm'n*,
557 F.2d 1008 (3d Cir. 1977). . . . . . . . . . . . . . 75

*Town of Castle Rock* v. *Gonzales*,
— U.S. —, 125 S. Ct. 2796 (2005). . . . . . . . . . . 21-22

*United Mine Workers of Am. v. Pennington*,
　381 U.S. 657 (1965).. . . . . . . . . . . . . . . . *passim*

*United States* v. *Al Jibori*,
　90 F.3d 22 (2d Cir. 1996).. . . . . . . . . . . .  90-93

*United States* v. *Alameh*,
　341 F.3d 167 (2d Cir. 2003).. . . . . . . . . . 83, 86, 94

*United States* v. *Anvari-Hamedani*,
　378 F. Supp. 2d 821 (N.D. Ohio 2005). . . . . . . . . . . 64

*United States* v. *Arch Trading Co.*,
　987 F.2d 1087 (4th Cir. 1993).. . . . . . . . . . . . 64

*United States* v. *Armstrong*,
　517 U.S. 456 (1996).. . . . . . . . . . . . . . . . *passim*

*United States* v. *Attanasio*,
　870 F.2d 809 (2d Cir. 1989).. . . . . . . . . . . . . 43

*United States* v. *Bejasa*,
　904 F.2d 137 (2d Cir. 1990).. . . . . . . . . . . . . 61

*United States* v. *Belmont*,
　301 U.S. 324 (1937).. . . . . . . . . . . . . . . 17, 18

*United States* v. *Bernstein*,
　533 F.2d 775 (2d Cir. 1976).. . . . . . . . . . . . . 41

*United States* v. *Berrios*,
　501 F.2d 1207 (2d Cir. 1974). . . . . . . . . . . . 93-94

*United States* v. *Cannone*,
　528 F.2d 296 (2d Cir. 1975).. . . . . . . . . . . . . 61

*United States* v. *Carpentier*,
　689 F.2d 21 (2d Cir. 1982). . . . . . . . . . . . . . 49

*United States* v. *Carrington*,
　No. 02 Cr. 897 (LTS), 2002 WL 31496199
　(S.D.N.Y. Nov. 7, 2002).. . . . . . . . . . . . . . . 57

*United States* v. *Casamento*,
　887 F.2d 1141 (2d Cir. 1989). . . . . . . . . . . . 50-52

*United States* v. *Chalmers*,
410 F. Supp. 2d 278 (S.D.N.Y. 2006).. . . . . . . 59-60, 63-64

*United States* v. *Crowers*,
456 F.2d 1074 (4th Cir. 1972).. . . . . . . . . . . . . 88

*United States* v. *Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936).. . . . . . . . . . . . . . . 14, 81

*United States* v. *Dhafir*,
No. 05-4770-CR, 2006 WL 2440982
(2nd Cir. Aug. 24, 2006). . . . . . . . . . . . . . 64, 79

*United States* v. *Diaz*,
176 F.3d 52 (2d Cir. 1999). . . . . . . . . . . . . . 55

*United States* v. *Downing*,
297 F.3d 52 (2d Cir. 2002). . . . . . . . . . . . . 52-53

*United States* v. *Esfahani*,
No. 05 Cr. 255, 2006 WL 163025
(N.D. Ill. Jan. 17, 2006).. . . . . . . . . . . . . . 64

*United States* v. *Evans*,
667 F. Supp. 974 (S.D.N.Y. 1987). . . . . . . . . . . 37-38

*United States* v. *Fares*,
978 F.2d 52 (2d Cir. 1992). . . . . . . . . . . . . . *passim*

*United States* v. *Feyrer*,
333 F.3d 110 (2d Cir. 2003).. . . . . . . . . . . . . *passim*

*United States* v. *Frame*,
885 F.2d 1119 (3d Cir. 1989). . . . . . . . . . . . . 77

*United States* v. *Fruchter*,
104 F. Supp. 2d 289 (S.D.N.Y. 2000).. . . . . . . . . . 61

*United States* v. *Girard*,
601 F.2d 69 (2d Cir. 1979). . . . . . . . . . . . . . 50

*United States* v. *Goldberg*,
906 F. Supp. 58 (D. Mass. 1995).. . . . . . . . . . 26, 29

*United States* v. *Goodwin*,
457 U.S. 368 (1982).. . . . . . . . . . . . . . . . 88

*United States* v. *Grote*,
  632 F.2d 387 (5th Cir. 1980). . . . . . . . . . . . . . . 92

*United States* v. *Hastings*,
  126 F.3d 310 (4th Cir. 1997). . . . . . . . . . . . . . . 90

*United States* v. *Helmsley*,
  941 F.2d 71 (2d Cir. 1991). . . . . . . . . . . . . . 10, 14

*United States* v. *Hommosany*,
  No. 99-1534, 2000 WL 254050
  (2d Cir. Mar. 3, 2000). . . . . . . . . . . . . . . . . . 85

*United States* v. *Javino*,
  960 F.2d 1137 (2d Cir. 1992). . . . . . . . . . . . . . . 37

*United States* v. *Johnson*,
  21 F. Supp. 2d 329 (S.D.N.Y. 1998). . . . . . . . . . . . 53

*United States* v. *Mallah*,
  503 F.2d 971 (2d Cir. 1974).. . . . . . . . . . . . . . . 47

*United States* v. *Mann*,
  517 F.2d 259 (5th Cir. 1975). . . . . . . . . . . . . . .  6

*United States* v. *McKeeve*,
  131 F.3d 1 (1st Cir. 1997). . . . . . . . . . . . . . 38, 39

*United States* v. *Mezzanatto*,
  513 U.S. 196 (1995).. . . . . . . . . . . . . . . . . . . 90

*United States* v. *Moon*,
  718 F.2d 1210 (2d Cir. 1983). . . . . . . . . . . . . . . 84

*United States* v. *Nachamie*,
  91 F. Supp. 2d 565 (S.D.N.Y. 2000). . . . . . . . . . *passim*

*United States* v. *Nerlinger*,
  862 F.2d 967 (2d Cir. 1988).. . . . . . . . . . . . . . . 46

*United States* v. *Nersesian*,
  824 F.2d 1294 (2d Cir. 1987). . . . . . . . . . . . . . . 53

*United States* v. *Ong*,
  541 F.2d 331 (2d Cir. 1976).. . . . . . . . . . . . . . . 47

*United States* v. *Padilla*,
  No. 94 Cr. 313 (CSH),
  1994 WL 681812 (S.D.N.Y. Dec. 5, 1994). . . . . . . . . . . 51

*United States* v. *Panza*,
  750 F.2d 1141 (2d Cir. 1984). . . . . . . . . . . . . . . . 50

*United States* v. *Percevault*,
  490 F.2d 126 (2d Cir. 1974).. . . . . . . . . . . . . . . . 62

*United States* v. *Persico*,
  621 F. Supp. 842 (S.D.N.Y. 1985). . . . . . . . . . . . . . 62

*United States* v. *Pierce*,
  224 F.3d 158 (2d Cir. 2000).. . . . . . . . . . . . . 13, 20

*United States* v. *Pitt*,
  193 F.3d 751 (3d Cir. 1999).. . . . . . . . . . . . . . . .  4

*United States* v. *Porcelli*,
  865 F.2d 1352 (2d Cir. 1989). . . . . . . . . . . . . . . . 14

*United States* v. *Quinn*,
  401 F. Supp. 2d 80 (D.D.C. 2005). . . . . . . . . . . . . . 34

*United States* v. *Ramos*,
  346 F. Supp. 2d. 567 (S.D.N.Y. 2004). . . . . . . . . . . . 51

*United States* v. *Reddy*,
  190 F. Supp. 2d 558 (S.D.N.Y. 2002).. . . . . . . . . . . . 60

*United States* v. *Rock Royal Co-op, Inc.*,
  307 U.S. 533 (1939).. . . . . . . . . . . . . . . . . . . . 77

*United States* v. *Rosa*,
  11 F.3d 315 (2d Cir. 1993). . . . . . . . . . . . . 49-50, 54

*United States* v. *Salameh*,
  152 F.3d 88 (2d Cir. 1998). . . . . . . . . . . . . 42, 43, 55

*United States* v. *Salerno*,
  481 U.S. 739 (1987).. . . . . . . . . . . . . . . . . . . . 80

*United States* v. *Savin*,
  No. 00 Cr. 45 (RWS), 2001 WL 243533
  (S.D.N.Y. Mar. 7, 2001).. . . . . . . . . . . . . . . . 56-57

*United States* v. *Schaffer*,
  266 F.2d 435 (2d Cir. 1959),
  aff'd, 362 U.S. 511 (1960) . . . . . . . . . . . . . . . . 41

*United States* v. *Stein*,
  428 F. Supp. 2d 138 (S.D.N.Y. 2006) . . . . . . . . . *passim*

*United States* v. *Taormina*,
  97 Cr. 1120 (MBM), 1998 WL 702341
  (S.D.N.Y. Oct. 8, 1998) . . . . . . . . . . . . . . . 62-63

*United States* v. *Thompson*,
  76 F.3d 442 (2d Cir. 1996) . . . . . . . . . . . . . . . . 48

*United States* v. *Todd*,
  446 F.3d 1062 (10th Cir. 2006) . . . . . . . . . . . . . . 6

*United States* v. *Tramunti*,
  513 F.2d 1087 (2d Cir. 1975) . . . . . . . . . . . . . . . 47

*United States* v. *Trapilo*,
  130 F.3d 547 (2d Cir. 1997) . . . . . . . . . . . 9, 10, 14

*United States* v. *Trippe*,
  171 F. Supp. 2d 230 (S.D.N.Y. 2001) . . . . . . . . . . . 54

*United States* v. *Turkish*,
  458 F. Supp. 874 (S.D.N.Y. 1978) . . . . . . . . . . 57, 64

*United States* v. *Uccio*,
  917 F.2d 80 (2d Cir. 1990) . . . . . . . . . . . . . 46, 47

*United States* v. *Valerio*,
  737 F. Supp. 844 (S.D.N.Y. 1990) . . . . . . . . . . . . . 57

*United States* v. *Vanwort*,
  887 F.2d 375 (2d Cir. 1989) . . . . . . . . . . . . . . . 46

*United States* v. *Westmoreland*,
  122 F.3d 431 (7th Cir. 1997) . . . . . . . . . . . . . . . 90

*United States* v. *White*,
  972 F.2d 16 (2d Cir. 1992) . . . . . . . . . . . . . . . . 90

*United States* v. *Yakou*,
  428 F.3d 241 (D.C. Cir. 2005) . . . . . . . . . . . . . . 38

*Vaughan* v. *Northup*,
   15 Pet. (40 U.S.) 1 (1841). . . . . . . . . . . . . . . . .   9

*Wayte* v. *United States*,
   470 U.S. 598 (1985).. . . . . . . . . . . . . . . . . . . *passim*

*Welch* v. *United States*,
   750 F.2d 1101 (1st Cir. 1985).. . . . . . . . . . . . .   26

*Whelan* v. *Abell*,
   48 F.3d 1247 (D.C. Cir. 1995).. . . . . . . . . . . . .   26

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
   343 U.S. 579 (1952). . . . . . . . . . . . . . . . . . .   80

*Zafiro* v. *United States*,
   506 U.S. 534 (1993).. . . . . . . . . . . . . . . . . . 49-51

## STATUTES, RULES, AND OTHER AUTHORITIES

3 U.S.C. § 301 . . . . . . . . . . . . . . . . . . . . 66, 69

7 U.S.C. §§ 2102-18 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 2611-27 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 2701-18 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 3401-17 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 4301-19 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 4601-12 . . . . . . . . . . . . . . . . . .   77

7 U.S.C. §§ 4901-16 . . . . . . . . . . . . . . . . . .   77

18 U.S.C. § 951 . . . . . . . . . . . . . . . . . . . .   89

18 U.S.C. § 2332d.. . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3500. . . . . . . . . . . . . . . . . . 58-59, 61

28 U.S.C. § 1746. . . . . . . . . . . . . . . . . . . .   95

31 C.F.R. §§ 575.201 – 575.211. . . . . . . . . . . . .   67

31 C.F.R. § 575.207.. . . . . . . . . . . . . . . . . .   34

31 C.F.R. §§ 575.211 . . . . . . . . . . . . . . . . . . . *passim*

31 C.F.R. § 575.522 . . . . . . . . . . . . . . . . . . . *passim*

31 C.F.R. § 575.523 . . . . . . . . . . . . . . . . . . . *passim*

31 C.F.R. § 575.533 . . . . . . . . . . . . . . . . . . . 66

42 U.S.C. § 291c . . . . . . . . . . . . . . . . . . . . . 76

50 U.S.C. §§ 1601–1651 . . . . . . . . . . . . . . . . . . 69

50 U.S.C. § 1621 . . . . . . . . . . . . . . . . . . . 65, 66

50 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . *passim*

50 U.S.C. § 1702 . . . . . . . . . . . . . . . . . . . . . 65

50 U.S.C. § 1705 . . . . . . . . . . . . . . . . . . . . . 35

69 C.F.R. § 46092 . . . . . . . . . . . . . . . . . . . . . 66

Black's Law Dictionary (6^th^ ed. 1990) . . . . . . . . . . 28

Convention on Privileges and Immunities of the
    United Nations, 21 U.S.T. 1418, T.I.A.S. No. 6900 . . . 7, 32

Executive Order No. 12722 . . . . . . . . . . . . . . . . . *passim*

Executive Order No. 12724 . . . . . . . . . . . . . . . 36, 66

Executive Order No. 13350 . . . . . . . . . . . . . . . . . 66

Fed. R. Civ. P. 17 . . . . . . . . . . . . . . . . . . . 7–10

Fed. R. Crim. P. 8 . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Crim. P. 14(a) . . . . . . . . . . . . . . . . . . *passim*

Iraq Sanctions Act of 1990, P.L. 101–513,
    104 Stat. 2047 . . . . . . . . . . . . . . . . . . . 66, 77

Restatement (Third) of Foreign
    Relations Law (1987) . . . . . . . . . . . . . . . . . *passim*

United Nations Charter . . . . . . . . . . . . . . . . . . 7

United Nations Security Council Resolution 986,
    S/Res/986 (April 14, 1995).. . . . . . . . . . . . . . *passim*

U.S. Const, amend. I. . . . . . . . . . . . . . . . . 26, 31-32

6A Wright and Miller, Federal Practice and
    Procedure 2d (2005).. . . . . . . . . . . . . . . . . . 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                 :

   - v. -                          :

DAVID B. CHALMERS, JR.,                   :     S4 05 Cr. 59 (DC)
OSCAR S. WYATT, JR.,
LUDMIL DIONISSIEV,                        :
BAYOIL (USA), INC., and
BAYOIL SUPPLY & TRADING LIMITED,          :

     Defendants.              :

- - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS

   The Government respectfully submits this response to the pretrial motions of David B. Chalmers, Jr., Ludmil Dionissiev, Bayoil (USA), Inc., and Bayoil Supply & Trading Limited (collectively, the "Bayoil Defendants"), as well as the pretrial motions of Oscar S. Wyatt, Jr. (collectively, the "Defendants"). For the reasons stated herein, the Government respectfully urges the Court to:

- deny the Defendants' motions to dismiss the wire fraud charge in Count Two for want of a cognizable victim;

- deny the Bayoil Defendants' motion to dismiss the wire fraud charge in Count Two under the Noerr-Pennington doctrine;

-1-

- delay ruling on the Defendants' requests for clarifications of the Indictment until the grand jury can return a superseding indictment in the coming weeks;

- deny Bayoil Supply & Trading Limited's motion to dismiss Counts Three and Four as inapplicable to a foreign-chartered corporation;

- deny the Defendants' requests for separate trials;

- deny the Bayoil Defendants' motion to compel the Government to produce early exhibit and witness lists;

- deny Wyatt's motion to dismiss Counts Three and Four under the nondelegation doctrine; and

- deny Wyatt's motion to dismiss the entire Indictment or grant discovery on his claim of selective prosecution.

## I.   COUNT TWO STATES A VALID WIRE FRAUD CHARGE.

The Defendants unpersuasively contend that Count Two of the Indictment, which alleges a violation of the wire fraud statute, Title 18, United States Code, Section 1343, must be dismissed.  The Court of Appeals has held that the "essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme."  <u>Fountain</u>

-2-

v. United States, 357 F.3d 250, 255 (2d Cir. 2004) (brackets in the original, internal quotation marks and citation omitted).

The Indictment plainly contains sufficient allegations as to each of these three essential elements. First, the Indictment alleges that the Defendants participated in a "scheme to defraud" — namely, the Surcharge Scheme described in great detail, see Indictment ¶¶ 7, 18-23, which Scheme victimized the Oil-for-Food Program ("OFFP") and the Iraqi people by, among other things, diverting funds from the OFFP Bank Account (the "Bank Account").[1] Second, the Indictment alleges that "object of the scheme" was "money or property" — as set forth in the Indictment, the Defendants made millions of dollars in secret payments, see id. ¶¶ 20, 22, precisely so that they could continue to participate in the lucrative business of obtaining Iraqi oil under the OFFP. See id. ¶¶ 6 and 18. Finally, the Indictment alleges that wire transmissions were used to further the Surcharge Scheme. See, e.g., id. ¶ 27(b), (c), (g), (h), (r), and (w).

Despite the facial sufficiency of the wire fraud charge, the Defendants collectively adduce four reasons that

_____

[1] As used herein, the "Oil-for-Food Program" or "OFFP" means those United Nations entities (including, for example, the United Nations Office of the Iraq Programme, Oil-for-Food) that were directly involved in the processes by which Iraqi oil was allocated and sold; the proceeds of these sales were used to obtain humanitarian goods or food; and these items were distributed.

Count Two must be dismissed.  However, as set forth below, none of these is persuasive.

### A. Wyatt is not being held responsible for the Government of Iraq's actions.

First, Wyatt argues that "to ask the defendants to answer for a policy decision that was allegedly made by the Government of Iraq, namely the decision to circumvent international sanctions and obtain funds outside of OFFP control, is . . . contrary to international law[.]"  Wyatt Mem. at 19. This argument might conceivably have some traction if a principle of international law were cited in support of it — or if it were made by a Government of Iraq official who claimed in <u>his</u> defense that he was simply executing the Hussein regime's directives by participating in the Surcharge Scheme.  <u>See</u> <u>generally</u> <u>United States v. Pitt</u>, 193 F.3d 751, 756 (3d Cir. 1999) (describing "public authority" as a common law defense under which "illegal actions committed by a public official or an officer of the law in the course of his duties were not crimes").  But Wyatt is not and has never been an official of Iraq; he is an American businessman.  And Wyatt is not being called to "answer" for the actions of others; he is being called to "answer" for his own actions, including his active participation in a massive scheme to defraud.

**B.    The Indictment alleges that the Surcharge Scheme diverted money from the Bank Account.**

Next, the Bayoil Defendants argue that "the very structure of the [Oil-for-Food] Program," Bayoil Mem. at 3-5, compels the conclusion that the Surcharge Scheme did not result in the diversion of money from the Bank Account, because the payment of surcharges did not have any impact on the volume of legitimate payments into the Account. See id. Accordingly, the Bayoil Defendants argue, no one was victimized — indeed, no one could have been victimized — by the Surcharge Scheme. See id.

The Indictment alleges in plain terms that the Surcharge Scheme resulted in the diversion of funds from the Bank Account. See Indictment ¶ 20 ("By participating in th[e] Surcharge Scheme and bypassing the Oil-for-Food Program, [Wyatt and others] caused funds to be diverted from the Oil-for-Food Bank Account[.]"); id. ¶ 23 ("By participating in th[e] Surcharge Scheme and bypassing the Oil-for-Food Program, [the Bayoil Defendants and others] caused funds to be diverted from the Oil-for-Food Bank Account[.]"). The Bayoil Defendants may, of course, argue to the jury that these allegations are false — that because of the "very structure of the Program," Bayoil Mem. at 3-5, the Surcharge Scheme could not have caused a diversion of funds from the Bank Account, as the Grand Jury determined it did. But for the purposes of their motion to dismiss the Indictment, the Bayoil Defendants must take the Indictment's allegations as

true.   See, e.g., United States v. Todd, 446 F.3d 1062, 1067
(10th Cir. 2006) ("An indictment should be tested solely on the
basis of the allegations made on its face, and such allegations
are to be taken as true.") (citations and quotations omitted);
see also United States v. Mann, 517 F.2d 259, 266-67 (5th Cir.
1975) (collecting Supreme Court cases).   They do not do so.
Rather, the Bayoil Defendants argue that the Indictment's
allegations are not true because they cannot be true — and
arguments that presume the falsity of the charging instrument's
allegations have no place in a motion to dismiss an indictment.
See id.

     This said, on the merits, the Bayoil Defendants'
argument with regard to the "structure of the Program," see
Bayoil Mem. at 3-5, is simply baseless.   For example, the
Indictment alleges that, as part of the Surcharge Scheme, the
Defendants lobbied United Nations personnel to lower the official
selling price of Iraqi oil.   See Indictment ¶¶ 19-20.   Even
holding constant for the quantity of oil sold, a lower selling
price would of course reduce the amount of money flowing into the
Bank Account.[2]   And as set forth below, this reduction in the
amount of money flowing into the Bank Account victimized the Oil-

---

     [2]   In terms of the simplified graphic prepared by the Bayoil
Defendants, see Bayoil Mem. at 5, if the horizontal bar that
represents the official selling price of Iraqi oil were lowered,
the gray box that represents "Oil-For-Food Program Revenues"
would get smaller.

for-Food Program and the people of Iraq.  Accordingly, contrary
to the Bayoil Defendants' argument, the Indictment does not
allege an impossibility: the Surcharge Scheme, which included
efforts to lower the official selling price of Iraqi oil, see
Indictment ¶¶ 19-20, was entirely capable of causing the
diversion of funds from the Bank Account and the consequent
victimization of OFFP and the people of Iraq.

## C.   The OFFP is a legally cognizable victim of the charged wire fraud.

Third, the Defendants press various arguments as to why
the OFFP cannot constitute a victim of the charged wire fraud
scheme — because it lacked (a) capacity and (b) property rights
in the funds that were held in the Bank Account.  However, these
contentions are not persuasive.

Citing Federal Rule of Civil Procedure 17, Wyatt argues
that the OFFP "lacks sufficient capacity to hold a property
interest in the surcharge payments," such that the OFFP cannot be
a victim of the Surcharge Scheme.  See Wyatt Mem. at 20-22.

The factual premise of Wyatt's argument is flawed.  The
OFFP comprised various actors within the United Nations
Secretariat, and the Secretariat is a constituent part of the
United Nations.  See United Nations Charter, Article 7.1.  In
turn, the United Nations certainly does not "lack capacity."  See
Convention on Privileges and Immunities of the United Nations
("Convention"), Feb. 13, 1946, 21 U.S.T. 1418, T.I.A.S. No. 6900,

Art. I, Sec. 1 ("The United Nations shall have the capacity: (a) to contract; (b) to acquire and dispose of immovable and movable property; (c) to institute legal proceedings."); <u>see</u> <u>also</u> Restatement (Third) of Foreign Relations Law § 223 (1987) ("an international organization has (a) status as a legal person, with capacity to own, acquire, and transfer property, to make contracts, to enter into international agreements with states and other international organizations, and to pursue legal remedies; and (b) rights and duties created by international law or agreement").

Moreover, even assuming <u>arguendo</u> that the OFFP lacks capacity to sue or be sued, it certainly does not follow that it is incapable of maintaining property rights.  Within the meaning of Rule 17 of the Federal Rules of Civil Procedure, "[c]apacity has been defined as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest[.]"  6A Wright & Miller, Federal Practice and Procedure 2d § 1559 (2005) (collecting cases); <u>see also</u> <u>Joseph Muller Corp. Zurich v. Societe Anonyme de</u> <u>Gerance et D'Armament</u>, 451 F.2d 727, 728 (2d Cir. 1971) (<u>per</u> <u>curiam</u>) ("Rule 17(b) deals only with the general capacity of a corporation to sue or be sued") (citing, <u>inter</u> <u>alia</u>, Wright & Miller).  For example, a corporation suspended by a state for failure to pay certain taxes may temporarily lose its capacity to initiate a law suit.  <u>See</u> <u>Mather Constr. Co. v. United States</u>,

-8-

475 F.2d 1152, 1155 (Ct. Cl. 1973).  But no would contend that, while suspended and unable to sue, the corporation is necessarily incapable of holding any property.  Similarly, at common law, an administrator of a deceased's estate, vested with administrative authority in one state, lacked capacity to sue in a second state. See, e.g., Vaughan v. Northup, 15 Pet. (40 U.S.) 1 (1841) (Story, J.).  But there is no suggestion in the caselaw that, while in the second state, the administrator necessarily loses his ability to hold property on behalf of the deceased's estate.  In short, whether an entity does or does not possess Rule 17 capacity to sue has no bearing on whether it can possess property.

         At its most fundamental level, Wyatt's argument runs aground on the plain language of the wire fraud statute.  As the Court of Appeals has emphasized, the wire fraud statute proscribes "any scheme or artifice to defraud."  United States v. Trapilo, 130 F.3d 547, 551 (2d Cir. 1997) (emphasis in original); id. at 552 (same).  "[A]s the [wire fraud] statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property.  Nothing more is required.  The identity . . . of the victim . . . [is] irrelevant."  Id. at 551.  The reason why is fundamental: the gravamen of a scheme to defraud is the defendant's participation in the scheme itself — not who the scheme victimizes.  See Durland v. United States, 161 U.S. 306, 313 (1896) (for purposes

-9-

of the mail fraud statute, the "significant fact is the intent and purpose"); United States v. Helmsley, 941 F.2d 71, 94 (2d Cir. 1991) ("Section 1341 punishes the scheme, not its success."); cf. Pasquantino v. United States, 544 U.S. 344, 371 (2005) (United States wire fraud scheme to deprive Canada of tax revenue "was complete the moment the[] [defendants] executed the scheme inside the United States").

Wyatt's argument that the OFFP cannot be a victim of the Surcharge Scheme for want of Rule 17 capacity is nothing more than an attempt — in the face of the expansive language of the statute, and Trapilo's directive that "[t]he identity . . . of the victim . . . [is] irrelevant," Trapilo, 130 F.3d at 551 — to argue that those who lack capacity cannot constitute wire fraud victims. There is no basis for reading this limitation into the wire fraud statute.

The Defendants also contend that the entities that together comprise the OFFP lacked property rights in the funds that were held in the Bank Account. See Wyatt Mem. at 22-27; Bayoil Mem. at 5-8. This argument rests on the Supreme Court's decision in Cleveland v. United States, 531 U.S. 12 (2000), and it is entirely unpersuasive.

Cleveland concerned a scheme to procure gambling licenses from the state of Louisiana by means of material omissions in the license applications. See id. at 15. The Cleveland Court held that this scheme could not be prosecuted

-10-

under the wire fraud statute because the state's interest in issuing the gambling licenses was not property within the meaning of that statute.  See id. at 26.  As the Supreme Court has recently explained: "We held [in Cleveland] that a State's interest in an unissued video poker license was not 'property,' because the interest in choosing particular licensees was 'purely regulatory' and '[could not] be economic.'"  Pasquantino, 544 U.S. at 357 (quoting Cleveland).

The Defendants seek to analogize the OFFP with the licensing role played by the State of Louisiana in Cleveland.  But this analogy fails.  Pursuant to United Nations Security Council Resolution 986, S/Res/986 (April 14, 1995) ("Resolution 986") (Bruff Decl., Ex. F), the funds deposited into the Bank Account were to be used for a variety of purposes.  Some of these funds were, of course, to be used to finance the export of food and humanitarian goods to the Government of Iraq.  See Resolution 986, ¶ (8)(a).  But large amounts of the money deposited into the Bank Account were to be directly remitted to the OFFP itself.  Thus, for example, some of the money paid into the Bank Account was earmarked for paying the costs of the inspectors and accountants whose services were required by the OFFP.  See Resolution 986, ¶ (8)(d).  Similarly, at least $100 million was to be transferred every 90 days from the Bank Account to a United Nations entity providing food and humanitarian goods within the northern regions of Iraq.  See Resolution 986, ¶ 8(b).

-11-

Accordingly, Resolution 986 did not "merely result[] in payments to the . . . Bank Account," Wyatt Mem. at 25, which payments never came into the hands of the OFFP. Rather, various large payments were to be made from the Bank Account to the OFFP. See id. at (8)(b), (d). In a similar vein, while it may be that "the United Nations' monitoring and administration of payments through the OFFP was an exercise of its regulatory powers," Wyatt Mem. at 24, money was to be paid directly from the Bank Account to the OFFP to fund the exercise of these powers, see Resolution 986, ¶ (8)(d), and to advance other substantive policy goals, such as helping beleaguered Iraqi civilians.

In short, the OFFP was a direct financial beneficiary of the money deposited into the Bank Account. Accordingly, the OFFP did not have a "purely regulatory" interest, Pasquantino, 544 U.S. at 357 (emphasis added), interest in the funds diverted from the Bank Account by the Surcharge Scheme, and the Supreme Court's decision in Cleveland is therefore readily distinguishable. A regulatory entity's issuance of a license, see Cleveland, 531 U.S. at 21, involves no "monetary loss" to the entity, Fountain, 357 F.3d at 256 (construing Cleveland) — and because that is the case, there can be no interference with the entity's property rights, and no basis for a wire fraud charge. See id. at 256; see also Pasquantino, 544 U.S. at 357.

But that is a far cry from this case. Here, the Defendants' fraud very much caused the OFFP a "monetary loss."

-12-

Because of the Defendants' Surcharge Scheme, money was fraudulently diverted from the Bank Account, <u>see</u> Indictment ¶¶ 20, 23, that would otherwise have gone directly to the OFFP. <u>See</u>, <u>e.g.</u>, Resolution 986 (8)(b), (d). This sort of diversion of money is a paradigmatic "interfere[nce]," <u>United States v. Pierce</u>, 224 F.3d 158, 165 (2d Cir. 2000), with property rights of the kind proscribed by the wire fraud statute.

### D. The Iraqi people are a legally cognizable victim of the charged wire fraud.

Next, the Defendants press a number of arguments as to why the people of Iraq cannot constitute a victim of the charged wire fraud. None of these arguments is persuasive.

First, Wyatt contends that the Iraqi people cannot constitute a victim of the charged wire fraud because "the legal personality of the Iraqi citizenship under international law is subsumed in, and cannot be separated from, the Government of Iraq." Wyatt Mem. at 10 (citing, <u>inter</u> <u>alia</u>, the Restatement (Third) of Foreign Relations Law of the United States). This focus on international law simply misses the point.

"[P]ersons under international law" are those "whose acts and relationships are the principal concerns of international law," Restatement (Third) of Foreign Relations, Part II, Introductory Note at 1, and the principal concern of international law is "the relations between states." Restatement (Third) of Foreign Relations § 1. Accordingly, "persons under

-13-

international law" are states (such as the United States) and those international organizations that states create (such as the United Nations).  See id. at Chapter I and Chapter II.

But there is simply no reason to believe that only an entity that is an international law "person" can be a victim for the purposes of a wire fraud scheme.  The individual states that comprise the United States, for example, are not "states" within the meaning of international law — see Restatement (Third) of Foreign Relations cmt. g; cf. United States v. Curtiss-Wright Export Co., 299 U.S. 304, 317 (1936) — and hence are not "persons" under international law.  See Restatement (Third) of Foreign Relations, Part II, Introductory Note at 1; id. at § 1.  But it is beyond dispute that individual states of the United States can constitute wire fraud victims.  See, e.g., United States v. Porcelli, 865 F.2d 1352, 1358 (2d Cir. 1989) (scheme to defraud New York State of tax revenue); United States v. Helmsley, 941 F.2d 71, 94 (2d Cir. 1991) (same); see generally supra at 9 (noting that, under United States v. Trapilo, 130 F.3d 547 (2d Cir. 1997), any person or entity can constitute the victim of a wire fraud scheme).

Second, Wyatt argues that the Court should not permit the Government to go forward with the wire fraud count because doing so involves "recognizing" the people of Iraq, which "invites this Court to enter into determinations of U.S. foreign relations and policy," which determinations are committed to the

-14-

Executive Branch.  Wyatt Mem. at 18.  This argument, which relies in large measure on Knox v. Palestine Liberation Organization, 306 F. Supp. 2d 424 (S.D.N.Y. 2004), is meritless.

As an initial matter, Knox is far afield.  In that case, the Court was called upon by the defendant Palestine Liberation Organization ("PLO") to hold that the PLO is the representative of a foreign sovereign (i.e., "Palestine"), such that the PLO could obtain dismissal of a tort action brought against it by invoking Palestine's sovereign immunity.  The Knox Court declined to so hold, reasoning that to accept the PLO's position would necessarily fly in the face of the Executive Branch's persistent determination not to recognize Palestine as a foreign sovereign.  See id. at 439-48.  Here, the Government is not asking the Court to take any action — let alone the politically charged action of explicitly "recognizing" an unrecognized foreign sovereign.  Rather, the Government is simply providing notice in advance of trial that the victimization of the people of Iraq was an object of the Surcharge Scheme.[3]

By the same token, there is no merit to Wyatt's suggestion that the Government's wire fraud theory will improperly drag the Court "into determinations of U.S. foreign

---

[3]    To be sure, if it were the case that only sovereigns could constitute the victims of a wire fraud, the Government's wire fraud theory might be said to require a determination as to whether the people of Iraq were able to exercise the sovereign power of Iraq during the period of the Surcharge Scheme.  But even Wyatt does not press this extraordinary argument.

relations and policy" that are the province of the Executive Branch.  See Wyatt Mem. at 18.  That much is made clear by recent Court of Appeals and Supreme Court cases construing the common law "revenue rule," pursuant to which "courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns."  Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103, 109 (2d Cir. 2001).  The revenue rule is based on the very concerns that Wyatt invokes here: "respect for [another's] sovereignty, concern for judicial role and competence, and separation of powers."  Id.  In light of these concerns, the revenue rule bars many civil actions.  But as the Court of Appeals has explained, in a case in which Canada sued a private entity to recover uncollected taxes, the "revenue rule" does not bar criminal or civil actions initiated by the United States:

> In Trapilo and Pierce (and in Boots) [Court of Appeals cases], the executive branch of the United States brought the case [and the revenue rule was held not to bar the civil action in question], while here, Canada is the plaintiff.  When the United States prosecutes a criminal action, the United States Attorney acts in the interest of the United States, and his or her conduct is subject to the oversight of the executive branch.  Thus, the foreign relations interests of the United States may be accommodated throughout the litigation.  In contrast, a civil RICO case brought to recover tax revenues by a foreign sovereign to further its own interests, may be, but is not necessarily, consistent with the policies and interests of the United States.

Attorney General of Canada, 268 F.3d at 109.

-16-

This rationale has recently been embraced by the Supreme Court in a wire fraud prosecution involving uncollected Canadian taxes. See Pasquantino, 544 U.S. at 368-69 (explaining that the referenced wire fraud "prosecution creates little risk of causing international friction through judicial evaluation of the policies of foreign sovereigns" because "[t]his action was brought by the Executive to enforce a statute passed by Congress" and "we may assume that by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing international friction") (internal quotation marks, citations omitted). As Attorney General of Canada and Pasquantino make clear, to the extent that the Government's wire fraud theory might arguably involve matters that relate to the conduct of United States foreign policy, see Wyatt Mem. at 18, any such concern is fully allayed here by the fact that the Executive Branch is prosecuting this case.

There is nothing to the contrary in the two Supreme Court cases cited by Wyatt, each of which involves civil litigation following systematic government expropriations of private property. Wyatt cites United States v. Belmont, 301 U.S. 324, 332 (1937), for the sweeping proposition that "[w]hat another country has done in the way of taking over property of its nationals . . . is not a matter for judicial consideration here. Such nationals must look to their own government for any

-17-

redress to which they may be entitled." Id. at 332. But this passage seems relevant here only because it has been utterly taken out of context. The quoted passage was part of the Supreme Court's response to the argument that the Fifth Amendment has extra-territorial effect, such that it bars takings without just compensation by governments other than the United States. See id. The extra-territorial application of the Fifth Amendment has nothing to do with this case.

Similarly, Wyatt misapplies Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964), for the extraordinarily broad proposition that "[t]he courts of one independent government will not sit in judgment upon the validity of the acts of another done within its own territory." Wyatt Mem. at 13. But Wyatt fails to note that the quoted passage is no more than the Banco Nacional Court's verbatim recitation of a quotation from a state court decision construing state law, see Banco Nacional, 376 U.S. at 424-25 — and that the Supreme Court in Banco Nacional specifically disclaimed reliance upon state law. See id. at 425.[4]

---

[4] This is not the only instance of Wyatt's material misquotation of sources of authority. For example, according to Wyatt:

The International Court of Justice determines whether a group is a legal entity distinct from a larger aggregation whether composed of states, tribes, or of individuals under the following test: "in the case of non-individual entities the claimant may have to be in such a position that it possesses, in regard to its

-18-

Most fundamentally, <u>Banco Nacional</u>, a case in which the United States was not a party, turned in large measure on the principle that the Executive Branch should be accorded substantial deference in matters related to foreign affairs. <u>Id.</u> at 427-28. Here, that principle cuts strongly in favor of permitting the prosecution — which is of course brought <u>by</u> the Executive Branch — to go forward on its theory that the Surcharge Scheme defrauded the people of Iraq. <u>See</u> <u>Pasquantino</u>, 544 U.S. at 368-69; <u>Attorney General of Canada</u>, 268 F.3d at 109.

Finally, the Defendants contend that the people of Iraq cannot be victims of the Surcharge Scheme because they had no interest in the funds fraudulently diverted from the Bank Account. In pressing this argument, Wyatt emphasizes a factual

---

members, rights which it is entitled to ask them to respect."

Wyatt Mem. at 11 (quoting <u>Reparation for Injuries Suffered in the Service of the United Nations</u>, 1949 WL 3 (I.C.J.), 1949 I.C.J. 174). But the <u>Reparation</u> case does not purport to deal with the broad question of when states or tribes — among other "'non-individual entities'" — are to be considered part of a "larger aggregation." It deals with the much narrower question of the claims that the United Nations can bring against U.N. member states when the U.N.'s personnel are injured in the course of their duties. The International Court of Justice observed only that "[i]n order to answer this question, the Court must first enquire whether the [United Nations] Charter has given the [U.N.] such a position that it possesses, in regard to its Members, rights which it is entitled to ask them to respect." This is a far cry from Wyatt's general "test" for "non-individual entities." Indeed, the International Court of Justice's use of the term "Members" (to mean United Nations Members) is rendered generically by Wyatt, as "members"; and the <u>Reparations</u> opinion simply does not contain any of the language about "'non-individual claimants'" that Wyatt attributes to it in his brief.

-19-

point — namely, that, under Resolution 986 and the Memorandum of
Understanding Between the Secretariat of the United Nations and
the Government of Iraq on the Implementation of Security Council
Resolution 986 ("MOU") (Bruff Decl., Ex. H), the Government of
Iraq stood between the people of Iraq and the OFFP.  See Wyatt
Mem. at 11 (the people of Iraq were the "ultimate beneficiaries
of purchases of humanitarian goods and services by their
government," but had no "independent and distinct interest" in
the funds used to purchase those goods, which were purchased for
them by the Government of Iraq).  Accordingly, Wyatt contends,
although the people of Iraq were the "ultimate beneficiaries of
purchases of humanitarian goods and services by their
government," they had no "independent and distinct" property
interest in the funds used to purchase those goods, which were
bought by the Government of Iraq.  Id.  The Bayoil Defendants
emphasize a complementary legal point — that based on cases
determining what is property for Due Process Clause purposes, the
people of Iraq had no property interest in the money in the Bank
Account.  See Bayoil Mem. at 8-9; see generally Pierce, 224 F.3d
at 165 ("A scheme to deceive, however dishonest the methods
employed, is not a scheme to defraud in the absence of a property
right for the scheme to interfere with.").

        Neither of the Defendants' points is persuasive.  As a
factual matter, under the Resolution, more than $100 million was
to flow every 90 days from the Bank Account to the OFFP and then

on to the people of Iraq in the form of needed humanitarian goods.[5]  See Resolution 986, ¶ 8(b).  These goods were to be stored, transported, and delivered to the people of Iraq by the OFFP, based on the OFFP's assessments of individuals' "humanitarian needs," including "food needs."  MOU at Annex I, ¶¶ 2, 6.  With regard to the distribution of these multi-million dollar volumes of food and humanitarian goods, the Government of Iraq was bypassed.  There was no overarching role for the Government of Iraq, and the people of Iraq were to receive these volumes of food and humanitarian goods directly from the OFFP.  Accordingly, with regard to the food and humanitarian goods subject to paragraph 8(b) of Resolution 986, the interest of the people of Iraq in these items was entirely "independent and distinct," Wyatt Mem. at 11, from whatever interest the Government of Iraq may have had.

     The people of Iraq also had a powerful interest in those funds that were diverted from the Bank Account, but that were supposed to have been used by the Government of Iraq to buy food and humanitarian goods.  This is made clear by the very Due Process Clause jurisprudence invoked by the Bayoil Defendants.  The due process cases cited by the Bayoil Defendants are notable for having very little to do with this one.  See, e.g., Town of

_____

     [5]  Some of these goods were to be bought by the OFFP from the Government of Iraq when doing so was "cost-effective."  MOU at Annex I, ¶ 3.  Others were to be obtained through the United Nations procurement process.  See id.

<u>Castle Rock v. Gonzales</u>, --- U.S. ----, 125 S. Ct. 2796 (2005) (assessing whether an individual who has obtained a restraining order has a constitutionally protected property interest in having the police enforce the order) (cited in Bayoil Mem. at 8-9).  But there are whole lines of cases that present factual situations analogous to this one.  For example, the Supreme Court has held that people with a statutory entitlement to government benefits have a property interest in those benefits.  <u>See</u>, <u>e.g.</u>, <u>Goldberg v. Kelly</u>, 397 U.S. 254, 261 (1970) (New York State-provided welfare benefits are property because they "are a matter of statutory entitlement for persons qualified to receive them").  As the Court of Appeals has explained:

> Social welfare benefits have long been afforded constitutional protection as a species of property protected by the federal Due Process Clause. While not all benefits programs create constitutional property interests, procedural due process protections ordinarily attach where state or federal law confers an entitlement to benefits.  A mere unilateral expectation of receiving a benefit is not, however, enough; a property interest arises only where one has a legitimate claim of entitlement to the benefit.

> In determining whether a given benefits regime creates a property interest protected by the Due Process Clause, we look to the statutes and regulations governing the distribution of benefits.  Where those statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome, a property interest will be found to exist.

<u>Kapps v. Wing</u>, 404 F.3d 105, 113 (2d Cir. 2005) (internal quotation marks, citations, and brackets omitted).

The food and humanitarian goods provided to the people of Iraq in connection with the OFFP were certainly "[s]ocial welfare benefits," id., and the "statutes and regulations governing the distribution of [the] benefits," id., are the governing Security Council Resolutions and the MOU. There can be little genuine dispute that those sources "meaningfully channel official discretion by mandating a defined administrative outcome." Id. The Resolution stipulates in the plainest possible language that funds in the Bank Account "*shall* be used to meet the humanitarian needs of the Iraqi population." Resolution 986, ¶ 8 (emphasis added). The Resolution requires the Government of Iraq to "guarantee[]" the distribution of these goods pursuant to a "distribution plan" Resolution 986, ¶ 8(a)(ii) — which plan is highly specific, see MOU, Section II, ¶¶ 5-11, and itself requires the Government of Iraq "to effectively *guarantee* equitable distribution to the Iraqi population throughout the country of [humanitarian supplies] purchased with the proceeds of the sale of Iraqi petroleum and petroleum products." MOU, Section II, ¶ 5 (emphasis added). In short, the Resolution and the MOU "meaningfully channel[ed] official discretion by mandating a defined administrative outcome," Kapps, 404 F.3d at 113, by providing for "guarantee[d]," "equitable distribution" of humanitarian supplies to the "Iraqi population throughout the country." MOU, Section II, ¶ 5. Accordingly, the

-23-

people of Iraq had a property interest in those funds that were diverted from the Bank Account, from which funds the Government of Iraq was supposed to buy them food and humanitarian goods.

## II.  THE NOERR-PENNINGTON DOCTRINE IS INAPPLICABLE.

The Bayoil Defendants also fail to show that the Noerr-Pennington doctrine bars any reference in the Indictment or proof at trial as to the Defendants' efforts to influence the price at which the United Nations sold Iraqi oil under the OFFP.  See Bayoil Mem. at 12-17.

The Noerr-Penington doctrine is an antitrust rule that the United States Supreme Court first articulated in two Sherman Act civil actions:  Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and United Mine Workers of America v. Pennington, 381 U.S. 657 (1965).  In those decisions, the Court held that concerted lobbying efforts cannot generally form the basis for federal antitrust liability.  See Noerr Motor Freight, Inc., 365 U.S. at 136 ("the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly"); Pennington, 381 U.S. at 670 ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."). As the Supreme Court has more recently put it:  "Concerted

-24-

efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the doctrine established by Noerr." Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499 (1988). Thus, for example, in Noerr Motor Freight the Supreme Court held that trucking companies (and their trade association) could not recover from railroad companies (and their trade association), in an antitrust suit predicated on the fact that the defendant-railroads had sought to damage the commercial position of their competitors, the plaintiff-trucking companies, by lobbying for the passage and enforcement of certain laws. See Noerr Motor Freight, Inc., 365 U.S. at 136-37.

The Noerr-Penington doctrine is not relevant in the context of this case. First, and most basically, the Noerr-Pennington doctrine "protects businesses' and other associations' efforts to obtain a governmental imposition of a trade restraint." National Org. for Women v. Scheidler, 968 F.2d 612, 620 (7th Cir. 1992), rev'd on other grounds, 510 U.S. 249 (1994). There is simply no suggestion whatsoever in the Indictment that the Bayoil Defendants lobbied the United Nations with regard to the OSP in an effort to harm their competitors, or otherwise to restrain trade. Indeed, in lobbying the United Nations, the Bayoil Defendants worked with — not against — one of their "competitors." See Bayoil Mem. at 25; cf. Noerr Motor Freight, Inc., 365 U.S. at 136-37.

-25-

Second, the Bayoil Defendants are not being sued civilly for violating the Sherman Act. They have been charged criminally with, inter alia, wire fraud, and numerous cases have held that the Noerr-Penington doctrine "does not . . . immunize activities said to violate the criminal laws of the United States." United States v. Goldberg, 906 F. Supp. 58, 64 (D. Mass. 1995). As the Court explained in Goldberg,

> [T]he First Circuit has twice refused to extend the Noerr-Pennington doctrine to situations where criminal, not antitrust, laws have been violated. Welch v. United States, 750 F.2d 1101 (1st Cir. 1985) (failure to pay income taxes is not "protected speech" under Noerr-Pennington); United States v. Marcano-Garcia, 622 F.2d 12 (1st Cir. 1980) (refusing to extend Noerr-Pennington to kidnapping). The District of Columbia Circuit has also refused to extend the doctrine to the arena of the criminal law. Whelan v. Abell, 48 F.3d 1247 (D.C. Cir. 1995) (right to petition government does not include right to file false claims). Furthermore, as the Supreme Court has stated, "one could imagine situations where the most effective means of influencing government officials is bribery, and we have never suggested that that kind of attempt to influence the government merits protection." Allied Tube & Conduit Co. v. Indian Head, Inc., 486 U.S. 492, 504 (1988).

Goldberg, 906 F. Supp. at 64.

Third, the Noerr-Pennington doctrine does not purport to shield lobbying of the United Nations. The doctrine is grounded on the First Amendment's "Right to Petition" Clause, see, e.g., Primetime 24 Joint Venture v. National Broad. Co., Inc., 219 F.3d 92, 99-100 (2d Cir. 2000), which reads: "Congress shall make no law . . . abridging the . . . right of the people . . . to petition the Government for a redress of grievances." U.S.

CONST., amend. I.  And it is beyond dispute that when the United States Constitution speaks of "the Government," it is not referring to the United Nations.

Moreover, the Supreme Court has explained that the Noerr-Pennington doctrine is the "corollary" to the Parker doctrine, which, as set forth below, delineates the scope of governmental immunity under the Sherman Act:

> Parker recognized the States' freedom to engage in anticompetitive regulation, [but] it did not purport to immunize from antitrust liability the private parties who urge them to engage in anticompetitive regulation.  However, it is obviously peculiar in a democracy, . . . to establish a category of lawful state action that citizens are not permitted to urge. Thus, beginning with Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., we have developed a corollary to Parker:  The federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government.

City of Columbia v. Omni Outdoor Adver., 499 U.S. 365, 379-80 (1991)(citation omitted); see also Noerr Motor Freight, Inc., 365 U.S. at 137 & n.17.  In short, it was the existence of Parker immunity that all-but compelled the creation of Noerr-Penington immunity: because federal and state Governments could engage in anti-competitive activity under Parker, the Supreme Court reasoned, citizens should be allowed to ask those Governments to engage in such activity.  In these circumstances, it would make little sense if "Government" means one set of entities for Parker purposes and another set of entities for Noerr-Penington

-27-

purposes.   And in the <u>Parker</u> context, the Supreme Court has explained that "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign." <u>Goldfarb v. Virginia State Bar</u>, 421 U.S. 773, 790 (1975).   It follows, then, that the <u>Noerr</u>-<u>Penington</u> doctrine protects concerted lobbying of the Government with regard to activities undertaken by the Government in its capacity as "sovereign." <u>Id.</u>   The United Nations is not a sovereign.   <u>See</u>, <u>e.g.</u>, Black's Law Dictionary 1396 (6th ed. 1990) (defining sovereignty as "[t]he supreme, absolute, and uncontrollable power by which any independent state is governed").   Accordingly, the United Nations is not shielded by <u>Parker</u> immunity — and, thus, those who would lobby the United Nations and therefore not covered by <u>Noerr-Pennington</u> immunity.

In sum, the <u>Noerr</u>-<u>Pennington</u> doctrine is a creature of the civil antitrust context.   It has no relevance to a criminal case, such as this one, that has nothing to do with restraint of trade.   Moreover, the <u>Noerr</u>-<u>Pennington</u> doctrine does not shield individuals or entities that lobby the United Nations, and *that* is what is alleged here.

The Bayoil Defendants press two principal arguments in their attempt to contort the <u>Noerr</u>-<u>Pennington</u> doctrine to fit the facts of this case.   Neither is persuasive.

-28-

First, the Bayoil Defendants note that the Noerr-Penington doctrine does not apply only in the Sherman Act context — and therefore, they argue, the Noerr-Pennington doctrine applies here. See Bayoil Mem. at 13-14. This argument fails. The Noerr-Pennington doctrine shields defendants sued on the ground that their petitioning of the government has anti-competitive consequences — regardless of whether the cause of action under which they are sued arises under the Sherman Act (as was the case in Noerr and Pennington) or, for example, under a state common law cause of action, such as tortious interference with business relationships. See Havoco of America, Ltd. v. Hollobow, 702 F.2d 643, 649-50 (7th Cir. 1983) (collecting cases). But the focus of the Noerr-Pennington doctrine remains on restraint of trade, whether pleaded as a violation of a federal statute or as a common law tort. Accordingly, the fact that the Noerr-Pennington doctrine applies in certain non-Sherman Act contexts hardly suggests that it should be applied here — in a criminal case that simply has nothing to do with restraint of trade. See Goldberg, 906 F. Supp. at 64.

Next, the Bayoil Defendants note that at least some cases — all of which cite the Fifth Circuit's decision in Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1366 (5th Cir. 1983) — hold that the Noerr-Pennington doctrine applies to lobbying efforts directed at foreign governments. See Bayoil Mem. at 14-15. Accordingly, the Bayoil Defendants contend, the

-29-

<u>Noerr</u>-<u>Pennington</u> doctrine shields their efforts to lobby the United Nations.  <u>See</u> <u>id.</u>

This argument is deeply flawed.  The Fifth Circuit's view that the <u>Noerr</u>-<u>Pennington</u> doctrine applies to foreign governments was based on two premises: first, that the <u>Noerr</u>-<u>Pennington</u> doctrine was grounded on the Supreme Court's interpretation of the Sherman Act, not on the First Amendment Right to Petition "the Government;" and second, that the non-constitutional right to petition protected in the Sherman Act (and interpreted in <u>Noerr</u>-<u>Pennington</u>) sweeps more broadly than the constitutional Right to Petition set out in the First Amendment.  <u>See</u> <u>Coastal States Mktg.</u>, 694 F.2d at 1364-67.

But the Second Circuit takes a different view.  The Second Circuit noted that the <u>Noerr</u>-<u>Pennington</u> doctrine is based on the constitutional Right to Petition — not solely on an interpretation of what "restraint of trade" means in the Sherman Act context.  <u>See</u> <u>Landmarks Holding Corp. v. Bermant</u>, 664 F.2d 891, 895-96 (2d Cir. 1981) (holding that the relevant question is whether the actions in questions are "immunized by the First Amendment from antitrust liability under the Noerr-Pennington doctrine"); <u>Miracle Mile Associates v. City of Rochester</u>, 617 F.2d 18, 20 (2d Cir. 1980) ("[u]nder <u>Noerr</u>, mere solicitation of governmental action through legislative processes . . . is an activity which is fully protected by the First Amendment and is immune from Sherman Act liability"); <u>accord</u>, <u>e.g.</u>, <u>Energy</u>

-30-

Conservation, Inc. v. Heliodyne, Inc., 698 F.2d 386, 388 & n.2
(9th Cir. 1983); Australia/Eastern U.S.A. Shipping Conf. v.
United States, 537 F. Supp. 807, 810 (D.D.C. 1982); Occidental
Petroleum Corp. v. Buttes Gas & Oil Co., 331 F. Supp. 92, 108
(C.D. Cal. 1971).   Construing "the government" for Noerr-
Pennington purposes to include foreign governments may make sense
if the doctrine is based on an interpretation of the Sherman Act,
as the Fifth Circuit held in Coastal States.   But if the Noerr-
Pennington doctrine is based on interpretation of the Right to
Petition Clause of the First Amendment — as the Second Circuit
has indicated —  construing "the Government" to include foreign
governments makes little sense.   This is because, as courts have
frequently noted, "the first amendment was not intended to
protect   the   right   to   petition   foreign   governments."
Australia/Eastern U.S.A. Shipping Conf., 537 F.Supp. at 812.

        In  any  event,  the  Fifth  Circuit's  expansive  holding
with regard to the foreign reach of the Noerr-Pennington doctrine
depends on its interpretation of the Sherman Act.   See Coastal
States Marketing, 694 F.2d at 1364-67.   Therefore, as the Tenth
Circuit  has  noted,  the  Coastal States Marketing  holding  has  no
bearing in cases — such as this one — where litigants argue that
the  Noerr-Pennington  doctrine  protects  the  petitioning  of  a
foreign government in a context that has nothing to do with the
Sherman Act.   See, e.g., Cardtoons, L.C. v. Major League Baseball
Players Ass'n, 208 F.3d 885, 890-91 (10th Cir. 2000) (making this

-31-

point at length, and explaining that "Coastal States' grant of immunity to prelitigation threats was not based on the right to petition and, therefore, does not inform our decision in the present non-antitrust case").

Moreover, even if the Noerr-Pennington doctrine could be said to shield lobbying of foreign governments in non-Sherman Act contexts, this would be irrelevant to whether the doctrine shields lobbying of the United Nations. The United Nations is not a government, foreign or otherwise; it is not a sovereign, see supra at 27 (discussing Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975)); and it is not accountable to any public constituency. Cf. Allied Tube & Conduit Corp., 486 U.S. at 499 (petitioning of business association is not protected by the Noerr-Pennington doctrine when the association is, inter alia, "unaccountable to the public"). The Bayoil Defendants seek to bridge this gap between the United Nations and foreign governments by asserting that "the United Nations is comprised of foreign governments." Bayoil Mem. at 15. But this is unavailing, because the United Nations plainly has an identity that is independent of its constitutive, member governments. See, e.g., Convention on Privileges and Immunities of the United Nations, Feb. 13, 1946, 21 U.S.T. 1418, T.I.A.S. No. 6900, Article 1, Section 1 (a treaty ratified by the United States, indicating that the United Nations has its own juridical personality). Accordingly, there is no basis for concluding that

-32-

doctrines applicable to foreign government apply to the United Nations.

        In sum, the Noerr-Pennington doctrine has no relevance to a criminal case, such as this one, that has nothing to do with restraint of trade and in which individuals or entities attempted to influence the United Nations.  The Fifth Circuit's decision in Coastal States Marketing is not to the contrary because, in the Second Circuit's view, the Noerr-Pennington doctrine is grounded on the First Amendment's Right to Petition Clause, not the Sherman Act — and the Clause does not purport to reach, and protect, petitioning of the United Nations.

## III. THE DEFENDANTS' MISCELLANEOUS REQUESTS FOR CLARIFICATION OF THE INDICTMENT WILL BE ADDRESSED IN A SUPERSEDING INDICTMENT.

        In the coming weeks, the Government will ask the grand jury to return a superseding indictment against the Defendants. That new indictment will contain at least one new charge against defendant Oscar Wyatt relating to evidence that has already been disclosed to the defense (and which was presented in the recent trial of United States v. Tongsun Park).  That superseding indictment will also address three issues raised in the defendants' motions:

1) the Bayoil Defendants complain that paragraph 37(g) of the current indictment references "conspiracy" as a grounds for

violating IEEPA.[6]  Citing <u>United States v. Quinn</u>, 401 F. Supp. 2d
80 (D.D.C. 2005), the Bayoil Defendants urge the Court to strike
any reference to a conspiracy-theory of liability premised on the
Iraqi Sanctions Regulations.  Bayoil Mem. at 18-20.  Rather than
litigate this issue and to avoid any jury confusion — in light of
the fact that Count Four charges the defendants with a
substantive violation of IEEPA rather than conspiracy — the
Government agrees to remove the sentence relating to conspiracy
liability (set off in **bold** below) in the superseding indictment.

   2) the Bayoil Defendants also complain that the "to-wit"
clause of paragraph 38 imprecisely suggests that travel to Iraq —
without more — constitutes a violation of IEEPA, despite the
Indictment's quotation of the applicable regulation (which states
plainly that the prohibition covers "any transaction relating to
travel ... in Iraq," 31 C.F.R. § 575.207).  Again, to avoid any
potential jury confusion on this issue and spare litigation on
the matter, the superseding indictment will clarify that the
defendants "engaged in transactions relating to travel to Iraq."

---

   [6]   Paragraph 37(g) cites 31 C.F.R. § 575.211: "[A]ny
transaction that has the purpose of, or which has the effect of,
evading or avoiding, or which facilitates the evasion or
avoidance of, any of the prohibitions set forth in this subpart
is hereby prohibited.  Any attempt to violate the prohibitions
set forth in this part is hereby prohibited.  **Any conspiracy
formed for the purpose of engaging in transactions prohibited by
this part is hereby prohibited.**"

3) Wyatt properly complains that the "to-wit" clause of paragraph 38 (Count Four) is unclear.[7] See Wyatt Mem. at 31. The superseding indictment will clarify that clause to state something along the lines of: "to wit, without obtaining the required OFAC approval, the defendants made and/or caused to made payments to the Government of Iraq, which transactions were unauthorized by and concealed from the United Nations' Oil-for-Food Program, and engaged in transactions relating to travel to and from Iraq."

Thus, the Government respectfully asks the Court to rule on these three requests for relief after the grand jury decides whether to return a superseding indictment that should moot those requests.

## IV.  COUNTS THREE AND FOUR PROPERLY NAME DEFENDANT BAYOIL SUPPLY & TRADING LIMITED AS A DEFENDANT.

Defendant Bayoil Supply & Trading (hereinafter, "Bayoil S&T") is properly charged with violating the laws charged in Counts Three and Four.  Bayoil S&T argues that, as a corporation chartered in the Bahamas, it cannot be subject to the statutes at issue in those Counts — 18 U.S.C. § 2332d (Count Three) and 50

---

[7]     That clause presently reads: "to wit, without obtaining the required OFAC approval, which transactions were designed to and did allow those recipients to make payments to the Government of Iraq unauthorized by and concealed from the United Nations' Oil-for-Food Program, engaged in financial transactions with the Government of Iraq, which transactions were unauthorized by and concealed from the United Nations' Oil-for-Food Program, and traveled to and from Iraq."  Indictment at ¶ 38.

U.S.C. § 1705(b) (Count Four) — because those statutes purport to govern the conduct of "United States persons."   Bayoil Mem. at 20-22.

The definitions of "United States person" are largely consistent between the two statutes.  Section 2332d(b)(2) defines "United States person" as any "(A) United States citizen or national; (B) permanent resident alien; (C) juridical person organized under the laws of the United States; or (D) *any person in the United States*." (Emphasis added.)  The Executive Orders on which the ISR are based (Executive Orders 12722 and 12724, *see* Indictment ¶ 35) — and whose violations are punished criminally by IEEPA — likewise define the term "United States person" as "any United States citizen, permanent resident alien, juridical person organized under the laws of the United States (including foreign branches), or *any person in the United States*, and vessels of U.S. registration." (Emphasis added.)

Bayoil S&T is properly subject to regulation under these statutes on two independent grounds.  First, the evidence at trial will demonstrate that Bayoil S&T qualifies as a "United States person" because it conducted its criminal activity "in the United States."  Co-defendant David Chalmers was the owner and operator of Bayoil S&T, and the evidence will show that the relevant transactions conducted by Bayoil S&T in this case were handled by Chalmers and his employees from the offices of co-

-36-

defendant Bayoil (USA), Inc. in Houston, Texas.  On this basis, then, Bayoil S&T was subject to regulation under §2332d and IEEPA as a "United States person."

Second, even assuming *arguendo* that Bayoil S&T is not itself subject to regulation as a "United States person," Bayoil S&T is properly charged with aiding-and-abetting the violations of law of its U.S.-based co-defendants.  Regardless of its status as a "United States person," Bayoil S&T's charged conduct had a "substantial, direct, and foreseeable effect" in the United States and plainly affected United States interests, as would be required by principles of international law.  See United States v. Javino, 960 F.2d 1137, 1143 (2d Cir. 1992) (quoting Restatement (Third) of Foreign Relations Law §§ 403(1) & (2)).  It cannot be disputed that Bayoil S&T's criminal conduct was intended to affect the United States and its citizens, even crediting the assertion that Bayoil S&T provided all of its assistance from abroad.  Indeed, §2332d, IEEPA, and the ISR are all "inherently international in scope," United States v. Evans, 667 F. Supp. 974, 981, 985 (S.D.N.Y. 1987) (Sand, J.) (interpreting the Arms Export Control Act to permit extraterritorial application to foreign arms-dealers selling American-made weapons exported from the United States), and presume some measure of international activity in the course of the offenses.

The case on which Bayoil S&T wholly relies — <u>United States v. Yakou</u>, 428 F.3d 241 (D.C. Cir. 2005) — is distinguishable and incorrect as a matter of law. <u>Yakou</u> held that the Arms Control Export Act and its implementing regulations did not permit aiding-and-abetting liability for an individual whose alleged criminal conduct occurred wholly outside the United States. <u>Id.</u> at 254. The court held that no extraterritorial application was intended because the regulations govern "United States persons," <u>id.</u> at 252, but it reached this holding only by side-stepping Judge Sand's opinion in <u>Evans</u> (see above) and noting that Yakou was alleged to have acted as a broker *only* in Iraq (<u>i.e.</u>, no involvement with property or interests in the United States). <u>Id.</u> at 253. That distinction does not work for Bayoil S&T, which worked hand-in-glove with almost all of the other defendants to promote their criminal activities in the United States through the use of property, businesses, money, and vessels based in the United States.

    <u>Yakou</u> and Bayoil S&T also fail to deal with <u>United States v. McKeeve</u>, 131 F.3d 1, 11 (1st Cir. 1997), which upheld the extraterritorial application of IEEPA to non-U.S.-based members of a conspiracy. The defendant in that case, a British citizen, traveled to the United States to oversee the shipment of computer equipment ultimately bound for Libya — a business transaction barred by IEEPA. <u>Id.</u> at 6. The defendant was

-38-

convicted of conspiring to violate IEEPA, and his co-conspirators were identified as foreign citizens operating outside the United States.  See id. at 10-11.  The defendant argued unpersuasively that — as none of his co-conspirators were "United States persons" or otherwise subject to U.S. jurisdiction — he could not be convicted of conspiring with himself.  Id.  The First Circuit tersely rejected this argument, noting that "as long as either [of the foreign co-conspirators] knew the locus of the equipment and knew that U.S. law prohibited its export to Libya, the ensuing agreement with the appellant had an unlawful design sufficient to animate the federal conspiracy statute."  Id. at 11; see also id. at 12 (discussing evidence of co-conspirators' extraterritorial participation in the conspiracy and citing Ford v. United States, 273 U.S. 593, 620 (1927) for the proposition that "when a conspiracy 'was directed to violation of the United States law within the United States by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy . . . all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the country'").  Aiding-and-abetting is the sister of conspiracy, and the "unlawful design sufficient to animate the federal conspiracy statute" applies equally to 18 U.S.C. § 2.

For the foregoing reasons, either of which is independently sufficient, the Government respectfully urges the Court to deny Bayoil S&T's motion to dismiss Counts Three and Four as applied to it.

**V.   DEFENDANTS ARE NOT ENTITLED TO SEPARATE TRIALS.**

Wyatt and the Bayoil Defendants assert unconvincingly that they should be tried separately from one another — even though they are charged with participating together in a common conspiracy.  See Bayoil Mem. at 23-27; Wyatt Mem. at 53-61.  This argument inconsistent with well-established precedents and, if accepted, would result in a unjustified waste of the Court's resources.

**A.   Severance is not warranted under Fed. R. Crim. P. 8.**

Rule 8(b) of the Federal Rules of Criminal Procedure governs joinder, and provides that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.  Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Under Rule 8, joining Wyatt and the Bayoil Defendants for trial is plainly proper.  The Defendants here are charged with participating "in the same series of acts" that together "constitute an offense" — namely, the systematic payment of

-40-

millions of dollars in illegal kickbacks to the Government of Iraq, which "acts" form the basis of each "offense" charged in the Indictment.

In addition, Count One of the Indictment charges the Defendants with participating together in a single conspiracy, and it is well-established that "the allegation of a conspiracy count meets the requirements of Rule 8(b)[.]" United States v. Schaffer, 266 F.2d 435, 440 (2d Cir. 1959) (collecting cases), aff'd 362 U.S. 511 (1960). Joinder of the defendants is proper because they are alleged to be co-conspirators. In turn, "joinder of a conspiracy count [Count One] and the substantive counts arising out of the conspiracy [Counts Two and Three] is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common plan." United States v. Bernstein, 533 F.2d 775, 789 (2d Cir. 1976); see also, e.g., United States v. Stein, 428 F. Supp. 2d 138, 142 (S.D.N.Y. 2006) ("[t]he claim of an overall conspiracy said to link the substantive crimes charged in an indictment justifies joinder under Rule 8(b)") (collecting cases).

Moreover, the policy concerns that animate Federal Rule of Criminal Procedure 8 strongly support the conclusion that the defendants should be joined for trial. As the Supreme Court has explained, joint trials "play a vital role in the criminal justice system" because they promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of

-41-

inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 209-10 (1987); see also, e.g., United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) ("For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials."); see also United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998) (quoting Richardson and explaining that "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand").

Here, enormous resources would plainly be squandered if the Defendants were tried separately. For example, foreign witnesses (and numerous cooperating witnesses) would be required to testify on multiple occasions. In addition, the background to the charged crimes — for example, the operation of the OFFP, Iraq's policy of demanding and collecting surcharge payments, and the basic nature of the global energy business — would need to be twice presented. Not only would trying this case twice waste time and resources, it would hand an extraordinary windfall to the Defendants who are tried last. The wages of this windfall would, of course, be a greater chance of acquittal for the last-

tried Defendants, see Salameh, 152 F.3d at 115, and inconsistent verdicts are not in the interests of justice.  See Richardson, 481 U.S. at 209-10 (joint trials "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts").

Resisting the common-sense conclusion that joinder here is proper under Rule 8, Wyatt and the Bayoil Defendants argue that Count One of the Indictment does not properly charge a conspiracy.  On Wyatt's argument, joinder is improper because the Indictment, though it alleges a single conspiracy, actually describes multiple conspiracies.  See Wyatt Mem. at 54-59.  On the Bayoil Defendants' argument, joinder is improper because the Indictment suggests that the defendants were competitors, not co-conspirators.  See Bayoil Mem. at 24-25.  These closely similar variants on the argument that Count One does not properly charge a conspiracy are flawed in the same two ways.

First, and most fundamentally, the argument that Count One does not properly charge a conspiracy is simply beside the point.  The Court of Appeals has long "read the language of Rule 8(b) to mean that the joinder of defendants is proper when the alleged acts are 'unified by some substantial identity of facts or participants, or arise out of a common plan or scheme.'" Feyrer, 333 F.3d at 113 (quoting United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (emphasis added)).  The disjunctive is important here.  Even assuming arguendo that the conspiracy charge in Count One is somehow infirm — that is, even assuming

-43-

that the Defendants' acts cannot be said to "arise out of a common plan or scheme" — the Defendants' acts were still "'unified by some substantial identity of facts or participants.'" Id. In particular, both Wyatt and the Bayoil Defendants are alleged to have paid surcharges, or caused them to be paid, to officials of the Government of Iraq. Moreover, both Wyatt and the Bayoil Defendants are alleged to have lobbied United Nations officials in pursuit of a lowered O.S.P. Because of this common core of "facts" and "participants," joinder for trial would be appropriate even if the conspiracy count here were somehow infirm as a matter of law, see, e.g., United States v. Stein, 428 F. Supp. 2d 138, 142 (S.D.N.Y. 2006), which it is not.

This is so even assuming arguendo that the Defendants were participating in multiple conspiracies — and not, as charged, in a single conspiracy. As to this point, United States v. Feyrer, 333 F.3d 110 (2d Cir. 2003), is instructive. In that securities fraud case, two defendants — each of whom controlled an unrelated company — bribed stockbrokers at a particular firm, so that the brokers would induce their customers to buy stock in the companies. The defendants were charged in two separate conspiracies, see id. at 114, and the severance motion of one of the defendants was denied. Reviewing this decision de novo, see id. at 113, the Court of Appeals determined that joinder was proper, even though two distinct conspiracies were alleged. The Court of Appeals explained that, although there were two "stock

-44-

manipulation plans" involving two different companies, various third parties — including the stockbrokers — "were common and central participants in both[.]"  See id. at 114.

That is assuredly the case here.  Third parties — Iraqi officials who requested and received surcharge payments — were central players in the Surcharge Scheme, just as the stockbrokers were in the scheme charged in Feyrer.  This identity of key participants counsels against severance here, as it did in Feyrer.

Next, the Feyrer Court noted that "the two conspiracies shared a common plan, namely, to enrich themselves while "generat[ing] income for [various people associated with the stockbrokers] through fraudulent stock transactions."  Id. at 114.  In addition, the Feyrer Court noted that "the schemes were run at the same time," id., and that the defendants were aware of each other's fraud.  That is the very sort of "common plan" at issue here — a plan by the defendants to enrich themselves while generating income for Saddam Hussein regime.

In short, even assuming arguendo that the Defendants' acts did not "arise out of a common plan or scheme," Feyrer, 333 F.3d at 113, they certainly were "unified by some substantial identity of facts or participants," id., such that joinder is proper here.  Indeed, as Feyrer makes clear, joinder would be

-45-

proper here even if Count One somehow charged multiple conspiracies.

The Defendants' Rule 8 argument also fails because it does not reckon with the "'established rule' that 'a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).'" <u>United States v. Uccio</u>, 917 F.2d 80, 87 (2d Cir. 1990) (quoting <u>United States v. Nerlinger</u>, 862 F.2d 967, 973 (2d Cir. 1988)); <u>see also</u> <u>United States v. Vanwort</u>, 887 F.2d 375, 384 (2d Cir. 1989). There can be no credible argument that the conspiracy charge here in Count One is "frivolous."

The gravamen of the charge in Count One of the Indictment is, of course, that the defendants participated in a scheme to pay millions of dollars in kickbacks to the Government of Iraq so that they could participate in the lucrative business of obtaining and selling Iraqi oil. With oil prices fixed by the United Nations at the Official Selling Price, the cost of paying kickbacks to the Government of Iraq could not be readily passed on by oil companies to oil customers in the form of higher prices. Accordingly, the success of the Surcharge Scheme depended in at least some measure on the O.S.P. being set at an artificially low level — so that there could be room "below" the O.S.P. for oil companies to both make an adequate profit and pay the kickback demanded by the Government of Iraq.

-46-

The Indictment explicitly charges that the Defendants actively worked together in a coordinated campaign to lower the O.S.P.  <u>See</u> Indictment ¶¶ 17, 19.  This is precisely what co-conspirators do — they work together for the achievement of the goals of a criminal scheme.  This working together took place in a context in which it was perfectly obvious that each of the defendants, as a participant in the Iraqi oil trade, was paying surcharges or causing them to be paid.  <u>See</u> Indictment ¶ 18.  In addition, the Indictment alleges that the co-conspirators operated together even <u>apart</u> from their coordinated efforts to press down the O.S.P.  For example, David Chalmers communicated with Government of Iraq officials — both on his own and through his co-defendant, Oscar Wyatt — with regard to future shipments of oil to one of the Bayoil Companies.  <u>See</u> Indictment ¶ 27(j).

In light of these allegations, there is no basis for arguing that the conspiracy charge against Wyatt and the Bayoil Defendants is "frivolous" such that Rule 8 joinder is inappropriate.  <u>See</u>, <u>e.g.</u>, <u>Uccio</u>, 917 F.2d at 87.  That the co-conspirators may have occasionally been competitors, <u>see</u> Bayoil Mem. at 24-25, does not even begin to suggest that the conspiracy charge is frivolous.  <u>See</u>, <u>e.g.</u>, <u>United States v. Ong</u>, 541 F.2d 331, 337 n.3 (2d Cir. 1976) (citing <u>United States v. Tramunti</u>, 513 F.2d 1087, 1106-07 n.23 (2d Cir. 1975) and <u>United States v. Mallah</u>, 503 F.2d 971, 980 (2d Cir. 1974)).

Moreover, the Grand Jury's conclusion that the Defendants were participating in a single conspiracy, and not in multiple conspiracies, see Wyatt Mem. at 54-59, can hardly be termed "frivolous." On even the most conservative view of the conspirators' interactions, the Indictment alleges a single conspiracy of the classic "hub-and-spoke" variety. Officials of the Government of Iraq were the hub, while Wyatt and the Bayoil Defendants were each spokes connected to one another by a rim on the outside of the "wheel," by their coordinated activity to facilitate the success of the conspiracy by pressing down on the O.S.P., by their shared knowledge that paying surcharges was a necessary requisite of participating in the purchase of Iraqi oil, and by Chalmers communicating with Iraqi officials through Wyatt. In addition, the evidence will show that Wyatt and the Bayoil Defendants actively worked together with regard to Iraqi oil — buying oil from one another, for example, and referring customers to one another. See, e.g., United States v. Thompson, 76 F.3d 442, 454 (2d Cir. 1996) (holding that evidence was sufficient to show that narcotics purchasers were co-conspirators, with their supplier as "a hub" and themselves and "others participating as spokes," because, inter alia, the record included evidence that one "spoke" "knew of the involvement of [another]," even though [one spoke] "may not have known the precise prices that others paid [the narcotics supplier at the hub]").

-48-

In sum, joinder here is entirely proper under Rule 8. The Indictment charges a conspiracy.  A joint trial in this case serves the policy goals that animate Rule 8.  The charged conspiracy is far from frivolous — and, in any event, the crimes charged in the Indictment share a common core of facts and participants, such that joinder would be appropriate even if, as they now suggest, the Defendants were participating in multiple conspiracies, rather than in a single one.

**B.    Severance is not warranted under Fed. R. Crim. P. 14.**

In addition to arguing from Rule 8, Wyatt and the Bayoil Defendants contend — again, unpersuasively — that their cases should be severed from one another under Rule 14.

Federal Rule of Criminal Procedure 14(a) authorizes the Court to grant a severance of defendants' joint trial "[i]f it appears that a defendant or the government is prejudiced by a joinder."  Fed. R. Crim. P. 14(a).  The Supreme Court has instructed that such severance is warranted only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro v. United States, 506 U.S. 534, 539 (1993).  This demanding standard for Rule 14 severance reflects the settled "preference" in the criminal law "for providing defendants who are indicted together with joint trials." See Feyrer, 333 F.3d at 114.

-49-

The preference for joint trials is so strong that the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993). Indeed, "[w]here, as here, the crime charged involves a common scheme or plan [among the defendants], a joint trial of the participants is proper, absent a clear showing of prejudice." United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979) (collecting cases).

A defendant seeking severance therefore shoulders the "'extremely difficult burden'" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (quoting United States v. Carpentier, 689 F.2d 21, 27 (2d Cir. 1982)). The prejudice must be so "substantial" that there exists "a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." Rosa, 11 F.3d at 341. It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S. at 540; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

-50-

Here, the Defendants fail to carry their "extremely difficult burden," Casamento, 887 F.2d at 1149 (internal quotation marks omitted), of establishing that severance is warranted.

Wyatt first contends that he is entitled to severance because of the "complexity of the trial," and because "[t]he sheer amount of evidence to be introduced is likely to cause confusion." Wyatt Mem. at 60. This is just not so. The Government anticipates that its case-in-chief will occupy approximately six to eight weeks. This is hardly the sort of extraordinarily long trial whose length cuts in favor of severance. See Stein, 428 F. Supp. 2d at 145 (no severance in spite of Government's estimate that trial would occupy three months); United States v. Padilla, No. 94 Cr. 313 (CSH), 1994 WL 681812, at *5 (S.D.N.Y. Dec. 5, 1994) (same); see also, e.g., United States v. Ramos, 346 F. Supp. 2d. 567, 572 (S.D.N.Y. 2004) (length of trial does not cut in favor of severance when trial is expected to last three to four weeks); cf. Casamento, 887 F.2d at 1152 (when a trial is anticipated to stretch for longer than four months, the Government should provide "reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials for groups of defendants").

Nor is the evidence here extraordinarily complex. <u>See</u> Wyatt Mem. at 60-61 (arguing for severance based on the "complexity of the trial"). This case involves relatively unfamiliar statutes, and witnesses from other countries. But the core of the matter is simple: a kickback scheme, to be proved in large part by witness testimony, corroborating documents, and some recorded phone calls. This sort of evidence is not arcane, and the Defendants have not carried their "extremely difficult burden," <u>Casamento</u>, 887 F.2d at 1149 (internal quotation marks omitted), of showing that the jurors — instructed by Your Honor and represented by capable counsel — will not be able to follow the case unless it is severed in two. <u>Cf.</u> <u>Stein</u>, 428 F. Supp. 2d at 146 (denying severance in a potentially "complex" tax fraud case because "this case is not beyond the ken of our jury pool, particularly given the high caliber of the attorneys involved").

Next, Wyatt contends that "[t]here is also a possibility that 404(b) evidence could be introduced during the trial and prejudice Wyatt." Wyatt Mem. at 62. However, Wyatt cannot carry his burden by alluding to a "possibility" that may or may not come to fruition. Moreover, the Court will presumably instruct the jury with regard to the proper role of 404(b) evidence, and jurors are presumed to follow judges' limiting instructions. <u>See</u>, <u>e.g.</u>, <u>Shannon v. United States</u>, 512 U.S. 573, 585 (1994) (law assumes that jurors follow district court's instructions); <u>Zafiro</u>, 506 U.S. at 540 (same); <u>United States v.</u>

-52-

Downing, 297 F.3d 52, 59 (2d Cir. 2002) ("Absent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

Wyatt also seeks severance because "evidence will be admitted against co-defendants that would not be admissible if Wyatt were tried alone, and this will create an intolerable risk of prejudice." Wyatt Mem. at 61. But Wyatt — who has received tens of thousands of pages of discovery — fails to identify a *single* piece of evidence that would be admitted at a joint trial, but that would not be admissible if he were tried alone. See, e.g., United States v. Johnson, 21 F. Supp. 2d 329, 340 (S.D.N.Y. 1998) (rejecting severance argument because, inter alia, "defendants have not made a sufficient showing that [a certain piece of evidence] would not be admissible against all defendants in the conspiracy at separate trials").

It is not surprising that Wyatt fails to identify any evidence that would be excluded at separate trials. Because "[t]he Defendants in this case are charged with conspiracy, and generally, in conspiracy cases, the Government is entitled to present the entire range of evidence against each defendant," United States v. Trippe, 171 F. Supp. 2d 230, 239 (S.D.N.Y. 2001) (citing United States v. Nersesian, 824 F.2d 1294, 1304 (2d Cir. 1987)), it is entirely likely that the evidence offered at two severed trial would be essentially the same as the evidence

offered at a single trial.  See Trippe, 171 F. Supp. 2d at 239
(denying severance in part on this basis).  As the Court of
Appeals has noted, "the fact that testimony against a codefendant
may be harmful is not a ground for severance if that testimony
would also be admissible against the moving defendant tried
separately.    Evidence  at  the  joint  trial  of  alleged
coconspirators that, because of the alleged conspiratorial nature
of the illegal activity, would have been admissible at a separate
trial  of  the  moving  defendant  is  neither  spillover  nor
prejudicial."  United States v. Rosa, 11 F.3d 315, 341 (2d Cir.
1993) (internal citations omitted).  In short, at a trial against
Wyatt alone (or against the Bayoil Defendants alone), the
Government would put on much of the same evidence that it will
put on at a joint trial.   This cuts strongly against the
Defendants' severance motions.

        Wyatt further contends that "[b]y forcing [him] to be
tried with only the Defendants in the Bayoil Conspiracy, the jury
is likely to presume Wyatt is somehow connected to the parties."
Wyatt Mem. at 61.  The Bayoil Defendants press essentially the
same argument.  See Bayoil Mem. at 26-27.  But these arguments
entirely miss the point.  It is the Government's theory that
Wyatt and the Bayoil Defendants were "connected:" as co-
conspirators.  That is why it makes perfect sense to try the
Defendants together.  If there is a juror who might be "likely to
presume," id., that the charged conspiracy existed simply because

-54-

Wyatt and the Bayoil Defendants are sitting together at the defense table, the remedy is for that juror to be stricken for cause — not for the Court (and two juries) to endure two separate trials.  Moreover, any risk of jurors presuming that the Defendants participated in a conspiracy together merely because they are being tried together, or because they are Texas oil men, see Bayoil Mem. at 26, can be easily cured by a firm instruction to the jury from the Court.  See, e.g., Salameh, 152 F.3d at 116-17 (collecting numerous cases on the impact of judicial instructions in the severance context); see also, e.g., United States v. Diaz, 176 F.3d 52, 102 (2d Cir. 1999).

*     *     *     *     *

For the foregoing reasons, the Defendants' motions for severance should be denied.  Joinder is entirely appropriate under Rules 8 and 14, and under the long-established principles that govern the trial of cases such as this one — in which a conspiracy is charged, and all counts of the Indictment are grounded on a common core of facts.

## VI.  THE BAYOIL DEFENDANTS ARE NOT ENTITLED TO EARLY DISCLOSURE OF THE GOVERNMENT'S EXHIBIT AND WITNESS LISTS.

The Bayoil Defendants argue unpersuasively that the Government should be required to produce its exhibit list and witness list in advance of trial.

Federal Rule of Criminal Procedure 16 requires the Government to produce certain types of materials in advance of

-55-

trial.    But  there  is  nothing  in  Rule  16  that  even  begins  to
suggest  that  the  Government  must  indicate  for  the  defendant  <u>how</u>  —
for  example,  as  an  exhibit  —  it  will  make  use  of  any  particular
document  at  trial.    This  point  has  been  made  by  Judge  Scheindlin,
whose  opinion  in  <u>United  States  v.  Nachamie</u>,  91  F.  Supp.  2d  565
(S.D.N.Y.  2000),  bears  extended  quotation:

> Given  the  scope  of  the  Government's  document
> production,  there  is  little  doubt  that  it  has  produced
> documents  in  each  of  the  three  categories  specified  in
> Rule  16(a)(1)(C),  namely  documents:  (1)  material  to  the
> preparation  of  a  defense;  (2)  intended  for  use  at  trial;
> and  (3)  obtained  from  the  defendant.  The  problem,  then,
> is  not  one  of  failure  to  produce  but  of  failure  to
> designate.    Defendants'  complaint  is  that  because  of  the
> enormity  of  the  production,  they  cannot  determine  which
> documents  are  simply  material  to  the  preparation  of
> their  defense  and  which  documents  the  Government  intends
> to  use  at  trial.  In  short,  defendants  demand  that  the
> Government  identify  which  documents  fall  into  each  of
> the  categories  outlined  above.  The  clear  language  of
> Rule  16(a)(1),  however,  does  not  require  the  Government
> to  identify  which  documents  fall  in  each  category  —  it
> only  requires  the  production  of  documents  responsive  to
> any  category.  .  .  .
>
> [D]istrict  courts  have  found  that  the
> Government  has  a  duty  to  identify  those  documents  that
> it  intends  to  use  in  its  case-in-chief  at  trial,  but
> none  of  those  decisions  are  supported  by  the  language  of
> Rule  16(a)(1)  or  prior  case  law.  The  earliest  case,
> <u>United  States  v.  Turkish</u>,  458  F.  Supp.  874,  882
> (S.D.N.Y.  1978),  simply  stated  that  it  was  improper  for
> the  Government  to  "bury  the  defendant  in  paper"  by
> making  all  documents  generally  available.    The  <u>Turkish</u>
> court  cited  no  authority  for  its  conclusion  that  the
> Government  had  an  obligation  to  identify  the  documents
> it  intended  to  use  in  its  case-in-chief  .  .  .  .

<u>Nachamie</u>,  91  F.  Supp.  2d  at  568-70  (citations,  footnotes
omitted);  <u>accord</u>,  <u>e.g.</u>,  <u>United  States  v.  Savin</u>,  No.  00  Cr.  45
(RWS),  2001  WL  243533,  at  *6  (S.D.N.Y.  Mar.  7,  2001)  (Rule  16

does not require production of exhibit list); <u>United States v.</u>
<u>Carrington</u>, No. 02 Cr. 897 (LTS), 2002 WL 31496199, at *2
(S.D.N.Y. Nov. 7, 2002) (same); <u>United States v. Valerio</u>, 737 F.
Supp. 844, 847 (S.D.N.Y. 1990) (same).  In sum, the Government is
not required to produce a pre-trial exhibit list.  And, as
explained in <u>Nachamie</u>, <u>Turkish</u> (cited by the Bayoil Defendants)
is conclusory and not persuasive authority to the contrary.

That said, even assuming <u>arguendo</u> that the Government
may in some circumstances be required to provide a pre-trial
exhibit list, it need not do so here.  First, the Bayoil
Defendants contend that they are entitled to "test the
government's translation of foreign language documents," a test
that, they say, would "be impossible in the absence of an early
exhibit list, unless the defendants translate every such
document, a task which would take years."  Bayoil Mem. at 27-28.
This argument is, to say the least, disappointing.  Going well
beyond its Rule 16 obligations, the Government has — for nearly a
year, now — been providing translations of foreign language
documents to the Bayoil Defendants.  As the Bayoil Defendants
know, these documents are not randomly selected; many are
important, and many are likely to become trial exhibits.  From
the production of these translated documents, the Bayoil
Defendants are getting a sense of the sorts of trial exhibits
that the Government intends to introduce.  Moreover, with regard
to any need to "test[]" the accuracy of Government translators,

these voluminous translated documents certainly give the Bayoil
Defendants enough to work with, such that an exhibit list is
unnecessary.

Second, the Bayoil Defendants can hardly claim to be in
the dark as to the nature of the evidence against them.  The
Government has filed an extraordinarily detailed Indictment in
this case.  For example, Count One describes in detail the
genesis and execution of the co-conspirators' Surcharge Scheme.
<u>See</u> Indictment ¶¶ 7, 18.  It sets forth when and how the Bayoil
Defendants participated in that Surcharge Scheme.  <u>See</u>, <u>e.g.</u>, <u>id.</u>
at ¶¶ 22, 23.  It explains at length certain steps that the
Bayoil Defendants took to ensure the success of the Surcharge
Scheme.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 17, 19 (describing lobbying efforts
with regard to official selling price of Iraqi oil — who lobbied,
who was lobbied, where they were lobbied, by what means they were
lobbied, when they were lobbied, and why they were lobbied).

Count One also describes with specificity the manner in
which certain of the Bayoil Defendants undertook to obscure their
participation in the Surcharge Scheme by using a foreign front
company.  <u>See</u> <u>id.</u> ¶ 22 (describing how the Bayoil Foreign Company
was funded; explaining when payments were made; and indicating
that payments took the form of inflated commission prices, and
were made by wire transfer to Al Wasel and Babel General Trading
(L.L.C.), a United Arab Emirates entity).  Count One also
provides a wealth of details with regard to a number of specific

acts that relate to the Bayoil Defendants' prohibited financial transactions. See, e.g., ¶ 27(b), (c), (e), (f), (g), (i), (m), (r), (s), (v), (w), (x), (y), (z), (jj), and (mm).

In addition to the allegations set forth in the Indictment, the Independent Inquiry Committee into the United Nations Oil-for-Food Programme ("IIC") has published a substantial report on the Surcharge Scheme, in general, and the activities of the Bayoil Defendants, in particular.

Furthermore, with regard to each of the overt acts alleged in the Indictment, the Government indicated in writing to the Bayoil Defendants on June 8, 2005, and again on November 1, 2005, the particular documents in the discovery that support each alleged overt act. The Bayoil Defendants — represented by highly competent counsel — have had much of the discovery in this case for over a year, along with written road-maps for where to find various significant items within it.

Moreover, as ordered by this Court, the Government months ago provided to the Bayoil Defendants the prior statements of a number of potential witnesses. See United States v. Chalmers, 410 F. Supp. 2d 278, (S.D.N.Y. 2006). This disclosure — made long before the 18 U.S.C. § 3500 deadlines observed in this District — plainly sheds significant light on the nature of the proof against the Bayoil Defendants.

Finally, and again as ordered by this Court, the Government will be providing the defendants with certain

particulars thirty days in advance of trial.  <u>See</u> <u>Chalmers</u>, 410 F. Supp. 2d at 290-91.

In short, the Bayoil Defendants have not been buried in an undifferentiated mass of paper.  Represented by able counsel, they have had the benefit of an enormous amount of time to review Rule 16 discovery, as well as certain § 3500 materials.  The Bayoil Defendants have also had the benefit of a detailed Indictment, the IIC's report, and Government-prepared cover letters that provide a road map to the discovery.  Shortly, the Bayoil Defendants will have certain particulars, as ordered by Your Honor.  In light of all these circumstances, there is no compelling reason for the Government to divert its energies to the preparation and provision of an exhibit list.

All this said, the Government will do all that it can to facilitate an efficient trial, and intends to provide the Court and defense counsel with a preliminary exhibit list when 18 U.S.C. § 3500 material is handed over.  This should afford defense counsel sufficient opportunity to raise evidentiary challenges in an orderly fashion.  <u>See</u> <u>United States v. Reddy</u>, 190 F. Supp. 2d 558, 571 (S.D.N.Y. 2002) ("The Government has indicated that it intends to make its exhibits available for inspection consistent with its production pursuant to 18 U.S.C. section 3500. The Court finds that such disclosure is sufficient under the circumstances to promote an orderly trial.").

As to the Bayoil Defendants' request for a witness list, no aspect of Rule 16(a), Brady and its progeny, or Section 3500 imposes a general obligation upon the Government to produce a witness list in advance of trial. Cf. United States v. Bejasa, 904 F.2d 137, 139-140 (2d Cir. 1990) (finding no abuse of discretion in District Court's decision not to compel such disclosure absent "a specific showing that disclosure was both material to the preparation of the defense and reasonable in light of the circumstances surrounding the case") (internal quotations omitted); United States v. Fruchter, 104 F. Supp. 2d 289, 312 (S.D.N.Y. 2000) ("Upon a showing of need, it is in the district court's discretion whether to compel disclosure of a witness list."). Summarily asserting that a witness list is necessary for the preparation of a defense is insufficient. See United States v. Cannone, 528 F.2d 296, 301-02 (2d Cir. 1975).

No pre-trial witness list needs to be provided here. First, as the Bayoil Defendants are surely aware, even a cursory review of the discovery they received many months ago — with specific citations to relevant documents produced in discovery — sheds a great deal of light on the identities of unnamed co-conspirators in this case, some of whom will be witnesses at trial.

Second, as noted above, the Government months ago provided to the Bayoil Defendants the prior statements of several individuals. This disclosure — made long before the 18 U.S.C. §

-61-

3500 deadline — sheds light on the identity of the witnesses who will be testifying against the Bayoil Defendants.

Third, the Government's investigation of the Bayoil Defendants' co-conspirators is active and on-going. This fact cuts further against an early identification of witnesses. See, e.g., Nachamie, 91 F. Supp. 2d at 572 (noting that "potential harm to the Government's investigation" cuts against providing the names of co-conspirators).

Finally, safety concerns, as well as concern for the possibility of obstructing justice, witness intimidation, and suborning perjury, counsel here against early disclosure of a witness list. As Judge Mukasey has noted:

> The stakes in a criminal case are high, and the temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.

United States v. Taormina, No. 97 CR. 1120 (MBM), 1998 WL 702341, at *4 (S.D.N.Y. Oct. 8, 1998) (collecting cases); see also, e.g., United States v. Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985). Cf. United States v. Percevault, 490 F.2d 126, 132 (2d Cir. 1974) (describing Congressional concerns regarding "[f]ear of intimidation of witnesses and concern over efforts to suborn perjury" with regard to pre-trial disclosure of names of Government witnesses).

-62-

These concerns have special force here. A number of the witnesses that the Government intends to call live outside the United States, including in Iraq. The Government cannot assure the safety of each of these non-U.S.-based witnesses — especially those now in Iraq — if their identities are now revealed. More importantly, if the names of witnesses are now provided, there is a risk of perjury and subornation of perjury — and that witnesses, outside of the subpoena of the Court, will determine not to appear. See generally Taormina, 1998 WL 702341, at *4. Moreover, other witnesses are current employees or business associates of the Defendants whose involvement in this prosecution might cause them to suffer work-related consequences or be subject to improper persuasive pressure from the Defendants.

Indeed, in light of many of these same concerns, Your Honor denied the Bayoil Defendants' prior request for pre-trial disclosure of the name of unindicted co-conspirators. Your Honor's reasoning applies to the Bayoil Defendants' request for pre-trial disclosure of a witness list:

> [T]he defendants' request for the identities of co-conspirators is denied. . . [T]he Government has provided extensive discovery, minimizing the need for a bill of particulars identifying the unindicted co-conspirators in this case. Further, whether the unindicted co-conspirators might be in danger should their identities be revealed, it is clear that the potential harm to the Government's investigation that might be caused by specification of unindicted co-conspirators is significant in this case.

Chalmers, 410 F. Supp. 2d at 286 (internal quotation marks, citations omitted).

Without an order compelling the production of a pre-trial witness list, the Bayoil Defendants will learn who the Government anticipates its witnesses will be in advance of trial, when § 3500 material is produced.  Given the extraordinary resources to which the Bayoil Defendants have access, see Turkish, 458 F. Supp. at 881, this will give the Bayoil Defendants more than enough time to "investigate" each witness, Bayoil Mem. at 30, and prepare a defense.

## VII. COUNTS THREE AND FOUR DO NOT REST UPON AN UNCONSTITUTIONAL DELEGATION OF POWER.

Defendant Oscar Wyatt unpersuasively moves to dismiss Counts Three and Four on the theory that the Department of Treasury's Iraqi Sanctions Regulations ("ISR") are unconstitutional.  Wyatt fails to establish that the ISR's reference to the United Nations rendered those regulations an unconstitutional delegation of authority to a private actor.[8]  He also fails to cite any authority for his assertion that the Executive Order supporting the ISR — which declared a national

---

[8]     Wyatt does not challenge the propriety of the IEEPA's delegation of authority to the Executive Branch, which has been affirmed in numerous cases.  See, e.g., United States v. Dhafir, No. 05-4770-CR, 2006 WL 2440982 (2d Cir. Aug. 24, 2006); United States v. Arch Trading Co., 987 F.2d 1087, 1093 (4th Cir. 1993); United States v. Esfahani, No. 05 Cr. 255, 2006 WL 163025, at *11 (N.D. Ill. Jan. 17, 2006); United States v. Anvari-Hamedani, 378 F. Supp. 2d 821, 828 (N.D. Ohio 2005).

emergency with respect to Iraq and rendered trade with Iraq subject to IEEPA — was somehow deficient.

**A.    IEEPA and the Iraqi Sanctions Regulations**

Congress enacted IEEPA to provide the President, upon his declaration of a "national emergency," plenary authority to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit . . .dealing in . . . any property in which any foreign country or national thereof has any interest." 50 U.S.C. §§ 1701, 1702; see also 50 U.S.C. § 1621, et seq. The President's peace-time authority under IEEPA mirrors the authority given to the President to act in times of war, as set forth in Section 5(b) of the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. § 5(b). This grant of authority in IEEPA has been construed broadly. See Dames & Moore v. Regan, 453 U.S. 654, 672 (1981) (noting "the broad authority of the Executive when acting under this congressional grant of power"). This broad authority, however, is not unlimited; it may only be exercised by the President during times of a declared national emergency to "deal with any unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy or economy of the United States." 50 U.S.C. § 1701(b).

Following Iraq's invasion of Kuwait on August 2, 1990, three successive United States Presidents invoked and exercised

their authority under IEEPA to impose a variety of sanctions and prohibitions on investment and trade with the regime of Saddam Hussein.[9]  On August 2, 1990, the date of Iraq's invasion of Kuwait, President George H.W. Bush issued Executive Order No. 12722, declaring a national emergency with respect to Iraq under the authority of IEEPA, 50 U.S.C. § 1701(b), the National Emergencies Act, 50 U.S.C. § 1621, et seq., and 3 U.S.C. § 301, the statute generally endorsing presidential delegations of power to agencies within the Executive Branch.  Executive Order 12722 — together with Executive Order 12724, issued on August 9, 1990 — authorized the Secretary of the Treasury to promulgate regulations prohibiting most transactions with Iraq.  Congress endorsed the President's imposition of economic sanctions on Iraq with enactment of the Iraq Sanctions Act of 1990, P.L. 101-513, 104 Stat. 2047, which, in Section 586E, increased the criminal penalties of IEEPA for violations of the Iraqi Sanctions Regulations from 10 years' to 12 years' imprisonment.[10]

---

[9]    The economic sanctions on Iraq were substantially lifted, effective May 23, 2003, by the issuance of a general license by OFAC after Saddam Hussein was removed from power.  See 31 C.F.R. § 575.533.  The emergency originally declared in Executive Order 12722 was terminated on July 29, 2004.  See Executive Order 13350; 69 C.F.R. § 46092.

[10]    The Act also required that any regulations enacted as a result of the Executive Orders be submitted to Congress prior to their taking effect.  See Iraq Sanctions Act, Section 586B, P.L. 101-513, 104 Stat. 2047.

At issue in this case are the specific provisions of the ISR, promulgated under IEEPA, that prohibited certain transactions with the Government of Iraq without prior authorization from the Department of Treasury's Office of Foreign Assets Control ("OFAC"). Among other things, provisions of the ISR barred the unlicensed payment of money directly to the Government of Iraq, as well as the provision of satellite phone systems and other goods to the Hussein regime.[11]

Wyatt distorts the plain language of the ISR in alleging that the licensing provisions of 31 C.F.R. §§ 575.522 and 575.523, allow the United Nations, a non-government private entity, to define criminal conduct. Wyatt Mem. at 27-29, 46. Section 575.522 states in pertinent part:

> (b) United States persons are authorized to enter into executory contracts for the trading, importation, exportation, or other dealings in or related to Iraqi-origin petroleum and petroleum products outside Iraq, the performance of which is contingent upon the prior authorization of the Office of Foreign Assets Control in or pursuant to this part.
>
> (c) The authorization contained in [paragraph (b)] of this section applies only to executory contracts meeting both of the following conditions:
>> (1) The executory contracts, including all related financing, insurance, transportation, delivery, and other incidental contracts, are consistent with all requirements of UNSC Resolution 986, other applicable Security Council resolutions, the May 20, 1996

---

[11]     The ISR prohibits such transactions with Iraq in general, see 31 C.F.R. §§ 575.201 - 575.211; and specifically with regard to the Oil-for-Food Program, 31 C.F.R. §§ 575.523(e) and 575.526(b).

> Memorandum of Understanding Between the
> Secretariat of the United Nations and the
> Government of Iraq on the Implementation of
> Security Council Resolution 986 (1995), and
> applicable guidance issued by the 661
> Committee; and
> (2) The executory contracts make any
> performance involving the exportation,
> reexportation, transfer or supply of any
> goods, technology or services that are
> subject to license application requirements
> of another Federal agency contingent upon the
> prior authorization of that agency. See §
> 575.101(b).

The authorization referred to in this section is *OFAC's* authorization, not the United Nations' authorization. The United Nations was not authorized here, or in any other section of the Iraqi Sanctions Regulations, to grant a license to a United States person to enter into an executory contract under the Oil-for-Food Program. Compliance with the requirements of the Oil-for-Food Program was simply one necessary condition to the issuance of an OFAC license. It was not a sufficient condition; OFAC retained authority to conduct its own evaluation of a license application (examining, for example, whether the applicant complied with other, related licensing requirements, see 31 C.F.R. § 575.522(c)(2)).

Rather, the ISR's references to the Oil-for-Food Program were a common-sense acknowledgment that, since late 1996, there was no lawfully recognized commercial trade with the Hussein regime by *any* U.N. signatory, and that OFAC would not grant a license to a U.S. person that would have subverted the

humanitarian program to which the Executive Branch of the U.S. Government had devoted substantial resources to implement and monitor. The acknowledgment of relevant United Nations standards merely exhibited an awareness that the Oil-for-Food Program was the only internationally recognized avenue for trade with Iraq. Nonetheless, under the ISR, only OFAC was authorized to approve transactions by United States persons involving property in which the Government of Iraq had an interest. See 3 U.S.C. § 301; 18 U.S.C. § 2332d; 50 U.S.C. §§ 1601-1651, 1701-1706; Executive Order 12722; 31 C.F.R., Part 575.

Once an executory contract was signed, a specific license was required before seeking approval from the United Nations and performing the contract. That U.N. approval was only possible, however, if OFAC exercised its discretion to grant a license and the proposed contracting party was placed on a list of eligible United States companies/individuals that could participate in the Oil-for-Food Program. There was no "rubber stamping" of a United Nations decision, as Wyatt wrongly alleges. See Wyatt Mem. at 48. As set forth in 31 C.F.R. § 575.523:

> (a) Specific licenses may be issued on a case-by-case basis to permit United States persons to purchase Iraqi-origin petroleum or petroleum products from the Government of Iraq in accordance with the provisions of UNSC Resolution 986, other relevant Security Council resolutions, the Memorandum of Understanding, and other guidance issued by the 661 Committee. Licensees will be included on the U.S. oil purchaser list to be provided to the 661 Committee, *authorizing such U.S. persons to seek approval from the 661 Committee* or its

> designee for the purchase of Iraqi-origin petroleum or petroleum products.   Licensees are authorized to perform a contract approved by the 661 Committee or its designees in accordance with its terms. [Emphasis added.]

Under the terms of this regulation, OFAC's licensing decision would have been completed prior to approval of a contract by the United Nations.

That regulation, amplifying others,[12] went on to note explicitly that the payment of surcharges directly to the Government of Iraq was forbidden under the ISR:

> This section does not authorize any transfer of funds or other financial or economic resources to or for the benefit of the Government of Iraq or a person in Iraq except transfers to the 986 Escrow Account.

31 C.F.R. §§ 575.523(e), 575.526(b).   This clear prohibition was not tied in any way to any United Nations approval or authorization for such payments.

In addition, OFAC offered its own, independent guidance to U.S. companies/individuals regarding the payment of surcharges to the Hussein regime.   The guidance, issued on December 26,

---

[12]   Count Four of the Indictment sets out other restrictions in the ISR that proscribe Wyatt's conduct.   For instance, 31 C.F.R. § 575.211 provides that:

> Any transaction for the purpose of, or which has the effect of, evading or avoiding, or which facilitates the evasion or avoidance of, any of the prohibitions set forth in this subpart, is hereby prohibited.   Any attempt to violate the prohibitions set forth in this part is hereby prohibited.   Any conspiracy formed for the purpose of engaging in a transaction prohibited by this part is hereby prohibited.

See Indictment ¶ 37(g).

2000, specifically addressed the surcharges being demanded by the Government of Iraq in exchange for oil allocations under the Oil-for-Food Program.  OFAC's guidance underscored the provisions of the Iraqi Sanctions Regulations that prohibited transfers of funds directly to the Government of Iraq and outside of the Resolution 986 Escrow Account.  31 C.F.R. §§ 575.523(e) & 575.526(b).  The December 22nd notice stated unequivocally that "the ISR does not authorize any transfer of funds or other financial or other economic resources to or for the benefit of the government of Iraq or a person in Iraq, except transfers to the 986 Escrow Account."

**B.   There was no unconstitutional delegation of authority to the United Nations.**

The above-referenced regulations demonstrate that the United Nations did not exercise decision-making authority in place of OFAC.  With respect to executory contracts, compliance with the Oil-for-Food Program's standards was one condition, but not the only one.  See 31 C.F.R. § 575.522(c).  And with respect to specific licenses to perform contracts, OFAC made its licensing determination *before* the United Nations decided whether to approve a particular contract.  See 31 C.F.R. § 575.523.  In any event, the payment of surcharges directly to the Iraqi regime was an act expressly prohibited by the ISR and not tied to any United Nations standard or approval.  See, e.g., 31 C.F.R. § 575.523(e), 575.526(b).

The common thread throughout these regulations is OFAC's independent and conclusive decision-making authority. OFAC's authority was exercised against a backdrop of U.N. regulations, but OFAC did not delegate any of its decision-making authority to the United Nations. As such, there was no delegation to a private party — let alone an unconstitutional delegation.

Moreover, even in cases involving a direct delegation of authority to a private party — which is *not* present in this case — the Supreme Court has repeatedly upheld such delegation where the governmental agency retained the ultimate decision-making power. For instance, in <u>Sunshine Anthracite Coal Co. v. Adkins</u>, 310 U.S. 381 (1940), the Court upheld the constitutionality of the Bituminous Coal Act of 1937, which organized coal producers into a Bituminous Coal Code to fix minimum prices for Code members, <u>id.</u> at 388; those prices became effective upon approval (or modification) by the Executive Branch agency charged with regulating the industry, the National Bituminous Coal Commission, <u>id.</u> The Court held:

> Nor has Congress delegated its legislative authority to the industry. The members of the code function subordinately to the Commission. It [the Commission], not the code authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid.

Id. at 399.

Several courts have applied a similar analysis in upholding the constitutionality of statutes where a private party remained subordinate to a governmental actor. For instance, in Cospito v. Heckler, 742 F.2d 72 (3d Cir. 1984), the court rejected a challenge to the termination of federal benefits to the Trenton Psychiatric Hospital following the loss of its accreditation from a non-governmental body, the Joint Commission on Accreditation of Hospitals (JCAH). Various patients in that case alleged that Medicare and Medicaid regulations delegated responsibility for formulating and applying policies relating to decertification of psychiatric institutions to the JCAH instead of to a member of the Executive Branch. Id. at 74, 87-88. The Third Circuit rejected that constitutional challenge, noting that "the Secretary retains ultimate authority over decertification decisions," id. at 88, and that "the Secretary could independently determine whether a particular institution was qualified for participation," id.; see also, e.g., Ass'n of Amer. Physicians & Surgeons v. Mathews, 395 F. Supp. 125, 129-30 (N.D. Ill.) (3-judge panel) (approving the use of private parties — Professional Standards Review Organizations — to review whether Medicaid and Medicare services are medically necessary where the Secretary of Health, Education and Welfare retained the power to review such determinations), aff'd, 423 U.S. 975 (1975); Perot v.

-73-

<u>Federal Election Comm'n</u>, 97 F.3d 553, 559-60 (D.C. Cir. 1996) (upholding Federal Election Commission's decision to allow private, non-profit organizations to stage candidate debates because the Commission retained authority to penalize organizations whose debates did not employ certain, required standards); <u>Noblecraft Indus., Inc. v. Sec. of Labor</u>, 614 F.2d 199, 203 (9th Cir. 1980) (upholding OSHA's reliance on a private body — the American National Standards Institute — to distill a "national consensus standard" for use in the sawmill and plywood industries and noting that "OSHA in practice did not surrender to ANSI all its standard-making function"); <u>Chiglades Farm, Ltd. v. Butz</u>, 485 F.2d 1125, 1134 (5th Cir. 1973) (rejecting due process and other constitutional challenges to Secretary of Agriculture's reliance on recommendations from a committee of industry participants in regulating the sale of a particular commodity because the Secretary chose the members of that committee and retained jurisdiction to hear appeals of its orders).  By the same token, OFAC retained the authority — regardless of any reliance on standards established by the United Nations — to determine whether an applicant should be granted a license to engage in particular commerce with the Hussein regime.

The Second Circuit has applied the governing authority in a similar way.  In <u>R.H. Johnson & Co. v. Securities & Exchange Commission</u>, 198 F.3d 690, 691-92 (2d Cir. 1952), the court

considered a challenge to the Securities and Exchange Commission's use of a private body — the National Association of Securities Dealers — to conduct disciplinary hearings and impose sanctions on stock traders. The court upheld the constitutionality of that arrangement, noting that the Commission made its own findings following the NASD's hearing and — like OFAC in the instant case — made an independent decision with respect to the charges and penalty. *Id.* at 695; <u>see also</u>, <u>e.g.</u>, <u>Todd & Co., Inc. v. Sec. & Exch. Comm'n</u>, 557 F.2d 1008, 1012 (3d Cir. 1977) (same).

Even assuming *arguendo* that the United Nations played some limited, collaborative role in OFAC's decision-making, which it did not, Wyatt's argument would nevertheless fail. First, Wyatt's argument would fail because the Executive Branch actively participated in the activities of the alleged "private party" in this case: the United Nations Security Council. The United States has always maintained one of the five permanent seats on the U.N. Security Council and, derivatively, its sanctions committees (including the "661 Committee" that administered the Oil-for-Food Program). In that role, the United States holds the power to veto any action of the Security Council with which it disagrees and the ability to play a strong role in the formulation of the Security Council's resolutions and actions. Thus, unlike other cases in which Executive action is dictated by

-75-

purely private parties, see, e.g., Carter v. Carter Coal Co., 298 U.S. 238 (1936), the President maintains a degree of supervision of and involvement in the actions of the U.N. Security Council by appointing an ambassador to the United Nations to exercise the President's authority on the Security Council and its committees.

Second, Wyatt's argument would fail because courts have upheld regulations whose implementation was even more dependent on the approval of private parties than Wyatt alleges in this case.   For instance, the Supreme Court upheld the constitutionality of the Tobacco Inspection Act in Currin v. Wallace, 306 U.S. 1 (1939), even though the Act conditioned the Secretary of Agriculture's efforts to regulate that industry upon acceptance by a vote of two-thirds of the industry.  See id. at 15 (noting that Congress "placed a restriction upon its own regulation by withholding its operation as to a given market unless two-thirds of the growers voting favor it"); see also, e.g., New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co., 439 U.S. 96 (1978) (upholding California Automobile Franchise Act, which required a governmental agency to condition franchise establishments and relocations of new car dealerships upon the approval of existing franchisees in the area); Thomas Cusack Co. v. City of Chicago, 242 U.S. 526 (1917) (upholding municipal ordinance regulating the maintenance of billboards that permitted exceptions to be granted with the consent of the affected private

citizens); St. Louis, Iron Mountain, & Southern Ry. Co. v. Taylor, 210 U.S. 281, 287 (1908) (rejecting a delegation challenge to congressional legislation mandating that the height of drawbars on freight trains be set by a non-governmental body, the American Railway Association).   The Supreme Court applied similar reasoning in United States v. Rock Royal Co-op, Inc., 307 U.S. 533, 577 (1939), in upholding the constitutionality of the Agricultural Marketing Agreement Act, which required a majority of the "interested producers" of a particular commodity to approve a minimum sales price promulgated by the Secretary of Agriculture.[13]

This District applied Currin in Corum v. Beth Israel Medical Center, 373 F. Supp. 550 (S.D.N.Y. 1974) (Lasker, J.), where the court considered whether the Hill-Burton Act, 42 U.S.C. § 291c, unlawfully required the approval of a group of private actors — a council of twelve members, half of whom were

---

[13]   Congress has enacted several programs relating to agricultural commodities that require the Secretary of Agriculture to obtain the approval of producers of those commodities before implementing the programs.  See, e.g., 7 U.S.C. §§ 2102-18 (cotton); 7 U.S.C. §§ 2611-27 (potatoes); 7 U.S.C. §§ 2701-18 (eggs); 7 U.S.C. §§ 3401-17 (wheat); 7 U.S.C. §§ 4301-19 (flowers); 7 U.S.C. §§ 4601-12 (honey); 7 U.S.C. §§ 4901-16 (watermelon).  These sorts of programs have survived delegation challenges despite the veto power afforded private citizens (indeed, interested parties).  See, e.g., United States v. Frame, 885 F.2d 1119, 1127-29 (3d Cir. 1989) (upholding the Beef Promotion Act against a delegation challenge premised on the requirement that the beef industry approve the Secretary of Agriculture's marketing plan) (abrogated on commercial-speech grounds by subsequent caselaw, e.g., United States v. United Foods, Inc., 533 U.S. 405 (2001)).

experienced in managing medical facilities and half of whom represented the consumers of such facilities, id. at 552 — before the Executive Branch could promulgate regulations regarding payment for health-care services for the indigent. Citing Currin and other authorities, including Carter, 298 U.S. at 238, the court held that the regulation passed constitutional muster because the council itself did not make any regulations; that power rested exclusively with the Secretary of Health, Education and Welfare, *even though* that power was conditioned upon the approval of the council of private individuals. Id. at 553.

Considered in light of subsequent authority permitting delegations to private parties, Carter seems to have been limited to its facts. The animating principle in that case — that the Executive may not delegate final decision-making power to private individuals who have an anti-competitive interest in the decision, Carter, 298 U.S. at 310-11 — is not implicated by the ISR or its acknowledgment of the Oil-for-Food Program.

## C. There was no need to declare a new emergency to issue the ISR.

Wyatt wrongly asserts that Executive Order 12722 was insufficiently broad to cover the "national emergencies" that supported the ISR. See Wyatt Mem. at 43-45. Nothing in the plain language of IEEPA requires the President to declare a new national emergency to amend regulations promulgated pursuant to IEEPA's delegation. "The authorities granted to the President by

-78-

section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose."   50 U.S.C. § 1701(b). Such an emergency was declared broadly on August 2, 1990, and continued through the relevant period of the Indictment in this case.

Further, the President was required to report on a regular basis to Congress about the Iraqi emergency pursuant to IEEPA, 50 U.S.C. § 1703, and Section 586C of the Iraq Sanctions Act, P.L. 101-513, 104 Stat. 2047.[14]   Yesterday, the Second Circuit rejected a constitutional challenge to IEEPA premised on the President's compliance with these reporting requirements: "Public records reflect that each President has fulfilled his obligations under the IEEPA for the period (1990-2003) in which the relevant Executive Orders and regulations were in place." United States v. Dhafir, No. 05-4770-CR, 2006 WL 2440982, at *6 (2d Cir. Aug. 24, 2006).

Following each of those reports, Congress never challenged or overturned the Presidents' declaration of emergency.   No corrective action was taken, despite numerous opportunities for Congress to object in any way.   See, e.g.,

_____

[14]   The Iraq Sanctions Act also required that any regulations issued to enforce the economic sanctions on Iraq be submitted to Congress before taking effect.   That would include the amendments to the ISR to allow for the Oil-for-Food program.

Dames & Moore v. Regan, 453 U.S. 654, 668 (1981) (citing Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)) ("When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress.  In such a case the executive action 'would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.'").  Implausibly, Wyatt asks this Court to second-guess whether conditions in Iraq justified declaration of a new emergency — a foreign-policy determination ill-suited for judicial review.  The Court, here, should not be asked to substitute its judgment for that of Congress in evaluating the requirements of its own statutes.

OFAC's amendment of the ISR to take account of the Oil-for-Food Program was related to the continuing national emergency posed by the Hussein regime.  Although the specific actions of the Government of Iraq may have changed from year to year following its withdrawal from Kuwait, three successive Presidents declared twelve continuations of the Iraqi emergency, finding that the Government of Iraq remained hostile to America's interests.  Even though specifics in Iraq may have evolved with time, this does not mean that there was "new emergency," as that term is contemplated in IEEPA.  50 U.S.C. § 1701(b).  The grant

of authority in IEEPA, specifically delegated by Congress, has been construed to give the President broad authority.  See Dames & Moore, 453 U.S. at 672 (noting "the broad authority of the Executive when acting under this congressional grant of power"). That authority is at its apex in the Executive Branch's conduct of foreign affairs, including sanctions like the ISR.  See, e.g., United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 315, 320 (1936) (stating that delegation in the field of foreign affairs is granted tremendous deference because the President is "the sole organ of the federal government in the field of international relations").  Following Wyatt's argument to its logical conclusion, the President, dealing with a fluid national security and foreign policy situation with respect to a declared emergency, would be required to declare a "new" emergency, each time a fresh news story came out of the subject foreign country. There is no legal authority for this proposition.

        Moreover, there is no legal authority for Wyatt's suggestion of any remedy for this alleged defect.  Wyatt attempts to argue that heightened scrutiny of OFAC's delegation to a private party should result from the President's failure to declare new emergencies with respect to Iraq, see Wyatt Mem. at 45, but he can offer no legal authority whatsoever for this suggestion.  It is spurious, and the Court should decline Wyatt's invitation to create new law.

**D.    There is no basis to dismiss Count Three.**

Wyatt offers no basis to dismiss Count Three pursuant to his facial delegation challenge.[15]   18 U.S.C. § 2332d was enacted in 1996 — and amended nonsubstantively in 2002, see P.L. 107-273, Stat. 1806 — and was not a part of the Iraqi Sanctions Regulations; indeed, it does not reference Iraq at all.   Rather, the statute speaks more generally, referencing financial transactions with any country that has been "designated under section 6(j) of the Export Administration Act of 1979 as a country supporting international terrorism."   See Indictment ¶ 31.   Wyatt argues that the statute is tainted by the unconstitutional delegation described above, but the extent of the connection to that delegation is a perfunctory acknowledgment that the statute does not apply to financial transactions authorized by the Treasury Department.   There is no Treasury regulation that authorizes the sort of direct payments that Wyatt is charged with making.   Consequently, Wyatt's non-delegation challenge cannot be expanded to apply to Count Three.

---

[15]    See, e.g., United States v. Salerno, 481 U.S. 739, 745 (1987) (A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").

## VIII. WYATT'S ALLEGATION OF "SELECTIVE PROSECUTION" IS UNSUPPORTABLE.

The Supreme Court has made clear that the standard for proving a claim of selective prosecution is "a demanding one." United States v. Armstrong, 517 U.S. 456, 463, 465 (1996). Prosecutorial decisions enjoy a "presumption of regularity" and "in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." Id. at 464 (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926)); see also Wayte v. United States, 470 U.S. 598, 607 (1985) ("In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute.") (citations omitted). To make out a claim of selective prosecution, a defendant must "provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003) (quoting Armstrong, 517 U.S. at 465). Moreover, the Court has explained that "the showing necessary to obtain discovery" on such a claim "should itself be a significant barrier to the litigation of insubstantial claims." Armstrong, 517 U.S. at 464. These high thresholds are necessary because the "decision to prosecute is particularly ill-suited to judicial review" and "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the

-83-

prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." Wayte, 470 U.S. at 607.

As the Supreme Court has noted, "selective prosecution implies that a selection has taken place." Armstrong, 517 U.S. at 469. In other words, it requires that a defendant make a prima facie showing that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the [the defendant]" and that the defendant has been "singled out." United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992) (quoting United States v. Moon, 718 F.2d 1210, 1229 (2d Cir. 1983)); see also Cobb v. Pozzi, 363 F.3d 89, 110 (2d Cir. 2004) (same). Wyatt attempts to satisfy this demanding burden by asserting that the Government improperly selected him for prosecution on the basis of certain statements he made about U.S. policy toward Iraq over a period of about fifteen years. See Wyatt Mem. at 62 ("In a classic case of selective and discriminatory prosecution the government has chosen to select only the most outspoken of its critics for prosecution for regulatory violations of the very embargo he strenuously has criticized.").

Wyatt's memorandum lacks the necessary evidentiary support to back up such rhetoric. Most notably, Wyatt fails to establish that he has been improperly "singled out" from "others

similarly situated." <u>Fares</u>, 978 F.2d at 59.  He claims that the preliminary findings of the IIC indicate that "oil surcharges were paid in connection with the contracts of 139 companies." Wyatt Mem. at 63-64.  Wyatt offers nothing more — not by inference, and certainly not by credible evidence — to establish that he is "similarly situated" to these individuals and/or companies that also paid illegal surcharges.

The flaws in Wyatt's assertion of "similarity" are myriad.  For instance, Wyatt fails to note that these 139 individuals and/or companies are almost entirely located *outside* the United States.  The United States lacks extradition treaties with the countries in which large numbers of these 139 individuals and/or companies are located (<u>e.g.</u>, Russia, China, Lebanon, Syria, Jordan, Cyprus, etc.).  Moreover, several of the companies are owned or operated by foreign governments themselves — and thus further immune from any effort by the United States Government to prosecute those offenders in a United States court. The United States Government's inability to obtain personal jurisdiction over these foreign entities distinguishes them from Wyatt, David Chalmers, and several of their co-defendants.[16]

---

[16]    As the Second Circuit has established, where "evidence" of alleged selective prosecution includes national (or international) statistics and defendants outside of the prosecutor's jurisdiction, it is of "no probative value." <u>United States v. Hommosany</u>, No. 99-1534, 2000 WL 254050, at *2 (2d Cir. Mar. 3, 2000) (unpublished).

Furthermore, many foreign governments have initiated prosecutions against their citizens that paid illegal surcharges to Saddam Hussein's regime. See, e.g., Robert McMahon, "The Impact of the UN 'Oil-for-Food' Scandal," Council on Foreign Relations, May 12, 2006 [Available at: http://www.cfr.org/publication/10675/]. Wyatt offers nothing to suggest that he is similarly situated to any United States citizens or companies that also paid illegal surcharges to the Government of Iraq, or to any such foreign citizens or companies that are subject to the personal jurisdiction of this Court and not already subject to investigation/prosecution by their own governments.

Wyatt's belief that he was "singled out" for prosecution is unsupported by credible evidence — and thus, it does not warrant any further inquiry. See, e.g., Alameh, 341 F.3d at 174 n.4 (rejecting affidavit in support of selective prosecution claim because "the allegation proffered was based merely on belief and was lacking in specificity"); Fares, 978 F.2d at 59 ("Mere assertions and generalized proffers on information and belief are insufficient."). Even if Wyatt could establish some superficial identity between himself and the other 138 companies/individuals that he claims are cited in the IIC's report, his claim would not take into account the other factors distinguishing Wyatt from this group: his long history of acting in the United States as an unregistered agent of the Hussein

regime, including several meetings directly with Saddam Hussein himself; his illegal donation of global positioning devices, sophisticated satellite communication systems, and other equipment to the Hussein regime; his direct consultation with Iraqi officials about how to implement the charged "surcharge scheme;" and his flagrant violation of United States sanctions against the Hussein regime from the early 1990's through the beginning of 2003 (all detailed to this Court at the recent trial of co-defendant Tongsun Park and to be proven further at trial). Simply put, Wyatt fails to show that he was "similarly situated" to other offenders who were not indicted by a United States grand jury.

But even if Wyatt could show a discriminatory effect — which he has not, and cannot — his claim should nevertheless be denied because he also fails to satisfy the second requirement for a defense of selective prosecution, "that the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent [his] exercise of constitutional rights." Fares, 978 F.2d at 59. "Discriminatory purpose . . . implies more than . . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group." Wayte, 470 U.S.

-87-

at 610 (quoting <u>Personnel Adm'r of Massachusetts v. Feeney</u>, 442 U.S. 256, 279 (1979)).  Wyatt implausibly asserts that, but for his criticism of United States foreign policy, the Government would have looked the other way on, among other things, his payment of millions of dollars in secret kickbacks to Saddam Hussein.

Wyatt's claim would collapse even if the Court ignored this fundamentally flawed premise.  The Supreme Court has held that establishing a discriminatory purpose requires a showing that the prosecution is a "direct and unjustifiable penalty" that results "solely from the defendant's exercise of a protected legal right."  <u>United States v. Goodwin</u>, 457 U.S. 368, 384, n.19, 380 n.11 (1982).  In the First Amendment context, courts have generally found that requirement to be met only where the prosecution is a direct response to the speech-related conduct.  <u>Cf.</u> <u>United States v. Crowers</u>, 456 F.2d 1074 (4th Cir. 1972) (dismissing conviction for "unlawful disturbance" arising out of an anti-war protest).  It is not surprising, therefore, that Wyatt cites several inapposite "protest" cases — cases in which the charged crime *was* the expressions of the protected political speech — in support of his claim.  <u>See</u> Wyatt Mem. at 70.  Where, however, as here, protected speech is *not* part of the conduct underlying the charged crimes, Wyatt cannot meet the high burden established in <u>Goodwin</u> absent some other evidence of a *direct*

-88-

*correlation* between past speech and the prosecution.  See Wayte, 470 U.S. at 610 (holding that defendant must establish "Government prosecuted him *because of* his protest activities. Absent such a showing, his claim of selective prosecution fails.") (emphasis in original).

Wyatt thus falls far short of meeting the standard for a selective prosecution claim and for obtaining an order for discovery on that claim.  See Armstrong, 517 U.S. at 464 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.").  As the Supreme Court explained in United States v. Armstrong:

> Our cases delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one.  These cases afford a "background presumption" that *the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims*.
>
>     *    *    *    *    *
>
> If discovery is ordered, the Government must assemble from its own files documents which might corroborate or refute the defendant's claim.  Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution.  It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy.  *The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.*

-89-

Armstrong, 517 U.S. at 463, 468 (emphases added) (citing United States v. Mezzanatto, 513 U.S. 196 (1995)).

Accordingly, in order to establish an entitlement to discovery from the Government on a charge of selective prosecution, a defendant must come forward with "some evidence tending to show the existence" of *both* of the essential elements of a selective prosecution claim. Armstrong, 517 U.S. at 468; see also, e.g., United States v. White, 972 F.2d 16, 19 (2d Cir. 1992) (conclusory allegations as to timing of indictment, Government's failure to follow internal guidelines, and improprieties of prosecutors did not constitute "objective evidence" warranting discovery). Instead, a defendant's evidence of discriminatory effect and discriminatory intent must be "credible" in order to warrant discovery. See, e.g., United States v. Al Jibori, 90 F.3d 22, 25 (2d Cir. 1996) (Armstrong requires that the defendant come forward with "credible evidence" before discovery is allowed); United States v. Hastings, 126 F.3d 310, 313 (4th Cir. 1997) ("Before a defendant can obtain discovery from the government, . . . he or she must produce some evidence making a credible showing of both discriminatory effect and discriminatory intent."); United States v. Westmoreland, 122 F.3d 431, 434 (7th Cir. 1997) (defendant must come forward with "probative" evidence before discovery is allowed on a selective prosecution claim). Wyatt's claim fails to clear this hurdle.

Wyatt resorts to mischaracterization in an attempt to satisfy his burden.  He offers several speeches that he gave to Texas groups (without any evidence of any knowledge of or reaction to those speeches by decision-makers in this prosecution), topped off by a misleading quotation from a Government request for assistance to the Government of Switzerland.  Wyatt Mem. at 66.  In that request for assistance, the Government outlined Wyatt's past, unsuccessful efforts to lobby the American Government on matters of importance to the Iraqi government as part of its evidence of a potential violation of 18 U.S.C. § 951 — a charge for which the Government had to provide a factual basis in order to obtain evidence from Switzerland, a charge the Government was (and is still) investigating, and a charge supported by substantial evidence at the recent trial of co-defendant Tongsun Park.  Wyatt's misapplication of this portion of the Government's request to Switzerland speaks volumes about the merits of his selective-prosecution claim.

Furthermore, any suggestion that the Government chose to prosecute Wyatt because of political animus is wholly defeated by a cursory evaluation of Wyatt's co-defendants in this very action.  Co-defendant David Chalmers appears to be a long-time donor[17] to Republican legislators and political action committees

_____

[17]    According to records maintained by the Federal Election Committee, Chalmers and/or his father has contributed tens of

-91-

with no apparent history of public statements either for, or against, the Government's policies toward Iraq. By the same token, co-defendants Tongsun Park, John Irving, Ludmil Dionissiev, Catalina del Socorro Miguel Fuentes, and Mohammed Saidji similarly seem to have no prior history of supposedly inflammatory public statements against the policies of the United States Government toward Iraq. Where a defendant has simply been "caught in a net of increased awareness and sensitivity to particular classes of crimes," he cannot make out a successful selective prosecution claim. See, e.g., United States v. Grote, 632 F.2d 387 (5th Cir. 1980).

Wyatt unpersuasively cites two Second Circuit decisions in support of his claim for discovery. First, he cites United States v. Al Jibori, 90 F.3d 22 (2d Cir. 1996), as an example of the Second Circuit remanding a case for discovery. In Al Jibori, however, the Second Circuit explicitly stated that "we have no doubt that the [selective prosecution] motion could have been denied because the initial showing did not reach the Armstrong

thousands of dollars to Republican candidates and organizations over the past twenty-five years, including sizable gifts to the Texas Republican Congressional Committee; the National Republican Congressional Committee; the National Republican Senatorial Committee; Senator Phil Gramm (R-TX); Representative Jack Kemp (R-NY); Senator Dave Durenburger (R-MN); and Senator Richard Lugar (R-IN). At the end of 1991, Chalmers contributed approximately $1,000 to a political action committee operated by Senator Don Nickles (R-OK). [*Available at*: <http://newsmeat.com/fec/bystate_detail.php?last=Chalmers&first=David>].

threshold for discovery." Id. at 25. After acknowledging that the defendant's motion did *not* warrant discovery, the Court nonetheless held that remand was appropriate because the Government elected to respond to the defendant's motion with vague evidence of its use of the statute in question. Id. In other words, while the defendant's motion did not warrant discovery, remand was required to clarify the discovery voluntarily (and unnecessarily) produced by the Government. This case hardly supports Wyatt's claim.

Wyatt's reliance on Al Jibori hurts his claim in another way. In Al Jibori, the Second Circuit held that the Supreme Court's decision in Armstrong "seriously undermines our holding," 90 F.3d at 25, in the other Second Circuit case on which Wyatt's motion relies: United States v. Berrios, 501 F.2d 1207 (2d Cir. 1974). Wyatt cites Berrios for the proposition that discovery is appropriate whenever a defendant proffers "some evidence" tending to prove the essential elements of selective prosecution claim. See Wyatt Mem. at 69. The holding in Berrios, in addition to being "seriously undermined" by Armstrong, has been steadily refined by a series of decisions in which the Second Circuit did not allow discovery on selective-prosecution claims with the sort of thin showing made in Berrios (counsel's affidavit regarding his awareness of only three other prosecutions of similarly situated individuals). See, e.g.,

-93-

<u>Alameh</u>, 341 F.3d at 174 n.4 (rejecting affidavit in support of selective prosecution claim because "the allegation proffered was based merely on belief and was lacking in specificity"); <u>Fares</u>, 978 F.2d at 59 ("Mere assertions and generalized proffers on information and belief are insufficient."); <u>see also</u> <u>Armstrong</u>, 517 U.S. at 470 (affidavits "recount[ing] hearsay and report[ing] personal conclusions based upon anecdotal evidence" are not sufficient to justify discovery on a selective prosecution claim).   Thus, Wyatt's claim that <u>Berrios</u> supports his request for discovery is "seriously undermined" by both subsequent legal authority and the paucity of evidence suggesting that he was prosecuted in bad faith because of his public criticisms of the United States Government.

   For all of the foregoing reasons, the Government respectfully requests that the Court reject Wyatt's claim of selective prosecution.

## CONCLUSION

For the foregoing reasons, the Government respectfully urges the Court to:

- deny the Defendants' motion to dismiss the wire fraud charge in Count Two for want of a cognizable victim;

- deny the Bayoil Defendants' motion to dismiss the wire fraud charge in Count Two under the Noerr-Pennington doctrine;

- delay ruling on the Defendants' requests for clarifications of the Indictment until the grand jury can return a superseding indictment in the coming weeks;

- deny Bayoil Supply & Trading Limited's motion to dismiss Counts Three and Four as inapplicable to a foreign-chartered corporation;

- deny the Defendants' requests for separate trials;

- deny the Bayoil Defendants' motions to compel the Government to produce early exhibit and witness lists;

- deny Wyatt's motion to dismiss Counts Three and Four under the nondelegation doctrine; and

-95-

- deny Wyatt's motion to dismiss the entire Indictment or grant discovery on his claim of selective prosecution.

Dated:      August 25, 2006
            New York, New York

                        Respectfully submitted,

                        MICHAEL J. GARCIA
                        United States Attorney


            By:   _____/s/_____
                        Edward C. O'Callaghan/Stephen A.
                        Miller/Michael E. Farbiarz
                        Assistant United States Attorneys
                        (212) 637-2634/2210/1587

CERTIFICATE OF SERVICE

STEPHEN A. MILLER deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York,

And that on August 25, 2006, he caused a copy of the attached Government's Memorandum of Law in Response to Defendants' Pretrial Motions to be served, by overnight delivery, upon:

Catherine M. Recker
Welsh & Recker, P.C.
2000 Market Street, Suite 2903
Philadelphia, PA 19103
Tel. (215) 972-6430

David M. Howard
Dechert, LLP
Cira Centre—2929 Arch Street
Philadelphia, PA 19104
Tel. (215) 994-2218

Gerald L. Shargel
Law Offices of Gerald L. Shargel
570 Lexington Avenue, 45th Floor
New York, New York 10022
Tel. (212) 446-2323

Paul Shechtman
Stillman, Friedman & Shechtman
425 Park Avenue
New York, New York 10022
Tel. (212) 223-0200

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

Dated:    New York, New York
          August 25, 2006

_____

          /s/
          STEPHEN A. MILLER