UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA,                          :
:
vs.                                 :    NO. S5 05 CR. 59 (DC)
:
DAVID B. CHALMERS, JR., et al.,                    :
:
Defendants.                  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# REPLY MEMORANDUM OF LAW IN SUPPORT
# OF THE BAYOIL DEFENDANTS' PRE-TRIAL MOTIONS

Paul Shechtman                               Catherine M. Recker
Glen Kopp                                    Amy Carver
Stillman, Friedman & Shechtman, P.C.         Welsh & Recker
425 Park Avenue                              200 Market Street
New York, NY  10022                          Philadelphia, PA  19103
(212) 223-0200                               Counsel for Bayoil Companies
Counsel for David B. Chalmers

David M. Howard
Michael J. Gilbert
Tara L. Cooney
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
Counsel for Ludmil Dionissiev

**TABLE OF CONTENTS**

**PAGE**

POINT ONE:        COUNT TWO FAILS TO CHARGE
                  A PROVABLE FEDERAL OFFENSE ............................................................1

POINT TWO:        THE ALLEGATIONS IN COUNT TWO INVOLVING
                  LOBBYING THE UNITED NATIONS SHOULD BE
                  STRICKEN ON NOERR-PENNINGTON GROUNDS ...............................4

POINT THREE:      COUNTS THREE AND FOUR MUST BE DISMISSED
                  AS TO BAYOIL S&T BECAUSE IT IS NOT A "U.S. PERSON"..............7

POINT FOUR:       THE BAYOIL DEFENDANTS SHOULD BE
                  SEVERED FROM THE WYATT DEFENDANTS....................................9

POINT FIVE:       THE COURT SHOULD REQUIRE PRE-TRIAL
                  DISCLOSURE OF THE GOVERNMENT'S
                  EXHIBIT AND WITNESS LISTS ................................................................15

                  A. Exhibit List..............................................................................................15

                  B. Witness List.............................................................................................16

CONCLUSION......................................................................................................................18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
:
UNITED STATES OF AMERICA,                                              :
:
vs.                                                 :  NO. S5 05 CR. 59 (DC)
:
DAVID B. CHALMERS, JR., et al.,                                        :
:
Defendants.                                  :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**REPLY MEMORANDUM OF LAW IN SUPPORT
OF THE BAYOIL DEFENDANTS' PRE-TRIAL MOTIONS**

This memorandum is respectfully submitted in further support of the Bayoil Defendants' Pre-Trial Motions. As the Court knows, the government has recently filed a new Superseding Indictment, S5 05 Cr. 59 (DC), which renders moot Point Three in our original submission.[1] The other points, however, remain live issues warranting pre-trial relief.

POINT ONE

COUNT TWO FAILS TO CHARGE A PROVABLE FEDERAL OFFENSE

In our opening brief, we argued that Count Two and the first object of the conspiracy in Count One must be dismissed for failure to charge a provable crime. B. Def. Br. at 1-12. The government's response to that argument is lengthy but unpersuasive. G. Br. at 2-24. These points deserve emphasis:

1. The government argues that the Court "must take the Indictment's allegations as true" and therefore cannot dismiss the challenged counts. G. Br. at 5-6. That is not so. Rather, as Judge Stein has recently observed:

---

[1] That point argued that references to conspiracy and to "travel[] to and from Iraq" should be stricken from Count Four. The Superseding Indictment corrects both defects.

1

> [T]he basis for defendants' motion is not a pretrial challenge to the evidence or a claim that the indictment is not pled with sufficient specificity, but rather that the facts alleged do not state an offense as a matter of law. If defendants are correct, it would be improper and a waste of resources for everyone involved to conduct a lengthy trial - the parties estimate the trial as taking [several] months - and submit the case to a jury only to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial.

United States v. Bongiorno, 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006); see also United States v. Al Hedaithy, 392 F.3d 580, 589 (3d Cir. 2004)(indictment charging mail fraud must allege facts that, if proven, would constitute a violation of the statute). Because the theory of wire fraud enunciated in Count Two is not a federal crime, there is no reason to postpone ruling on this motion. See Fed. R. Crim. P. 12(b)(3)(B)("at any time while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense").

    2. It is now clear that <u>central</u> to the government's wire fraud theory is the claim that "the Defendants lobbied United Nations personnel to lower the official selling price of Iraqi oil [the 'O.S.P.']" and that this effort was "capable of causing the diversion of funds from the [Oil-for-Food] Bank Account." G. Br. at 6-7. Lobbying the U.N. by providing truthful information, however, is protected under the Noerr-Pennington doctrine. See Point Two infra.[2] If that is the lynchpin of Count Two, then it cannot survive scrutiny.[3]

    3. In our opening brief, we argued that the Oil-for-Food Program did not have a cognizable property interest in the funds allegedly diverted from the Oil-for-Food account, but rather was "in a regulatory position similar to that of the state in Cleveland."

---

[2] There is no allegation in the Superseding Indictment that the Bayoil Defendants provided false information to the U.N. or otherwise sought to influence them improperly.

[3] Notably, the most the government can claim is that the Bayoil Defendants <u>attempted</u> to persuade the U.N. overseers to set a lower O.S.P. There will be no proof that those attempts succeeded. See B. Def. Br. at 15. Thus, this is the unusual fraud charge in which the "loss amount" is concededly zero.

2

B. Def. Br. at 6. The government now claims that this is untrue because some of "the money deposited into the Bank Account w[as] to be directly remitted to the OFFP <u>itself</u>" to administer the program. G. Br. at 11. This, however, is an entirely new theory of the fraud, one that is not articulated in the Indictment and was not presented to the grand jury. <u>See</u> Sup. Ind. ¶ 23 (Bayoil Defendants "diverted [funds] from the Oil-for-Food Bank Account <u>that otherwise would have been available to purchase humanitarian goods</u>")(emphasis added). As such, it cannot support a conviction. <u>See</u> <u>Stirone v. United States</u>, 361 U.S. 212, 217 (1960)("a court cannot permit a defendant to be tried on charges that are not made in the indictment against him"). In any event, we are hard-pressed to believe that the OFFP's ability to reimburse itself for its administrative costs constitutes property in the "hands of the victim" as <u>Cleveland</u> requires. <u>See</u> <u>Cleveland v. United States</u>, 531 U.S. 12, 15 (2000); <u>see also</u> <u>id.</u> at 22 (State's entitlement to "a processing fee from applicants for new licenses" is insufficient to "establish a state property right").

      Likewise, the fact that "$100 million was to be transferred every 90 days from the Bank Account to a United Nations entity providing food and humanitarian goods within the northern regions of Iraq," G. Br. 11, does not convert the OFFP into a property holder under <u>Cleveland</u>. Rather, the OFFP was like a lawyer administering an escrow account for the benefit of others. It had no authority to "assign[], trade[], b[uy], or otherwise dispose[] of" the monies in any fashion it might choose. <u>United States v. Adler</u>, 186 F.3d 574, 577 (4th Cir. 1999).

      4.     Nor do "the Iraqi people" constitute wire fraud victims. As we argued in our opening brief, the Iraqi people had only an expectation that some of the proceeds of the oil sales would be used so that some unidentified Iraqis would receive additional humanitarian goods. When the Iraqi government closed down the program in April 2002 to protest Israel's policy toward Palestine, no one could contend that it thereby deprived the Iraqi people of any

property right.  The same is true here.  Plainly, there is a world of difference between the amorphous expectation of 26 million Iraqi people and the statutory entitlement of an individual in this country to welfare benefits.  Yet Goldberg v. Kelly, 397 U.S. 254, 261 (1970), is the only case that the government cites in support of its novel theory.  See G. Br. at 22.

    5. A hypothetical is instructive.  Assume that a fund is established to help needy children in New York State, and X is appointed as its administrator on the understanding that one percent of the funds raised can be used to reimburse her administrative costs.  Further assume that Y, posing as an employee of the fund, telephones wealthy individuals to solicit contributions, which he then diverts to himself.  Is X a wire fraud victim under Cleveland?  Are the unidentified needy children cognizable victims?  We know of no case so holding, nor has the government cited any in its submission.[4]

    6. The hypothetical raises one more point, which the government nowhere addresses.  To state a wire fraud violation, "the intent must be to obtain money or property from the one who is deceived."  United States v. Lew, 875 F.2d 219, 221 (9th Cir. 1989); see also B. Def. Br. at 9-11 (discussing convergence theory).  Even assuming the 26 million Iraqi people lost property, there is no allegation that the Bayoil Defendants deceived them.

## POINT TWO

### THE ALLEGATIONS IN COUNT TWO INVOLVING LOBBYING THE UNITED NATIONS SHOULD BE STRICKEN ON *NOERR-PENNINGTON* GROUNDS

As discussed above, the lynchpin of the wire fraud charge is that the Bayoil Defendants lobbied the United Nations to achieve a lower O.S.P.[5]  That activity is protected by

---

[4] In the hypothetical, the Cleveland victim would be the wealthy contributors.  That one can identify no similar victim here underscores that this is not a fraud case at all.

[5] By the government's own account, this "lobbying" preceded the "surcharge scheme" by several years.  Sup. Ind. ¶¶ 17, 18.

the Noerr-Pennington doctrine, and nothing in the government's submission supports a contrary conclusion.

In its response, the government argues that Noerr-Pennington is limited to protecting the efforts of business associations to obtain government action detrimental to competitors. G. Br. at 25. The government is wrong. The doctrine has been applied in a variety of contexts that do not involve efforts to restrain trade. Indeed, the government simply ignores the cases cited in our initial brief that establish this point. See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft, 189 F. Supp. 2d 385 (E.D. Va. 2002)(trademark infringement dispute); United States v. Hylton, 558 F. Supp. 872 (S.D. Tex. 1982)(prosecution for obstruction of an IRS investigation); Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc., 268 A.D.2d 101, 109 (2d Dept. 2000)(zoning proposal); Evers v. County of Custer, 745 F.2d 1196, 1204 (9th Cir. 1984)(dispute over public road crossing); Stern v. United States Gypsum, Inc., 547 F.2d 1329, 1344-45 (7th Cir. 1977)(complaints concerning internal revenue officer's performance of duties); Int'l Bhd. of Teamsters, Local 734 Health and Welfare Trust v. Philip Morris, Inc., 196 F.3d 818, 826 (7th Cir. 1999)(cigarette manufacturer's liability for statements to Congress).

Notably, a recent Ninth Circuit decision dismissed on Noerr-Pennington grounds a civil RICO claim premised on predicate acts of mail fraud unrelated to anticompetitive conduct. See Sosa v. DIRECTV Inc., 437 F.3d 923 (9th Cir. 2006). There, a satellite television company had sent pre-litigation demand letters to individuals who allegedly had purchased equipment that allowed them to access the satellite feed without authorization. A class of individuals who received the letters filed suit. On these facts, the Court applied the Noerr-Pennington doctrine, observing that it was "require[d] to the extent possible, [to] construe federal

statutes . . . to avoid burdens on activity arguably falling within the scope of the . . . First Amendment."[6]

The government next argues that the Noerr-Pennington doctrine is "grounded on the First Amendment's 'Right to Petition' Clause,'" G. Br. 26, and therefore does not have extraterritorial reach. Whatever its "grounding," however, it is now clear that the doctrine reaches well beyond a right to petition the state or federal government. See, e.g., Eurotech, 189 F. Supp. 2d at 391, 393 (finding that Noerr-Pennington doctrine was judicially created to guarantee the "right to petition the government" and applies to petitioning the United Nations World Intellectual Property Organization); Friends of Rockland Shelter Animals, Inc. v. Mullen, 313 F. Supp. 2d 339 (S.D.N.Y. 2004)(finding that Noerr-Pennington doctrine implements the First Amendment and applies to petitioning foreign governments); Carpet Group Int'l v. Oriental Rugs Imps. Ass'n, 256 F. Supp. 2d 249 (D.N.J. 2003)(finding that Noerr-Pennington protects "the first amendment right to petition the government," including lobbying of foreign governments). Moreover, even if petitioning the United States government were an essential element of a Noerr-Pennington defense, the lobbying activity here was aimed at the United Nations 661 Committee, of which the United States was a member.

Finally, the government argues that the Noerr-Pennington doctrine does not apply in criminal cases. G. Br. at 26. The cases cited by the government, however, hold only that when the "lobbying" activity consists of independently criminal acts (such as bribery or making false claims), the doctrine is inapplicable. Here, the indictment includes no allegation of any

---

[6]  Even under the government's constricted reading of Noerr-Pennington, the Defendants' lobbying activity could warrant protection. The alleged concerted action by the Bayoil Defendants and Wyatt to obtain favorable treatment from the 661 Committee is the type of activity that Noerr-Pennington was initially created to protect. After all, a lower O.S.P. would put the Bayoil Defendants and Wyatt in an advantageous position vis-à-vis companies that were not the recipients of Oil-for-Food Program allocations.

improper activity. Moreover, because the doctrine has constitutional roots, it is hard to imagine that it would not apply in a criminal prosecution. See Hylton, 558 F. Supp. at 874-75 (granting judgment of acquittal on Noerr-Pennington grounds).

In sum, Noerr-Pennington applies here to prevent the government from prosecuting the Bayoil Defendants for providing information to a quasi-governmental agency with regard to the most important aspect of their business -- the price of oil.

POINT THREE

COUNTS THREE AND FOUR MUST BE DISMISSED
AS TO BAYOIL S&T BECAUSE IT IS NOT A "U.S. PERSON"

In our opening brief, we argued that Counts Three and Four must be dismissed as to Bayoil Supply & Trading, Ltd. ("Bayoil S&T") because those counts are limited to conduct by "U.S. Persons," and Bayoil S&T is a Bahamian company. In its response, the government argues that Bayoil S&T is properly charged because (i) it "conducted its criminal activity 'in the United States,'" G. Br. at 36, and (ii) it "aided-and-abetted the violations of law of its U.S.-based co-defendants." G. Br. 37. Neither argument has merit.

The government would have this Court hold that being a "person in the United States" is the same as "conduct[ing] criminal activity in the United States" and that Mr. Chalmers's activities in Houston, as Bayoil S&T's owner, satisfy that jurisdictional requirement. That argument, however, ignores the origins of the Iraqi Sanctions regulations ("ISR") and therefore misses the mark. In 1990, the United Nations called upon each Member State to implement sanctions against Iraq in accordance with the UN Resolutions. U.N.S.C.R. 661 (1990). Resolution 661 specifically called upon all states to "prevent their nationals and any persons within their territories" from transferring funds or other economic resources to the Government of Iraq. ¶ 4 (emphasis added). The United States implemented the ISR "consistent

with Resolution 661 (August 6, 1990) and subsequent relevant resolutions." 56 FR 5636-01 (February 11, 1991).  Moreover, UN Resolution 986, which established the Oil-for-Food Program, mandated that each Member State ensure compliance by their nationals with the dictates of the program.  U.N.S.C.R. 986, ¶ 14 (1995).  For the government now to seek to criminalize conduct of a Bahamian company -- conduct over which another sovereign has a far stronger interest -- would not comport with the international framework upon which the sanctions were based.

        The framework of the ISR stands in stark contrast to the regulations that the United States <u>unilaterally</u> adopted with respect to Cuba and Iran.  The Cuban Assets Control Regulations define "Person within the United States" to include any corporation, partnership, association, or other organization, wherever organized or doing business, which is owned or controlled by a U.S. Person.  31 C.F.R. § 515.330.  Likewise, the Iranian Assets Control Regulations authorize jurisdiction over organizations owned or controlled by U.S. persons.  31 CFR § 535.329.  These schemes broaden U.S. jurisdiction so that an American businessman cannot circumvent the embargo by establishing a foreign entity to do his bidding.  The exercise of broad extraterritorial jurisdiction is logical under such circumstances -- as opposed to those here -- where no other sovereign has an interest in proscribing the transactions.

        Tellingly, the ISR is not the only regulatory scheme adopted as a result of a UN Resolution that limits jurisdiction to persons in the United States.  <u>See, e.g.</u>, UNITA (Angola) Sanctions Regulations, 31 CFR § 590.309 (1997), implementing UNSCR 864 (28 FR 64904-01); Taliban (Afghanistan) Sanctions Regulations, 31 CFR § 545.15, implementing UNSCR 1267 (66 FR 2729); Federal Republic of Yugoslavia (Serbia and Montenegro) Kosovo Sanctions Regulations, 31 CFR §586.319 (1999), implementing UNSCR 757 and UNSCR 787 (58 FR

8

13199). These U.N.-based sanctions respect the fact that other nations have an interest in regulating the activities of those within their borders, and limit extraterritorial jurisdiction accordingly.

On the issue of accessorial liability, we continue to believe that the <u>Yakou</u> court got it right: "Congress . . . did not go to such lengths to exclude non-U.S. persons . . . from direct extra-territorial liability . . . only to permit these same persons to be charged under an aiding-and-abetting statute." <u>United States v. Yakou</u>, 428 F.3d 241, 253-54 (D.C. Cir. 2005). Nor is the decision in <u>United States v. McKeeve</u>, 131 F.3d 1 (1st Cir. 1997), on which the government relies, to the contrary. G. Br. at 38-39. The defendant there, a British citizen, was in the United States at the time of the underlying events. His unindicted co-conspirators were also foreign citizens, but did not enter the United States, and were not indicted "presumably because they were beyond the court's jurisdiction." <u>Id.</u> at 6. On these facts, the defendant argued that he could not be convicted of conspiracy because his alleged co-conspirators were outside the territorial jurisdiction and a person cannot conspire with himself. The First Circuit correctly rejected that argument. The important point is that the prosecution did <u>not</u> assert jurisdiction over the foreign co-conspirators, who, like Bayoil S&T, were not "U.S. persons."

POINT FOUR

THE BAYOIL DEFENDANTS SHOULD BE
SEVERED FROM THE WYATT DEFENDANTS

In responding to the Bayoil Defendants' severance motion, the government recycles all the familiar boilerplate: the joinder of the Bayoil Defendants and Oscar Wyatt is proper "because they are alleged to be co-conspirators," G. Br. at 41; joint trials "promote efficiency," <u>id.</u>; and any risk of prejudice "can be easily cured by a firm instruction to the jury." <u>Id.</u> at 55. None of this, however, speaks to the facts of this case. The risk of unfair prejudice

from joinder was high even before the latest Superseding Indictment.  B. Def. Br. at 23-27.  Now, with the addition of a charge against Wyatt for "supply[ing] satellite communications equipment and services to the Government of Iraq," Sup. Ind. ¶ 39, and with the government's announcement that it will seek to offer "some evidence -- as background to the current charges -- relating to Wyatt's participation . . . in a conspiracy to act as an unregistered agent of . . . Iraq," Miller Letter of 8/31/06 at 1 (emphasis added), what was a risk has become a certainty.

       1.      In our opening brief, we argued that the Bayoil Defendants and the Wyatt Defendants "were competitors and not conspirators."  B. Def. Br. at 24.  The two groups bought Iraqi oil on their own, sold it to their own customers and, it is alleged, paid surcharges in different and uncoordinated ways.  Any link between them was fleeting.  On this point, we would add only the statement of Augusto Giangrandi, who will likely be the government's principal witness against Mr. Chalmers.  When asked about Wyatt, Giangrandi told the government this:  "Wyatt and Chalmers were competitors [and] Chalmers was always careful of what he told Wyatt."  Giangrandi 302, FBI 0127.  That statement speaks volumes about what actually happened here.[7]

       2.      To support joinder, the government argues that "the Defendants' acts 'arise out of a common plan or scheme'" and "[i]n particular both Wyatt and the Bayoil

---

[7] The principal link between the Bayoil Defendants and Wyatt is that Mr. Chalmers allegedly asked Wyatt to "hand-deliver a letter from Chalmers to an official of the Government of Iraq in which Chalmers sought favorable consideration from the Iraqis on future shipments of Iraqi oil based on his and the Bayoil Companies' long history of cooperation with the Government of Iraq." Sup. Ind. ¶ 27j. Notably, there will be no proof that Mr. Chalmers shared the contents of the letter with Wyatt or that Wyatt ever opened it. The government also argues that Mr. Chalmers enlisted Wyatt to "press down the O.S.P." G. Br. at 47. What it fails to disclose is that Mr. Chalmers enlisted anyone he could to encourage the U.N. to set a lower O.S.P., since he believed it was too high. See, e.g., Sup. Ind. ¶ 27m (describing a call in which Mr. Chalmers "recommended to an El Paso oil trader that the trader oppose the pricing policies for Iraqi oil recently adopted by the United Nations").

Defendants are alleged to have paid surcharges, or caused them to be paid, to officials of the Government of Iraq." G. Br. at 44. Even a cursory reading of the Report of the Independent Inquiry Committee ("IIC") demonstrates how flimsy a basis that is for joinder here. According to the IIC Report, "surcharges were paid in connection with the contracts of 139 companies." Independent Inquiry Committee, Report on Programme Manipulation, Oct. 27, 2005, at 1. If "participating in the lucrative business of obtaining and selling Iraqi oil" were grounds for joinder, G. Br. at 46, then presumably all of those companies could be joined for trial in a single instrument.

        3.     The government relies extensively on United States v. Feyrer, 333 F.3d 110 (2d Cir. 2003). There, the evidence showed that Yost, the President of Banyon Corporation, and Goldenberg, who controlled First Colonial Ventures, attended a conspiratorial meeting in Las Vegas. Also present were Wolff, an associate of the Symons Group brokerage firm, and Feyrer, who served as a "middleman" in the scheme. At the meeting, "the conferees discussed bribing [Symons] brokers to buy stock for their customers in [Banyon and First Colonial]." Id. at 113. Thereafter, it was agreed that Yost and Goldenberg would "transfer shares of Banyon and First Colonial to Feyrer's control so that he could use those shares to pay [Symons] brokers . . . as an inducement to them to promote [the companies'] stock." Id. What was planned then occurred: the brokers pumped up the price of the stocks and hid their compensation from their customers.

Not surprisingly, the Court found no error in the joinder of Yost and Goldenberg for trial. It observed: "each defendant was aware of the manipulation scheme involving the stock of the other's company, and in fact attended the same conspiratorial meeting in Las Vegas [so that] proof of both schemes would be admissible against both defendants, even at severed

11

trials." Id. at 115. That is not true here. There was no conspiratorial meeting; indeed there will be no evidence that Mr. Chalmers and Wyatt ever spoke with each other about surcharge payments. Nor would Wyatt's transactions be admissible against the Bayoil Defendants at a separate trial, anymore than oil purchases by the 137 other companies would come in. In short, Feyrer hardly "makes clear [that] joinder would be proper here even if [there were] multiple conspiracies," as the government contends. G. Br. at 45-46.

4.  What is most disingenuous about the government's brief is its claim that "at a trial against . . . the Bayoil Defendants alone . . . the Government would put on much of the same evidence that it will put on at a joint trial." G. Br. at 54. Nothing could be less true. Even before the latest Superseding Indictment, the evidence against the Bayoil Defendants and Wyatt was largely distinct. The cooperating witnesses against the Bayoil Defendants, it appears, are Augusto Giangrandi, Lucio Moriconi, and Murtaza Lakhani. We are now in possession of more than 190 pages of interview notes of those men. Oscar Wyatt is mentioned on four pages.[8] Moreover, the government has announced its intention to prove up 80 Bayoil transactions. Miller Letter of 9/14/06 at 1. Wyatt had a role (unrelated to the alleged payment of surcharges) in only three of those transactions. On this record, to suggest that the proof is "substantially overlapping" is to blink at what occurred.

5.  That the Bayoil Defendants were not involved in Wyatt's business dealings is further demonstrated by the new charge and by the government's pronouncement that

---

[8] In addition to the statement noted above, Giangrandi told the government that Mr. Chalmers had told him that Wyatt "tried to deal with the surcharge issue by creating foreign companies," a course that "Chalmers was opposed to." Giangrandi 302, FBI 0139. Lakhani told the government that he "has had no contact with Oscar Wyatt" but once heard that Wyatt was "having dinner with some SOMO people." Lakhani 302, FBI 0206. And Lakhani reported that "he had no proof that Oscar Wyatt and David Chalmers were somehow connected to one another." Lakhani 302, FBI 0213.

12

it will offer evidence relating to Wyatt's being an unregistered agent of Iraq. As the government will concede, the Bayoil Defendants had no involvement or knowledge of any of those activities. It is difficult, however, to imagine evidence more likely to "spillover" and prejudice their defense. Whatever one thinks of paying surcharges for Iraqi oil, it sounds far more nefarious to have purchased satellite communications equipment for Iraq or to have served as its agent. The government undoubtedly will seek to show that Wyatt and Tongsun Park met with United Nations Secretary General Boutros-Ghali on Iraq's behalf; that Samir Vincent and Wyatt met in Baghdad with Tariq Aziz to promote Iraq's agenda; and that Vincent and Wyatt traveled a second time to Iraq and met with Saddam Hussein to discuss lifting sanctions. Inevitably, a photograph of Wyatt and Saddam Hussein will be wafted before the jury, as it was at the Park trial. See United States v. Park, Trial Transcript Vol. 3, June 29, 2006, at 379, 381. None of this, of course, has anything to do with the Bayoil Defendants, but all of it will taint them irreparably.

6. The efficiency gains from a joint trial are, in truth, quite small. We recognize that "the operation of the OFFP, Iraq's policy of demanding and collecting surcharge payments, and the basic nature of the global energy business" would be common to separate trials. G. Br. at 42. Much of this, however, is uncontested, and none of it requires lengthy testimony. As Professor Phillip Johnson has remarked:

> When the courts resort to the law of conspiracy to determine a question of joinder, they often force defendants to endure the disadvantages of a joint trial without any significant compensating gain in efficiency. Joint trials promote efficiently only when the evidence against two or more defendants substantially overlaps. When the evidence against each defendant is distinct, trying several defendants together does not save any significant amount of time or money, or further any of the other policies underlying joinder law, regardless of any connection between the defendants' criminal activity.

13

Phillip E. Johnson, The Unnecessary Crime of Conspiracy, 61 Cal. L. Rev. 1137, 1173-74 (1973).

       7.     One other point deserves emphasis. Wyatt (but not Mr. Chalmers) was recorded talking with a trader about the illegal surcharge payments. In discussing an Iraq oil transaction involving Vitol, a Swiss company, Wyatt told the trader to "assume that [Vitol] paid the full 30 cents surcharge, just assume that they paid it because they did." EPNY 242939, Call Tr. of Mar. 1, 2001, at 7. This conversation was not in furtherance of any Bayoil-Wyatt conspiracy, and therefore is inadmissible against the Bayoil Defendants. The problem, of course, is that the government will argue that conversation expressed Wyatt's belief that everyone was paying surcharges, and the Bayoil Defendants will be unable to cross-examine Wyatt about it. Nor would a limiting instruction cure the prejudice. Here, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of the failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135 (1968).

       For all these reasons, severance of the Bayoil Defendants from Oscar Wyatt is required.

POINT FIVE

THE COURT SHOULD REQUIRE PRE-TRIAL
DISCLOSURE OF THE GOVERNMENT'S EXHIBIT AND WITNESS LISTS

The government's submission provides no compelling reason to preclude pre-trial disclosure of its exhibits and witnesses.

A.   Exhibit List

The government's suggestion that the Court cannot require it to produce a pre-trial exhibit list is inconsistent with the well-established proposition that the district court has "inherent authority" to regulate the timing of discovery. As Judge Pauley has observed:

> At least two district courts have held that based on the policy concerns of Rule 16 and principles of fairness, it is within a district court's authority to direct the Government to identify the documents it intends to rely on in its case in chief. See United States v. Upton, 856 F. Supp. 727, 748 (E.D.N.Y. 1994)(directing prosecution to "provide a list of all documents to be referred to or relied upon by government witnesses"); United States v. Turkish, 458 F. Supp. 874, 882 (S.D.N.Y. 1978)(directing prosecution "to identify to the defendants those documents it intends to offer, or to use or to refer to in connection with the testimony of any witness, on its case in chief"). In addition, the Second Circuit has recognized a district court's inherent authority to regulate the nature and timing of discovery. United States v. Cannone, 528 F.2d 296, 298 (2d Cir. 1975).

United States v. Giffen, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004).

Despite its claims to the contrary, the government has failed to provide any useful "road map" for the defense. G. Br. at 60. In response to the Court's order that 60 days before trial it "identify the particular transactions, etc., that it is likely to try to prove," Mar. 1, 2006 Court Conference Tr., at 14-15, the government has now identified every single contract in the eighth through thirteenth phases of the Oil-for-Food Program. Miller Letter of 9/14/06 at 1. That is some 750 different contracts in all. A very small percentage of those 750 contracts

15

involved <u>any</u> of the defendants, and an even smaller percentage are referenced in the Superseding Indictment. In fact, many of those contracts are outside of the so-called "Surcharge Period." If this is our "road map," we still cannot navigate the terrain.

Even now, less than two months before trial, the government continues to inundate the defense with materials. Since the Bayoil Defendants filed their initial brief in May, the government has produced nearly 15,000 pages of documents, more than 20,000 pages of documents from the IIC, and eleven DVDs and 2 CDs of documents in response to the Defendants' Rule 17(c) subpoenas. In the past three weeks alone it has produced an additional 10,000 pages of materials purportedly maintained by the Iraq State Oil Marketing Organization, and more than 1,000 pages in response to the defendants' Rule 17(c) subpoenas. <u>See</u> Treasury Department Letter to Michael Gilbert of 9/28/06. The Bayoil Defendants had originally requested that the Court order the government to produce its exhibit list 45 days before trial. Because the trial is now less than 45 days away, we respectfully request production of a preliminary exhibit list immediately, and a final list 20 days before trial.

B.   <u>Witness List</u>

The government contends that the provision of a few witness statements and the possibility that the Bayoil Defendants will be able to deduce the identities of unnamed co-conspirators counsel against early disclosure of its witness list. <u>See</u> G. Br. at 61. The standard for early disclosure, however, does not place the burden on the defense to guess at the government's witnesses. Rather, "[t]he applicable standard is 'whether a specific showing of need for disclosure by the defendant outweighs a specific showing of need for concealment by the government.'" <u>United States v. Turkish</u>, 458 F. Supp. 874, 881 (S.D.N.Y. 1978)(citations omitted). Since the filing of the Bayoil Defendants' initial brief, the government has turned this

16

already complex case into one that is even more so.  In circumstances not nearly as compelling, courts have exercised their discretion to order pre-trial production of the government's witness list.  See United States v. Villanueva Madrid, 302 F. Supp. 2d 187, 193 (S.D.N.Y. 2003)("the government's witness list is due one week before trial"); United States v. Rueb, 2001 WL 96177 (S.D.N.Y. Feb. 5, 2001)(ordering prosecution to produce witness list thirty days before trial).

The government contends that its investigation is "active and on-going" and that "safety concerns" and the "concern for the possibility of obstructing justice" militate against early disclosure.  G. Br. at 62.  Some witnesses, it argues, are "current employees or business associates of the Defendants" and their involvement might cause them to suffer "work-related consequences or be subject to improper persuasive pressure."  Id. at 63.  It also claims that a number of the witnesses live outside the United States, and that there is a risk of subornation of perjury and of witness non-appearance.  Id.  Such conclusory allegations, however, do not raise a "realistic possibility" that supplying witnesses' names would put their trial testimony at risk.  To date, there have been no allegations of improper conduct by the defendants, and there is no suggestion that any defendant is prone to such conduct.  The other Turkish factors strongly favor pre-trial disclosure as well.  See B. Def. Br. at 29-30.

Accordingly, the government should be required to disclose its witness list at least 20 days before trial.

## **CONCLUSION**

For these reasons, the Bayoil Defendants' motions for pre-trial relief should be granted.

Dated:  New York, New York
        October 4, 2006

                                    Respectfully submitted,


                                    By:          /s/
                                        Paul Shechtman
                                        Glen Kopp
                                        Stillman, Friedman & Shechtman, P.C.
                                        425 Park Avenue
                                        New York, NY  10022
                                        (212) 223-0200

                                    Counsel for David B. Chalmers

                                    Catherine M. Recker
                                    Amy Carver
                                    Welsh & Recker
                                    2000 Market Street
                                    Philadelphia, PA  19103

                                    Counsel for Bayoil Companies

                                    David M. Howard
                                    Michael J. Gilbert
                                    Tara L. Cooney
                                    Dechert LLP
                                    Cira Centre
                                    2929 Arch Street
                                    Philadelphia, PA  19104

                                    Counsel for Ludmil Dionissiev

TO:     AUSA Edward O'Callaghan
        United States Attorney's Office
        Southern District of New York
        One Saint Andrew's Plaza
        New York, NY  10007